# UNITED STATES DISTRICT COURT EASTERN DISTRICT OF MICHIGANSOUTHERN DIVISION

MICHAEL OLIVER,

                Plaintiff,                        Case No. 20-cv-12711

                                            HON: LAURIE J MICHELSON

v.

CITY OF DETROIT, a municipal corporation, and DETECTIVE DONALD        **JURY TRIAL DEMANDED** BUSSA, in his individual capacity,

                Defendants,

_____

**DAVID A. ROBINSON (P 38754)**      **PATRICK CUNNINGHAM(P67643)**
**BRANDON MCNEAL (P 81300)**        **City of Detroit Law Department**
**ROBINSON AND ASSOCIATES, P.C.**   **Attys for Defendants**
Attorneys for Plaintiff               2 Woodward Ave, 5th Floor
28145 Greenfield Rd., Suite 100      Detroit, MI 48226
Southfield, MI 48076             (313) 237-5032
(248) 423-7234                cunninghamp@detroitmi.gov
davidrobinsonlaw@gmail.com

**THOMAS E. KUHN (P37924)**
Co-Counsel for Plaintiff
645 Griswold Street, Ste. 1900
Detroit, MI 48226
313.963.5222; fax 313.963.9061
tekuhn@aol.com

_____

# PLAINTIFF'S FIRST AMENDED COMPLAINT

## INTRODUCTORY STATEMENT

1

1.      This wrongful arrest and imprisonment case exemplifies the grave harm caused by the misuse of, and reliance upon, facial recognition technology. Plaintiff Michael Oliver was falsely arrested because, as Detroit Police Chief later admitted "I would say 96% of the time it (facial recognition) would misidentify." Nonetheless, Defendant Bussa secured a warrant for Mr. Oliver's arrest without providing the authorizing magistrate with critical information about deficiencies in the investigation and how facial recognition technology  was used. As a result, Mr. Oliver was arrested without explanation on his way to work in broad daylight in public display, humiliated, and jailed in a dirty, overcrowded cell for more than 2 days where he had to sleep on bare concrete all for no reason other than being someone a computer thought looked like the "thief in the red hoodie."

2.      Mr. Oliver is a 27-year-old Black man who lives with his son's mother in their home in Detroit.

3.      On July 31, 2019, when Mr. Oliver was driving to work he was stopped  by a Ferndale police officer who ran his name in the statewide criminal database who informed him there was a warrant for his arrest out of Detroit. He was arrested in front of the monotoring public for a crime he did not commit. The officer then transported him to the Ferndale lock up where

2

Detroit PD was called and who picked him up transporting him to the Detroit

Detention Center. Once there he was jailed for more than 2 days. At no time

was he offered an interview or right to make a statement in order to protest and

prove his innocence. He was video arraigned and a bond was set with surety for

$10,000.00. After posting the bond, assuring his appearance, he was released

from custody with the criminal charges of Larceny From Person and Habitual

Offender 2nd Offense pending.

4.      Mr. Oliver was falsely accused of having snatched the phone of a citizen

while the citizen was recording a group of individuals who were gathering at the

school he taught. The crime occurred on May 5, 2019, over 2 months before

Plaintiff's wrongful arrest. The larceny was captured on the victim's cell

phone. In the recording the "thief in the red hoodie" was accompanied by

another individual who the victim knew as his student (the victim knew the

one as his former student and the other as his current student). The victim told

Defendant Bussa, about this person providing him with the student's name,

Andre Jackson.  Bussa never attempted to make contact with Jackson despite the

fact Jackson was a res gestae witness to the crime. Bussa then captured a still

photo from the recording. However, the still photo did not include Andre Jackson

and was distorted since the top of the perpetrator's head was cutoff. This portion

would have demonstrated a clear distinction between the Plaintiff and the perpetrator in the red hoodie. Nonetheless, Bussa had the photo run through facial recognition technology, which incorrectly identified Mr. Oliver as a possible match.

5.      It is well documented that facial recognition technology is flawed and unreliable under the best of circumstances. That, in part, is why many jurisdictions ban its use. According to Defendant Detroit Police Chief James Craig, "If we were just to use the technology by itself, to identify someone, I would say 96 percent of the time it would misidentify." And facial recognition is especially unreliable when attempting to identify Black people.

6.      It is also widely accepted that a "match" by facial recognition technology does not constitute probable cause to arrest a person. Probable cause must be established through independent means by obtaining reliable corroborating evidence. Indeed, in response to a question asked by a CBS reporter posed to Chief Craig "How did Michael Oliver slip through the cracks, Craig stated, "the one individual you're making reference to was before our existing policy." In fact, under the policy enacted by DPD after Plaintiff's arrest he would never have been suspected or arrested. In the same interview Andrew

4

Rutebuka, the Executive Manager of DPD Crime Intelligence stated "the due diligence of comparing the photographs wasn't quite done. We sent the image to the detective. But then from there, the detective has to go out and actually look at the photo and compare it to any other information. Was this person at the area of where the crime happened? Did they match any other records that they're looking for that relate to the actual crime? So, that wasn't all done at that time and so that goes to the investigative work."

In another interview DPD Captain Aric Tosqui stated, "Those cases (Oliver and William's) were larceny cases, a crime that predates our policy and would not be acceptable with our current policy. What we have done in Detroit is built in safeguards…to help overcome implicit bias. We use it for the most violent crimes only. It's not one analyst who's deciding that person is the candidate for the probe photo, but that analyst has to have his or her decision…corroborated by another analyst. And then once that's done prior to going to the detective as lead…the supervisor has to sign off on it. So prior to policy, none of that existed." Bussa requested a warrant for Plaintiff's arrest never revealing to the magistrate or prosecutor the fact that DPD had no policy guidelines that created constitutional safeguards to help to insure an unbiased use of DPD's facial recognition deymployment.

5

7.     Detective Donald Bussa, who was responsible for the investigation and who essentially relied entirely on facial recognition, performed "clearly sloppy, sloppy investigative work," causing Mr. Oliver's wrongful arrest. At law the detective is required to disclose all exculpatory information to the magistrate and to the Wayne County prosecutor.

8.     The entirety of Detective Bussa's "investigation" can be quickly described. Defendant Bussa did not perform even a rudimentary investigation into Mr.Oliver's whereabouts during the larceny incident; had he done so, he would have learned that Mr. Oliver would have been at work and could not have been the culprit. Defendant Bussa knew of the res gestae witness, Andre Jackson, but never attempted to contact him. Defendant Bussa also read the report of the officers who initially took the victim's statement wherein the victim told the officers he recognized the guy (guy who actually snatched the phone in the red hoodie) who snatched his phone *as his former student possibly named "Terry."* Defendant Bussa never looked for "Terry." Defendant never followed up on such critical information. Defendant Bussa never met with the Plaintiff to allow him to look at the image of the guy in red hoodie and Bussa never did what the prosecutor and Plaintiff's defense attorney did and scrutinize the probe photo and compare it with that of the

6

Plaintiff's. Had he of done so he would have concluded as did the prosecutor

and the defense attorney the two men were not the same person. Instead, based

on the questionable facial recognition technology "match," he obtained Mr.

Oliver's expired mugshot and from that obtained a photo from the Secretary of

State's Office and had a six-person photo array prepared with five other photos.

Then, Defendant Bussa arranged a photo lineup with the victim who had earlier

reported the res gestae witnesses' name and whom Bussa never warned of the

dangers of identification errors with the African American populations when it

came to facial recognition. When that person picked Mr. Oliver from the

lineup, Defendant Bussa prepared a request for an arrest warrant. The

warrant request was faulty and misleading because Defendant Bussa hid

multiple facts as alleged in greater detail below, including the Plaintiff had

significant tattoos on his arms unlike the guy in the red hoodie. Moreover, while

Defendant Bussa mentions the facial recognition "hit," he omits any mention

of the many facts that cut strongly against the reliability of the facial

recognition search. On the basis of Defendant Bussa'smisrepresentations and

omissions, a magistrate issued a warrant that led to Mr. Oliver's humiliating

arrest and incarceration.

9.      Despite facial recognition technology's well-known flaws, when the

DetroitPolice Department began using facial recognition technology, there was **no** DPD policy to offer quality control standards, ensure peer review, or offer detectives adequate training. With no policy, there was no direction to officers on whether or how to corroborate possible leads. Chief Craig has since publicly stated that the Detroit Police Department changed its policy to ensure that wrongful arrests like the arrest of Mr. Oliver would never happen again.

10.    Mr. Oliver brings this action under 42 U.S.C. § 1983, for violation of hisFourth Amendment right to be free of unlawful seizures. He seeks damages to compensate him for his unlawful and humiliating arrest and imprisonment, punitive damages against Defendant Bussa for recklessly disregarding his rights, attorneys' fees pursuant to 42 U.S.C. § 1988, and declaratory and injunctive relief to prevent similar unconstitutional arrests in the future.

### JURISDICTION & VENUE

11.    Because this civil rights action arises under the United States Constitution, this Court has jurisdiction under Article III of the Constitution and under 28 U.S.C. §§ 1331 and 1343(3) and (4). The relief

sought is authorized by the United States Constitution and by 42 U.S.C. § 1983.

12.     Declaratory relief is authorized under 28 U.S.C. §§ 2201 and 2202.

13.     Venue is proper in this Court according to 28 U.S.C. § 1391(b) because most incidents, events, and occurrences giving rise to this action occurred in the Eastern District of Michigan and because all Parties are domiciled in the Eastern District of Michigan.

## PARTIES

### Plaintiff

14.     Plaintiff Michael Oliver is a 27-year-old father of a young son and who lives in Detroit, Michigan.

### Defendants

15.     Defendant City of Detroit is a municipal corporation in the State of Michigan.

16.     At all times relevant to this Complaint, Defendant Donald Bussa was employed as a detective with the Detroit Police Department. Defendant Bussa is sued in his individual capacity.

## FACTUAL ALLEGATIONS REGARDING FACIAL RECOGNITION TECHNOLOGY

## The Many Flaws of Facial Recognition Systems

17. It is well-documented that facial recognition systems are deeply flawed.

18. Facial recognition systems are used to attempt to identify an individual by using an image of their face.

19. As described below, facial recognition algorithms consistently misidentify Black people at far higher rates than white people.

20. Facial recognition systems operate by analyzing the structure and details of faces to generate "face prints" i.e., unique digital codes corresponding to each face and attempting to match different images of the same face using those face prints. Because facial recognition systems function by discerning detail, misidentifications are particularly likely when the image of the face sought to be identified the "probe image" is not sufficiently visible, clear or otherwise distorted of otherwise cropped.

21. To operate the technology, a user inputs the probe image into the system in hopes of finding a match.

22. Once inputted, the system will create a face print by analyzing the probe image according to an "algorithm" a set of logical steps, operationalized through computer code, the system follows to achieve its

10

task of identifying the individual.

23.    Once a probe image is fed into the system, the system compares the face print it generates from the probe image to a database of already-generated face prints of other images and produces an output. The form of the output varies from system to system, but potential matches are typically assigned a likelihood score representing the algorithm's confidence in a match to the face depicted in the probe image. Because face recognition systems are inherently probabilistic (meaning they cannot say with certainty that two different images are or are not a match), they typically display a list of possible matches, organized in order of the algorithm's confidence in a match.

24.    In part because of errors in the algorithms and variations in the data they process, and in part because the output will often include several individuals with varying associated probability scores, search results are not to be considered positive identifications. The technology is not designed to assert the first-returned result, nor any of the returned results,  is an actual match.

25.    As shown below, using facial recognition systems involves risk of error which, in the law enforcement context, has grave consequencesfor the misidentified individual.

11

## The accuracy of a facial recognition search depends heavily on the quality of the probe image.

26.     Facial recognition systems are prone to user error because the user hasleeway in selecting which probe image to feed to the system.

27.     Inputting low-quality probe images or images distorted or otherwise Altered or manipulated will likely produce inaccurate results.

28.     Because facial recognition technology operates by matching details in a probe image to details in database images, it is well established that facial recognition searches are less accurate if the probe image is of low quality or where the subject is not expected to be cooperative. In this scenario it is unquestioned that the guy in the red hoodie is not posing as he breaks the law.[1]

29.     Four qualities of a probe image are particularly important for an accurate facial recognition search: (1) the lighting, (2) the angle at which the face is captured in the image, (3) the image resolution, and (4) facial obstruction. This includes images that have been altered as in this case.

30.     Moreover, if facial details are obscured by objects such as hats,

---

[1] Since the subject is not expected to be cooperative (not posing for face capture as in a mugshot scenario), there may be large pose and expression changes as well as occlusion of facial features due to the wearing of accessories like caps and sunglasses. In some cases, the subject may also intentionally hide his face from the camera to avoid detection. Clare Garvie, Ctr. On Privacy & Tech., *Garbage In, Garbage Out: Face Recognition on Flawed Data* 2 (May 16, 2019), https://www.flawedfacedata.com/.

masks, scarves, eye patches, etc., the accuracy of the facial recognition search willbe diminished.

31.    For example, a 2017 National Institute of Standards and Technology ("NIST") report tested dozens of facial recognition algorithms' accuracy in different settings. Researchers found that facial recognition algorithms werefar more accurate in well-lit environments where individuals are facing forward, such as airport boarding gates, than in poorly lit environments where individuals  are facing unpredictable  directions, such as sporting events. In this case the victim was inside his car under comprised illumination conditions.

32.    Recognizing this, many facial recognition system providers emphasize the importance of probe image quality to their users. For example, DataWorks, in its solicitation of a contract with the Detroit Police Department ("DPD"), states that probe images may be "unsearchable" without sufficient angle andlighting correction.

## Facial recognition  algorithms are racially biased.

33.    While careful users can decline to use low-quality probe images, they cannotavoid the fact that facial recognition  algorithms  misidentify people  of color at significantly higher rates than white people.

13

34.     For many years, researchers have understood that facial recognition

systems are racially biased-Black individuals are up to *one hundred* times

more likely to be misidentified by facial recognition systems than white men.

35.     This racial bias is embedded into the facial recognition system, in part,

because the algorithm is "trained" on racially skewed data-meaning that

most algorithms were built by analyzing a data set consisting primarily of

white (male) faces.[2]

In addition, bias is also introduced because digital cameras often fail to provide

the degree of color contrast that the algorithm needs to produce andmatch

face prints from photos of darker-skinned faces.

36.     A 2017 study by the National Institute of Standards and Technology of

140 face recognition algorithms found that problems with false positives "exist

broadly," and that "false positive rates are highest in West and East African

and East Asian people, and lowest in Eastern European individuals. This effect

is generally large, with a factor of 100 more false positives between countries."

_____

_____

[2] J.G. Cavazos et. Al., *Accuracy Comparison Across Face Recognition Algorithms: Where Are We on Measuring Race Bias?,* 3 IEEE Transactions on Biometrics, Behavior, and Identity Science, 1, 101 (2021), https://arxiv.org/pdf/1912.07398.pdf.

37.     Both DPD and the Michigan State Police contract with DataWorks, a company that provides the shell within which other vendors' facial recognition algorithms can be run. While the DataWorks program can interface with any facial recognition algorithm, the company recommends using either the Rank One Computing algorithm ("ROC") or the NEC Corporation algorithm ("NEC").

38.     The NIST study found that the two algorithms that ROC submitted for testing misidentified Black individuals at far higher rates than white individuals. NEC did not submit its algorithms for testing in the falsematch rate section of the NIST study.

39.     Importantly, the NIST study used only high-quality photographs to test thesealgorithms' accuracy. Researchers have since found that low-quality images exacerbate these disparate false-match rates.

### Cities across the country are banning the use offacial recognition systems in policing.

40.     Due to widespread public scrutiny of the technology and its various flaws, there has been an increasing awareness that facial recognition systems are inaccurate and dangerous.

41.     A growing number of jurisdictions have officially recognized the dangers

of facial recognition systems in policing. Since 2019, at least 20 cities in the United States have banned their police departments from using facial recognition systems, including San Francisco, Boston, New Orleans, Minneapolis, and Jackson, Mississippi.

43.     For example, Ricardo Arroyo, the City Councilor who sponsored Boston's bill banning facial recognition technology, reasoned that the technology "hasan obvious racial bias" and "also has sort of a chilling effect on civil liberties." Boston's Police Commissioner did not oppose the ban."

## FACTUAL ALLEGATIONS REGARDING MR. OLIVER'S FALSE ARREST

### The Larceny Incident

44.     On May 15, 2019 a teacher, Stephen Cassani, was in front of the school he taught. From inside his car he was recording on his phone a large crowd of students. Two persons in the crowd approached Cassani's car. One of them was wearing a red hoodie, who he reported to the police as a former student of his possibly named "Terry." The other, Andre Jackson, was identified later as Cassani's current student.

45.     Seeing Cassani recording the disturbance, the one in the red hoodie (Terry) reached into Cassani's car and snatched the phone. Andre Jackson, Cassani's then

current student, was next to "Terry" at the time the crime was committed. Other

students from the school recognized Cassani as a teacher and

hollered at the perpetrator and Andre Jackson that Cassini was a

teacher. This made the suspect (Terry) throw the phone away, after which Cassini

retrieved it.

46.     Cassini called the police to report the crime.  The recording on Cassini's

phone was undisturbed. He gave his phone to Bussa who obtained the images of

the black male in the red hoodie. However, the image recorded by Cassani never

captured the suspect's entire head.

47.     The images on Cassani's phone recorded a brief and shaky image of the

crime in progress, only a portion of the actual suspect and Andre Jackson,

Cassani's current student.

48.     At some later time Cassini met with Bussa and told Bussa that Andre

Jackson was the other African American in the recording who was in the company

of the suspect.

49.     On being assigned the case Bussa contacted the DPD Crime Intel Unit.

Before doing so, on information and belief, he cropped a still image of the dark

skinned male suspect producing an image to give to the facial recognition unit.

However, the cropped image was distorted in that it did not provide a complete

headshot of the suspect and had been enlarged. Bussa gave the manipulated image to Lieutenant Joseph Dabliz, who was in charge of DPD facial recognition and requested he run the altered image through the Data Works Plus data bank.

50.     The facial recognition data bank in use by the DPD returned Plaintiff's photo. Without any further investigation, Bussa denoted the Plaintiff was the person in the recording who assaulted Cassini.  Without further investigation and without the benefit of any DPD written policy on the use and implementation of facial recognition utility, Bussa determined Plaintiff was the most likely person who snatched Cassini's phone. This assumption was birthed by the failed and impliedly biased use of DPD facial recognition, the abject failure to follow traditional police leads and the failure of the DPD to have any written policy to guarantee protection of the Constitutional rights of citizens and the Plaintiff's in particular.

51.     Based on the failed technology and without any DPD policy for guidance and no "gum shoe" investigation Bussa, through investigator Stevie Posey, conducted a photo show up where Cassini allegedly identified the Plaintiff.

52.     There can be no dispute this identification was suggestive and constitutionally impermissive  given the fact that the victim had earlier identified the perpetrator as his former student "Terry."

18

53.     The image of the investigative lead produced by Dablitz was of poor quality but was accorded by Dablitz and Bussa the status as a "hit."

54.     Without contacting Andre Jackson or the school or any of the student witnesses to the actual crime, Bussa submitted a warrant request to the Wayne County Prosecutor which resulted in a warrant for the Plaintiff's arrest.

55.     On July 31, 2019, while the Plaintiff was driving to work he was stopped by a Ferndale police officer and told there was a felony warrant out of Detroit for his arrest. The officer took Plaintiff from his car and ordered him under arrest. The officer also impounded his car.

56.     Plaintiff was handcuffed and carted off to jail. Detroit police picked up the Plaintiff from Ferndale and drove him to the Detroit Detention Center (DDC) where he was jailed for nearly three days.

57.     While at the DDC, Bussa never made any attempt to take a statement from the Plaintiff or do anything to offer the Plaintiff the chance to prove his innocence.

58.     Bussa never attempted to take any other investigative strategies to correctly identify the actual criminal who assaulted Cassini.

59.     On August 26, 2019, at a preliminary examination Plaintiff was bound over. On or about September 13, 2019, Plaintiff's defense attorney and the prosecutor in the case examined for the first time the investigative lead image and the probe

19

image of the Plaintiff. Upon this casual scrutiny, at the prosecutor's request, all charges against the Plaintiff were dismissed as it was clear to the prosecutor, the court and Plaintiff's defense attorney the image of Plaintiff and that of the suspect demonstrated Plaintiff had been misidentified.

60.     As a direct and proximate result of the Defendants' misconduct, the Plaintiff suffered injuries and damages including, but not limited to:

a.      Physical and emotional injuries, aggravations and pain and suffering;

b.      Fear, anxiety, humiliation, and shame;

c.      Loss of liberty;

d.      Serious emotional distress;

e.      Economic damages, past and future, including, but not limited to medical expenses and attorney fees.

## **Defendant Bussa's investigation impermissibly relied on facial recognition technology**

61.     The larceny occurred and was reported to the police on May 15, 2019. On May 22, 2019 Bussa was assigned to investigate the crime.

62.     Bussa received and reviewed the incident report prepared by the officers who responded to Cassani's 911 emergency call. In the initial report Cassani told the responding officers the guy who robbed him was possibly named Terry and that Terry was a former student of his. Cassani also told the

responding officers he recognized another of his students, Amia Sanders exit a yellow vehicle with a bat.

63.     On June 4, 2019, Bussa met with Cassani to take a formal statement. This was before Bussa prepared and submitted a warrant request to the Wayne County Prosecutor for Plaintiff's arrest. At that time Cassani told Bussa the male with "Terry" was his actual current student, Andre Jackson.

64.     Despite being provided significant leads of res gestae witnesses and other information upon which to determine the whereabouts of "Terry" Bussa did absolutely nothing.

65.     On June, 5, 2019, Bussa prepared the warrant request for presentation to the Wayne County Prosecutor. In the body of the request Bussa only alleged the Plaintiff had been denoted an "investigative lead" produced by Dablitz and that at a photo show up Plaintiff was identified by the victim.

66.     Bussa purposely fabricated facts in support of the warrant request by failing to include vital exculpatory information that "Terry," not Michael Oliver, committed the crime; that there were 2 res gestae witnesses to the crime; that the identity of Terry could be obtained from the school and that these facts were pertinent and credible in as much as

21

they came from the victim.

67.     Resorting to facial recognition technology as his only method of investigation and ignoring probative and credible leads, Bussa used the cropped and manipulated inquiry image of Terry to conduct a facial recognition search. Bussa, in viewing the video of "Terry" in the course of committing the crime, ignored the significance that "Terry's" image was fleeting. As any criminal in the course of his criminal enterprise, he did not pose for the camera. Again, Bussa fabricated facts in support of the warrant request by failing to include this vital exculpatory information in pursuit of Plaintiff's arrest warrant.

68.     The still image used by Bussa was not only plainly unfit for use in a facial recognition search, but was unreliable since Bussa would have known the suspect was a former student of the victim. Bussa knew and so did Cassani, that the Plaintiff was not Cassani's former student "Terry" and therefore not involved in the crime.

69.     The following disclaimer appeared prominently on the Investigative Lead Report, in the form shown: **"THE RESULTS OF A FACIAL RECOGNITION SEARCH PROVIDED BY THE DETROIT POLICE DEPARTMENT IS ONLY AN INVESTIGATIVE LEAD AND IS NOT TO BE CONSIDERED A POSITIVE IDENTIFICATION OF ANY**

**SUBJECT. ANY POSSIBLE CONNECTION OR INVOLVEMENTOF**

**ANY SUBJECT TO THE INVESTIGATION MUST BE DETERMINED**

**THROUGH FURTHER INVESSTIGATION AND INVESTIGATIVE**

**RESOURCES."**

70.     The Investigative Lead Report contains neither the "score" generated

by thefacial recognition system representing the level of confidence that Mr.

Oliver's photo matched the probe image, nor the other possible matches that,

upon information and belief, should have been returned by the system.

71.     Neither the Detroit Police Department nor Bussa  made any attempt

to ascertain the "score" generated by the facial recognition search nor

request the other possiblematches to the probe photo.

### Defendant  Bussa was operating without any express DPD
### Facial recognition policy since none had been developed

72.     On the date Defendant  Bussa took control of the larceny investigation

DPD, although using facial recognition routinely two years earlier, had no

written policy. On September 19, 2019, finally a written policy was

put into place.

73.     The new policy acknowledged  several probe image factors that affect

facial recognition technology's reliability andrequired peer review. Further, the

new policy limited its use to part 1 violent crimes and or home invasions.

74.    Defendant Bussa, not having sufficient direction by way of any written policy, was caused to believe facial recognition was more than an investigative tool and not what the DPD has since learned was a device with only a 4% accuracy rate and one inherently discriminatory in its application to Black and Brown people.

### Defendant Bussa produces misleading request for warrant

75.    With nothing more than the facial recognition system's patently unreliable lead Defendant Bussaconcluded his investigation.

76.    On the very same day that Cassani made his "identification," Defendant Bussa wrote out a Request for Warrant ("RFW").

77.    The RFW is what the Detroit Police Department uses as an investigatingofficer's affidavit in support of a warrant. As an affidavit, the RFW must honestly and accurately represent the state's basis for a warrant to themagistrate.

78.    Defendant Bussa did not accurately or honestly represent either the facialrecognition match or Mr. Cassani's identification.

79.    Indeed, Defendant Bussa's RFW contained such glaring misrepresentationsand omissions about the backdrop of facts in support of the warrant request that they cannot be the product of mere negligence alone

24

they demonstrate deliberateness or recklessness.

80.     Defendant Bussa's RFW did not accurately or honestly represent to the prosecutor Cassani originally identified the perpetrator as one of his former students whose name was possibly "Terry."

81.     Bussa never revealed Cassani also identified two res gestae witnesses to the crime and that the probe image had been altered for his convenience for not following the evidence of credible leads.

82.     The "Investigation" section of the RFW also did not mention that the DPD had no written policy to direct investigators relying on using facial recognition for their criminal investigations.

83.     Any reasonable officer should have known that a magistrate considering whether to issue a warrant would need to know that another person, not the Plaintiff,  identified and known by the victim and otherwise identifiable by the victim was never investigated and instead the investigator took impermissible short cuts relying only of DPD's flawed facial recognition system. Defendant Bussa's RFW described the facial recognition lead in a similarly dishonest manner, omitting key details that there were other images generated from the probe image and that a probability factor of likeness for those images was assigned yet ignored by the investigator or by an established policy and practice by

25

the DPD as there was no policy for such verification at the time.

84.     However, in the RFW, Defendant Bussa reported simply that "Video and stills were sent to Crime Intel for facial recognition. Facial recognition cameback with a hit for suspect Michael Oliver. Defendant Bussa failed to disclose that the probe image used to generate that lead was altered. He also did not mention that facial recognition technology is known to be less reliable under all of these circumstances.

85.     Nor did he disclose that the image of Mr. Oliver that "matched" was actually his state identification rather than a fresh image of him.

86.     Moreover, Defendant Bussa did not disclose that facial recognition technology is substantially less accurate when identifying Black people, and that the person in the probe image is Black.

87.     Defendant Bussa further did not disclose the "score" that would have signified the facial recognition system's confidence that the probe image and Mr. Oliver's Id photo depicted the same person.

88.     Moreover, despite the Investigative Lead Report's emphasis that the facial recognition lead "IS NOT A POSITIVE IDENTIFICATION" and is merely "AN INVESTIGATIVE LEAD ONLY," and despite DPD policy's emphasis that facial recognition results are "NOT TO BE CONSIDERED A POSITIVE

IDENTIFICATION" (capitalization in original), Defendant Bussa presented

the facial recognition result as a "hit" -expressing an unjustifiable and

factually inaccurate confidence in the search results.

89.     On June 5, 2019, Defendant Bussa submitted the RFW to the

WayneCounty Prosecutor's Office.

90.     On July 4, 2019, the Wayne County Prosecutor's Office

authorized Defendant Bussa to seek a warrant to arrest Mr. Oliver for

Larceny From Person and Habitual Offender 2nd Offense pending.

91.      Because Defendant Bussa described the minimal "evidence" he

possessed with material misrepresentations and omissions, and because he

failed to disclose numerous exculpatory facts that were known to him at

the time of the request, the magistrate authorized the issuance of an arrest

warrant for Mr. Oliver.

## **What Happened to Michael Oliver Happened to Robert Williams**

92.     Robert Williams is a 43-year-old father who was born in

Detroit's west sideand is a graduate of Cooley High School. He has never

been convicted of a crime.

93.     On January 9, 2020, Detroit Police Department officers drove to

Robert Williams's home to arrest him for a crime that he did not

commit. This happened over three months after the warrant was issued

for his arrest, and over two months after DPD updated its facial

recognition policy to prohibit  the use of facial recognition technology in

cases involving theft offenses.

### Consequences of Wrongful Arrest and Incarceration

94.    Mr. Oliver was on probation for an offense unrelated to the instant

matter. But, because he was arrested in the instant matter, despite his

innocence, he was violated on his probation resulting in an extension for

several years.

95.    As a result of his arrest and the necessity to attend court, he lost his

job as a painter of parts.

### DPD institutes a written policy after Mr. Oliver's arrest

96.    On September 19, 2019, 2 month after the warrant issued for Mr.

Oliver's arrest, DPD enacted the "September policy".

97.    Section 307.5 - 5.2 of the policy strictly limited facial recognition use to

active or ongoing violent crime or home invasion investigations.

98.    The September policy expressly regulates facial recognition requests by

DPD officers and requires the officer to have their request approved by a CIU

supervisor.

99.    The September policy also introduces more robust peer review

measures.

100.   Section 307.5 - 5.4(3) demands that investigative leads receive two

levels of peer review before the lead is disseminated.

101.   However, the September policy did not provide for any retroactive review

of ongoing investigations or any active warrants issued in cases that used facial

recognition technology under earlier policies.

## CAUSES OF ACTION

102.   Plaintiff incorporates the above allegations as if fully set forth herein.

## COUNT I
## FALSE ARREST AND IMPRISONMENT IN VIOLATION OF THE FOURTH AMENDMENT AND 42 U.S.C. § 1983 (DEFENDANT BUSSA)

103.   The Fourth Amendment to the United States Constitution guarantees

the right of the people "to be secure in their persons ... against unreasonable ...

seizures" and demands that "no Warrants shall issue, but upon probable cause,

supported by Oath or affirmation."

104.   In providing that warrants may issue only upon probable cause, the

Fourth Amendment requires that the investigating officer will present their

evidence in good faith. Consequently, the law clearly recognizes that an

officer who obtains a warrant under false pretenses violates the constitutional

29

rights of the individual against whom that warrant issues.

105.   Applying clearly established law, a reasonable officer in Defendant

Bussa's position would have known that they did not have probable cause to seek

a warrant to arrest Mr. Oliver.

106.   Indeed, Defendant Bussa obtained an arrest warrant only because he

knowingly or recklessly misrepresented both the nature of Cassani's

identification and the reliability of the facial recognition result.

107.   Because Defendant Bussa knowingly and recklessly misrepresented and

omitted key facts about his evidence, a magistrate authorized a warrant to

arrest Mr. Oliver.

108.   By failing to disclose obviously exculpatory information that was known

to him at the time of the warrant request to procure an arrest warrant where no

probable cause existed, Defendant Bussa invaded the liberty guaranteed to Mr.

Oliver by the Fourth Amendment.

## Count II
### MONELL LIABILITY FOR FALSE ARREST AND IMPRISONMENT IN VIOLATION OF THE FOURTHAMENDMENT AND 42 U.S.C. § 1983 (DEFENDANTS CITY OF DETROIT AND CHIEF CRAIG IN HIS OFFICIAL CAPACITY)

109.   Mr. Oliver was injured and had his Fourth Amendment right to be free

of unreasonable seizures violated because DPD established inadequate

30

policies, failed to train officers, and exhibited a custom of acquiescence regardingdeficient facial recognition practices.

110.   The practice and pattern which governed DPD during the facial recognition search that led to Mr. Oliver's false arrest, left a bevy of factors unregulated. Once requests for facial recognition searches were received, the pattern and practice allowed searches without regard for the probe image quality. Once a search produced results, the pattern and practice did not demand that the lead be reviewed by peers or supervisors, or further corroborated in any way.Moreover, the pattern and practice did not regulate facial recognition requests being sent to external agencies.

111.   The flaws and weaknesses of facial recognition technology were both knowable and known to the DPD well before Mr. Oliver's wrongful arrest.

112.   Given the publicly known flaws of facial recognition technology, combined with Chief Craig's admission that facial recognition technologies are prone to misidentifying individuals, Defendants Chief Craig and the City of Detroitcaused Mr. Oliver's injuries and violated his Fourth Amendment rights by failing to guard against foreseeable errors and their consequences.

113.   The DPD's September policy regarding facial recognition made some

improvements, but did not require officers to re-examine any searches conducted prior to Mr. Oliver and Mr. William's arrests, creating an intolerable risk that searchesconducted prior to any policy would result in a false arrest.

114.   Similarly, the DPD's September policy regarding facial recognition made additional improvements, but did not require officers to comply with the policy for searches conducted prior to September 2019, creating an intolerable risk that searches conducted prior to the September policy wouldresult in a false arrest.

115.   Moreover, DPD did not adequately train its officers, including Detective Bussa, to properly utilize facial recognition technology at any point described herein.

116.   DPD knew and was in possession of information notifying them of the importance of probe image quality for generating reliable leads. Defendant Craig possessed information that facial recognition technology  will not workas intended if certain factors are met. However, the City of Detroit and DPDdid not adequately train officers to ensure that foreseeable errors were avoided.

117.   The probe image used is inarguably deficient for use in facial recognition technology. Nonetheless the probe image used and relied on for making arrests. Because theCity of Detroit and DPD knowingly permitted use

of facial recognition technology without adequately training those who would use or rely on facial recognition technology, the altered probe image was sent to Dablitz and was subsequently heavily relied on, leading to Mr. Oliver's false arrest.

118.   Given the weight DPD placed on facial recognition searches, as both Mr. Williams' and Mr. Oliver's cases evidence, the failure to regulate the use of facial recognition technology or train its employees about the technology amounts to deliberate indifference to the plight of those who would be erroneously "identified" and included in six-pack photo lineups, where there would be significant chance that they'd be identified once more, particularly given that their inclusion in such a lineup is likely to look *something* like the suspect precisely because of having been identified as a potential match by the facial recognition technology.

119.   On September 13, 2019, the Wayne County Prosecutor's Office droppedcharges against Mr. Oliver, putting DPD on notice of gaps in its earlier policies and training programs.

120.   Six days later, DPD promulgated the September policy which provided forno retroactive review of facial recognition use under earlier policies. The lack of retroactive review, despite the notice of the unlawful

effects of earlier policies and practices, amounts to tacit approval of facial

recognitionuse under the earlier policies.

## COUNT III
## MALICIOUS PROSECUTION UNDER 42 USC 1983

121.  Plaintiffs hereby re-allege and incorporate herein by reference all of the

Paragraphs, as though the same were fully set forth herein word for word.

122.  Bussa's actions were done in his individual capacity, and under color of

state law.

123.  Bussa's actions violated clearly established rights of the Plaintiff including

but not limited to:

a.  The right to be free from malicious prosecution of person and property, (4th

Amendment);

b.  The right to be free from retaliation for protected speech (1st Amendment);

 14th Amendments);

d.  The right to procedural and substantive due process and fair treatment

during prosecution (4th, 5th and 14th Amendments);

124.  As a direct and proximate result of Bussa's actions, Plaintiff suffered injury

and damages including those set forth in paragraph 18.

125.  Defendant pursued and continued prosecution of Plaintiff when he knew the

prosecution lacked probable cause, and was based on false and fraudulent

34

information provided by Defendant, willfully and wantonly, and with deliberate indifference.

## RELIEF REQUESTED

Wherefore, Plaintiff prays for:

a.       Damages as may be proven at trial to compensate Plaintiff for all pain, suffering, humiliation, shame, embarrassment, and emotionaldistress caused by being falsely arrested and imprisoned.

b.       Damages as may be proven at trial to compensate Plaintiff for all economic damages, including, but not limited to, lostwages caused by the unlawful arrest and imprisonment.

c.       All punitive and exemplary damages as may be proven at trial.

d.       Interest on all sums awarded to Plaintiff from the date of the events and/or losses.

e.       An award of Plaintiff's reasonable attorney's fees and costs of this action, pursuant to 42 U.S.C § 1988 and any other applicable law.

f.       A declaratory judgment and injunction requiring that officers usingfacial recognition technology must disclose to the magistrate:

i.       the probe image used when the presence of a "match" or"hit" is

35

disclosed to the magistrate;

ii.   that facial recognition technology's accuracy depends on the ability to discern facial details, and so depends on the probe image's image quality, lighting, face angle, and face obstructions;

iii.   that error rates increase as the quality of the probe image decreases;

iv.   the error rates associated with the relevant facial recognition algorithm, by race and gender;

v.   that a facial recognition "match" or "hit" is not considered a positive identification of the suspect.

g.   A declaratory judgment and injunction prohibiting Defendants from using facial recognition technology as an investigative technique so long as it misidentifies individuals at materially different rates depending on race, ethnicity, or skin tone.

h.   An injunction prohibiting Defendants from performing, or causing any other law enforcement agency to perform on their behalf, any facial recognition search using any database in which any images of Mr. Williams are included.

36

i.      Any further or other relief the Court deems just and proper.

Respectfully submitted,

/s/ David A. Robinson
David A. Robinson(P38754)
Brandon McNeal (P81300)
Thomas E. Kuhn (P37924)
ROBINSON AND ASSOCIATES, P.C.
Attorneys for Plaintiff

Dated:  July 7, 2021

# UNITED STATES DISTRICT COURT EASTERN DISTRICT OF MICHIGANSOUTHERN DIVISION

MICHAEL OLIVER,

            Plaintiff,                              Case No. 20-cv-12711
                                          HON: LAURIE J MICHELSON

v.

CITY OF DETROIT, a municipal corporation,
and DETECTIVE DONALD             **JURY TRIAL DEMANDED**
BUSSA, in his individual capacity,

            Defendants,

_____

**DAVID A. ROBINSON (P 38754)**     **PATRICK CUNNINGHAM(P67643)**
**BRANDON MCNEAL (P 81300)**     **City of Detroit Law Department**
**ROBINSON AND ASSOCIATES, P.C.**  **Attys for Defendants**
Attorneys for Plaintiff                2 Woodward Ave, 5th Floor
28145 Greenfield Rd., Suite 100     Detroit, MI 48226
Southfield, MI 48076             (313) 237-5032
(248) 423-7234                  cunninghamp@detroitmi.gov
davidrobinsonlaw@gmail.com

**THOMAS E. KUHN (P37924)**
Co-Counsel for Plaintiff
615 Griswold Street, Ste. 515
Detroit, MI 48226
313.963.522; fax 313.963.9061
tekuhn@aol.com

_____

## JURYDEMAND

    NOW COMES the Plaintiff requests a trial by jury in this matter.

38

Respectfully submitted,

/s/ David A. Robinson
David A. Robinson(P38754)
Brandon McNeal (P81300)
Thomas E. Kuhn (P37924)
ROBINSON AND ASSOCIATES, P.C.
Attorneys for Plaintiff

Dated:  July 7, 2021