# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**MICHAEL OLIVER,**

     **Plaintiff,**                       **CASE NO. 20-cv-12711**
                                      **HON. LAURIE J MICHELSON**

**v.**

**DONALD BUSSA, In his
individual and official capacity,
and CITY OF DETROIT,
Jointly and Severally,**

     **Defendants,**

                                              /

| | |
|---|---|
| **DAVID A. ROBINSON (P 38754)** | **PATRICK M CUNNINGHAM (P67643)** |
| **ROBINSON & ASSOCIATES, P.C.** | **CITY OF DETROIT LAW DEPARTMENT** |
| Attorney for Plaintiff | Attorney for Defendant City of Detroit |
| 28145 Greenfield Rd., Suite 100 | 2 Woodward Avenue, Suite 500 |
| Southfield, MI 48076 | Detroit, MI 48226 |
| (248) 423-7234 | (313) 237-5032 |
| davidrobinsonlaw@gmail.com | cunninghamp@detroitmi.gov |

                                              /

## PLAINTIFF'S RESPONSE AND BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

     NOW COMES PLAINTIFF, by and through counsel, and for his Response in Opposition to Defendants' Motion for Summary Judgment, requests that this Court deny Defendant's Motion.  Plaintiff certifies compliance with E.D. Mich. LR 5.1 and 7.1 as well as this Court's case management requirements.

                                          /s/ David A. Robinson
                                          DAVID A. ROBINSON (P38754)
                                          Attorneys for Plaintiff

Dated: APRIL 10, 2023

## STATEMENT OF ISSUES

I.    DOES COLLATERAL ESTOPPEL APPLY TO
      PLAINTIFF'S CLAIMS?
          PLAINTIFF'S ANSWER: NO
          DEFENDANTS' ANSWER: YES


II.   DOES AN ISSUE OF FACT EXIST CONCERNING THE
      CONSTITUTIONAL CLAIM OF FOURTH AMENDMENT
      WRONGFUL ARREST?
          PLAINTIFF'S ANSWER: YES
          DEFENDANTS' ANSWER: NO

III.  DOES AN ISSUE OF FACT EXIST CONCERNING
      CONSTITUTIONAL TORT OF MALICIOUS PROSECUTION?
          PLAINTIFF'S ANSWER: YES
          DEFENDANTS' ANSWER: NO

IV.   DOES AN ISSUE OF FACT EXIST CONCERNING
      CONSTITUTIONAL PROCEDURAL AND SUBSTANTIVE
      DUE PROCESS?
          PLAINTIFF'S ANSWER: YES
          DEFENDANTS' ANSWER: NO

V.    DOES AN ISSUE OF FACT EXIST CONCERNING DEFENDANTS'
      CLAIMS OF QUALIFIED IMMUNITY ON PLAINTIFF'S FEDERAL
      CLAIMS?
          PLAINTIFF'S ANSWER: YES
          DEFENDANTS' ANSWER: NO

VI.   HAS PLAINTIFF CREATED AN ISSUE OF FACT ON DEFENDANT
      CITY'S CUSTOM, POLICY AND PRACTICE?
          PLAINTIFF'S ANSWER: YES
          DEFENDANTS' ANSWER: NO

## INTRODUCTION TO DPD'S FACIAL RECOGNITION

Project Green Light is a Detroit police department initiative introduced to Detroit in 2016. It involves placing flashing green lights on private businesses as a crime fighting tool. Along with this effort, other surveillance projects were introduced, such as pole mounted cameras and shot spotters.  Co-operating private businesses were required to put on their buildings surveillance cameras that operated 24-7.  There is live feed which streams live images, in real time, to the Real Time Crime Center (RTCC).

A crime fighting function of these cameras was to be interfaced with facial recognition [ FR ] so that probe images of anybody's likeness could be run into the FR system. These surveillance efforts of course raised grave privacy concerns and created a windstorm of public outcry and debate by local advocates such as, Tawana Petty[1]. Despite the public outcry, DPD entered into a contract with Data Works Plus to provide FR identification software. The concern was privacy and racial bias when it comes to law enforcements' use or misuse of FR.[2] Through these public discussions it is clear the DPD knew of these public concerns.[3]

On July 31, 2017, after fierce public debate over the concerns that use and

---

[1] Tawana Petty appeared at Board of Police Commissioners meeting advocating against FR. She is a lifelong resident of Detroit. She serves as the National Organizing Director at Data for Black Lives, a convening member of the Detroit Digital Justice  Coalition and a non-resident fellow of the Digital Civil Society Lab at the Stanford on Philanthropy and Civil Society.

[2] Microsoft denied police facial recognition tech over human rights concerns - The Verge

[3] Riverwise Magazine: Detroiters want to be seen, not watched | Detroit Community Technology Project

deployment of Facial Recognition[4] (FR) in a city with a population of over 600,000 people, nearly 80% of whom are black and 8% Hispanic, would lead to the wrongful arrests of,  investigations of, and convictions of people of color due to the empirical data that demonstrates inherent bias against persons color.[5]   In fact, these same activists' concerns have arisen across the nation given law enforcements interest in this crime fighting tool.[6] Because of the patently known deficits in the accuracy of identifying persons of color, 13 different police agencies have banned its use because of these constitutional concerns.[7] Attached as **exhibit 1** is an article published in the Washington Post about 2 Detroit men wrongfully arrested by the instant defendant detective Bussa, whose images were derived through facial recognition.[8] In the article on page 3 James Craig, the then Detroit Police Chief, was quoted as saying, "On the question of false positives-it is absolutely factually, and it is well documented."   In another interview both Chief Craig and his staff members acknowledged there were problems in the arrest of Michael Oliver. (**Exhibit 2, Plaintiff's complaint paragraph 6).** In the country so far there have been 4 known African American men who have been the false arrest victims of false likeness due to

---

[4] Facial recognition is the automated searching of a facial mage in a biometric database (one –to-many), typically resulting in  a group of facial images ranked by computer-evaluated similarity.

[5] https://www.michigan-demographics.com

[6] Safe or Just Surveilled?: Tawana Petty on the Fight Against Facial Recognition Surveillance (logicmag.io)

[7] 13 Cities Where Police Are Banned From Using Facial Recognition Tech - Innovation & Tech Today (innotechtoday.com)

[8] Defending Black Lives Means Banning Facial Recognition | WIRED

FR. 2 of whom are from the same police and the same police detective who requested warrants for their arrest.

### Underlying Incident

On July 31, 2019 as he is driving to work, unbeknownst to Michael Oliver, he is about to be pulled over and arrested by a Ferndale police officer for a crime he had no connection **Exhibit 3 and 4**, [**Ferndale police report and Michael Oliver affidavit]**. Michael Oliver did not know that his image had been produced as a lead in a criminal investigation into a larceny. He also did not know a man by the name of Steven Cassani had been the victim of a crime on May 15, 2019. As a result of a manipulated probe image of a black suspect-unconnected to Michael-that was put into DPD FR search, Michael was determined to be an "investigative lead, only."

**[Exhibit 5, probe image of the perpetrator]** In the deposition of the Defendants own 30(b)(6) deponent, Jack Fennessey, the DPD admits the probe photo used in the FR search was altered:

A. But looking at these images, there's the original image which was a photograph -- looked like a photograph from inside of a car.· Then a cropped image which appears to be the same photograph.

Q.· · ·It looks like part of the forehead is cropped off too, right? ·

A.· · ·No, it looks like the young man is fortunate enough to still have all his hair, so I can't see where his forehead is.

5

Q.· · ·Do you see –

A.· · ·Oh, yeah, you're right, you're right, that's the car.

Q.· · ·Right.· It's cut off, correct? **Exhibit 6, deposition of Jack Fennessey, pg 31, ln 17 - 25.**

In FR training it is critical that the probe image be pristine to insure it's accuracy. The image used is subject to a biometric analysis. Where the image has been cropped and enlarged, as is the case here, the source image is considered improper or tainted.[9]

Following his arrest Michael was taken to the Detroit Detention Center where he was jailed for approximately 3 days. Although in custody at no time did Defendant Bussa offer Michael the opportunity to make a statement or protest his innocence. DPD policy says once a suspect identified in a photo lineup the member should proceed with a live lineup[10] **[Exhibit 7, DPD Eyewitness Identification and Lineups]** Despite other real investigative leads known to Bussa, he chose to rely exclusively on FR. On the date the larceny was committed, the victim told responding officers, **"the student is a previous student possibly named Terry."** In

---

[9] NACDL - Misidentified: The Challenges of Identifying and Litigating Facial Recognition Technology
[10] Subsequent conduct by a municipal policymaker may be used to prove preexisting disposition and policy. Sherrod v. Berry, 827 F.2d 195, 205 (7th Cir., 1987) (reversed on other grounds). Citing Grandstaff v. City of Borger, 767 F.2d 161, 171 (5th Cir. 1985), the Sherrod court acknowledged the difficulties a §1983 plaintiff is likely to encounter in attempting to prove the existence of an official municipal custom or policy at the time of her injury, and ruled that subsequent conduct — in that case two other lawsuits, including one for an incident that post-dated the plaintiff's incident, filed against municipal police officers, could be used to prove preexisting disposition and policy.

other words, the victim knew and could identify his assailant[11]. **(Defense exhibit 3, pg7, ECF; PgID original responding police report)**.

Plaintiff's Amended Complaint **(Exhibit 2)** has detailed the underlying incident and Defendants' involvement and liability.  A brief list of bullet points are set out each of which suggests the determination of this case of first impression rests with the jury. A video captures the crime which shows the victim, the assailant and a friend, of the assailant; **(see Exhibit 8, video of the crime in progress)**

a.  The friend, whose likeness is clear in the video and a res gestae witness, whose identity was later learned, was never contacted by Bussa **[Exhibit 9, color photo of the perpetrator and his friend, Andre Jackson] please note there are no tattoos on the perpetrator's arms, yet there are multiple tattoos on the Plaintiff's arms as in Exhibit 10**;

b.  At the time Bussa was assigned both Michael's and Robert Williams[12] cases Bussa complained in an Internal Affairs interview as follows:

"Det. Bussa stated that at the time he had been promoted he had never been in an investigatory unit. Det. Bussa stated he was promoted on Friday and in the days leading up to his promotion he was walking the beat as a radio code Monroe Beat 1. Det. Bussa stated that even up until the date of his interview he had not been required to take nor has·put in to take any training that is specialized towards investigation. Det. Bussa stated that from his experience he asked another detective on how to do something in particular only to be told later by a separate detective that it should be done  another way.· Det. Bussa stated that ·supervision within the PDU was always there to listen to him and provide guidance.· However, he wondered what their level of training or experience was due to some of his questions being referred to other people."

c.  Bussa presented a warrant request to the prosecutor that was woefully

---

[11] "Terry" was also Cassani's former student not to be confused with "Andre" Cassani's other then, current student.
[12] Robert Williams was another African American male arrested by Defendant Bussa based on facial recognition  and whose criminal case was dismissed.

Misleading in multiple ways;

    **i.**    Bussa admits Andre Jackson was a Res Gestae witness and that he did not investigate and did not disclose in the warrant request to the prosecutor anything about Andre Jackson.**[Defense exhibit B, ECF;ID pgs 25-26, ln 18to 25(pg 25) 1to 9 (pg 26)**

    **ii.**    Bussa admitted in deposition he never shared anything exculpatory with the prosecutor or magistate. **[Defense exhibit B, ECF;ID pgs 34-35, ln 25-3**

    iii.    Bussa admits the plaintiff's ID was generated by FR and he did no other investigation other than relying on FR. **[Defense exhibit B, ECF;ID pgs 39-40, ln 16 to 4]**

    **iv.**    Bussa also admits he had no discussion with the prosecutor or the magistrate about the potential misidentification of a suspect who happens to be a person of color. [**Defense exhibit 2, ECF;ID pg 41, ln 18 to 24**

    **v.**    At the time of his arrest Plaintiff's arms were covered in tattoos, the suspects weren't. Bussa had the probe photo of the suspect and Michael in custody but failed to make contact with the plaintiff to draw what was a clear and direct route for exoneration.**[Exhibit 9 and 10, picture of Plaintiff's  and the suspect's arms.**

    vi.    Bussa did not inform the prosecutor that he told the victim at the lineup that the Perp was in the lineup. **[Defense exhibit B, ECF;ID pg 14, ln 5 to 6]**

    vii.    Bussa admits the teacher/victim did not want to get his student in trouble. **[Defense exhibit B, ECF;ID pg 29, ln 3 to 7]**

    viii.    Bussa admits he had no training with regard to facial recognition. **[Defense exhibit B, ECF;ID pg 13, ln 7 to 9]**

    **d.** At the photo lineup Bussa told the victim the perp was among the photos;

    **(Defense Exhibit A, ECF;ID pg 14, ln 3 to 6)**

    e.   On the date of Plaintiff's arrest there was no facial recognition

policy for DPD investigators;

f. DPD policy required investigator to caution the witness that the person they are about to see *may or may* not be the perpetrator-**and it is equally important to clear an innocent person. (Exhibit 7, pg 2 paragraph h).** There was no such warning administered to the eyewitnesses in this case even  though the police chief admits FR gets it wrong 96% of the time with suspects of color.

g. At trial the prosecutor moved that the charges be dismissed on review of the image of the perp and of Michael which clearly showed 2 different people. **[Exhibit 11, the WCPO case file ]**

## A.  PLAINTIFF'S CLAIMS

Plaintiff brings claims against several Defendants **(Exhibit 2, Plaintiff's Amended Complaint)**.  Plaintiff brings claims against Defendants Bussa and City of Detroit (hereafter DPD) for the Constitutional violations.

## II.   ARGUMENT

## A. Standard of Review for Summary Judgment

Summary judgment under Federal Rules of Civil Procedure 56(c), is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

*LaPointe v. United Autoworkers, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). The evidence, all facts and any inferences that may permissibly be drawn from the facts must be viewed in [ the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)). The judge may not make credibility determinations or weigh the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The standard of review for a district court in deciding a motion for summary judgment requires that the evidence, all facts and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. The judge may not make credibility determinations or weigh the evidence. *Anderson*, 477 U.S. at 255.

### B.Collateral Estoppel Does Not Apply To Plaintiff's Claims

The Michigan Supreme Court has set out the elements of collateral estoppel. *Storey v. Meijer, Inc*., 431 Mich. 368, 373 n. 3, 429 N.W.2d 169 (1988); *Monat v. State Farm*, 677 N.W.2d 843, 469 Mich. 679 (2004).For collateral estoppel to apply, three elements must be satisfied: (1) "a question of fact essential to the judgment must have been actually litigated and determined by a valid and final judgment"; (2) "the same parties must have had a full [and fair] opportunity to

10

litigate the issue"; and, (3) "there must be mutuality of estoppel." *Storey v. Meijer, Inc.*, 431 Mich. 368, 373 n. 3, 429 N.W.2d 169 (1988); *Monat v. State Farm*, 677 N.W.2d 843, 845-6; 469 Mich. 679 (2004); *Hirmuz v. City Of Madison Heights*, 469 F.Supp.2d 466 (EDMI, 2007).

In *Monat*, the Michigan Supreme Court modified the element of mutuality, and set a clearer standard for ‖full and fair opportunity‖ to litigate the issue. The Supreme Court adopted the factors listed in 1 *Restatement Judgments*, 2d, Chap 3, Former Adjudication, Sec. 28-29. Section 28, p. 273, provides:

> Although an issue is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, relitigation of the issue in a subsequent action between the parties is not precluded in the following circumstances:
>
> (1) The party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action; or
>
> (2) The issue is one of law and (a) the two actions involve claims that are substantially unrelated, or (b) a new determination is warranted in order to take account of an intervening change in the applicable legal context or otherwise to avoid inequitable administration of the laws; or
>
> (3) A new determination of the issue is warranted by differences in the quality or extensiveness of the procedures followed in the two courts or by factors relating to the allocation of jurisdiction between them; or
>
> (4) The party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action; the burden has shifted to his adversary; or the adversary has a significantly heavier burden than he had in the first action; or
>
> (5) There is a clear and convincing need for a new determination of the issue (a) because of the potential adverse impact of the determination on the public interest or the interests of persons not themselves parties in the initial action, (b) because it was not sufficiently foreseeable at the time of the initial action that the issue would arise in the context of a subsequent action, or (c) because the party sought to be precluded, as a result of the conduct of

his adversary or other special circumstances, did not have an adequate
opportunity or incentive to obtain a full and fair adjudication in the initial
action.

*Monat*, *supra.*, at 845-6, fn 2.

An Eastern District of Michigan court applied Restatement, Sec. 28,
paragraph 1 to determine that the prior state criminal court action did not
collaterally estop the Plaintiff's subsequent 1983 claims.  See, *Hirmuz v. City Of
Madison Heights*, 469 F.Supp.2d 466 (EDMI, 2007).  In *Hirmuz*, the district court
looked at a Walker hearing and determined that the plaintiff had no way of
appealing the Walker hearing determination since he was found not guilty.  Thus,
collateral estoppel did not apply under the Michigan Supreme Court rulings.

Similarly, in the present case, none of the elements set by the Michigan
Supreme Court apply to this situation.  First, the probable cause determination at the
state preliminary exam was not essential to the eventual dismissal. In fact, the
probable cause determination was totally irrelevant to the dismissal.  Second, the
parties did not have a full and fair opportunity to litigate the issue of probable cause
as it relates to this case.

In this case, the Michigan –full and fair opportunity element of collateral
estoppel has several aspects.   With regard to Plaintiff's Fourth Amendment
wrongful seizure claim,  the probable cause at issue is that of the Defendant
Bussa when he forwarded the warrant request to the prosecutor.  The probable
cause determined at a later time, e.g., at the preliminary examination, is not the

same issue.  Thus, Plaintiff had no opportunity to fairly and fully litigate the issue

of probable cause of Defendant Bussa when he sent in the warrant request.

Plaintiff also had no opportunity to appeal the state criminal court

judgment, since as in *Hirmuz*, charges were dismissed against him prior to trial.

Thus, under the first Restatement factor, Plaintiff didn't have a ―full and fair‖

opportunity to litigate the issue.

The Sixth Circuit has held that the issue of a police officer's failure to

provide exculpatory evidence or falsifying evidence to get probable cause is a

different issue than that before a Michigan district court during a preliminary

exam.  See, e.g., *Darrah v. City of Oak Park*, 255 F3d 301 (6th Cir. 2001);

*McCollum v. Bahl*, 711 F.Supp.2d 802, 815-6 (WD MI 2010); *Taylor v City of

Detroit*, 368 F.Supp.2d 676, 685, 689 (ED MI 2005); *Hirmuz*, *supra*.

In general, the existence of probable cause in a Section 1983 action presents

a jury question, unless there is only one reasonable determination possible.  But

under Section 1983, an arresting agent is entitled to qualified immunity if he or she

could reasonably have believed that the arrest was lawful, in light of clearly

established law and the information possessed at the time by the arresting agent.

*Parsons v City of Pontiac*, 533 F3d 492, 501 (6th Cir 2008).Whether or not the

arresting agent Bussa reasonably believed there was probable cause is yet a

different issue from the probable cause determination made during the state

preliminary exam.  Plaintiff hasn't had a full and fair opportunity to litigate that issue either.

Plaintiff's Fourth Amendment claims are not precluded under the collateral estoppel elements and factors established by the Michigan Supreme Court. Therefore, this Court should deny Defendant's motion that Plaintiff's claims based on collateral estoppel be dismissed.

## B.  An Issue of Fact Exists Concerning Wrongful Arrest and Malicious Prosecution

Plaintiff has provided sufficient evidence to create issues of fact on the three Constitutional claims he brings against Bussa.  Each of these claims involves issues of fact concerning probable cause, along with other elements.

### 1. An Issue of Fact Exists Concerning Plaintiff's Constitutional Claim of Fourth Amendment Wrongful Arrest

The 6th Circuit has clarified the standards for summary judgment based on § 1983 claims of fabricating evidence and withholding exculpatory evidence to create probable cause for an arrest.  *Gregory v. City of Louisville*, 444 F3d 725 (6[th]Cir. 2006).  In *Gregory*, the Plaintiff was criminally convicted of several rapes, and his conviction vacated seven years later.  The Plaintiff brought claims against various police investigators and experts, alleging they lacked probable cause for his arrest even though police relied on an eye witness who they claimed provided probable cause for the arrest.

14

The 6th Circuit held that ―in a §1983 action, the existence of probable cause is a question of fact.‖ *Gregory, supra*., at p. 743.

The Court cited *Kuehl v. Burris*, 173 F3d 646, 650 (8th Cir. 1999):

> An officer contemplating arrest is not free to disregard exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists.

The *Gregory* Court cited *Radvinski v. City of Olmsted Falls*, 395 F3d 291, 305-6 (6th Cir. 2005).

The 6th Circuit further elaborated on the proof required in *Sykes v Anderson*, 625 F3d 294(6th Cir. 2010):

> [I]n order to prevail on a false-arrest claim, [plaintiff] was required to prove by a preponderance of the evidence that in order to procure the warrant, [defendant] "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood" and "such statements or omissions [we]re material, or necessary, to the finding of probable cause." *Wilson v. Russo,* 212 F.3d 781, 786-87 (3d Cir. 2000)
> *Sykes, supra.*at 305

In the present case, Plaintiff has presented significant evidence that Defendant Bussa made false statements or omissions creating a falsehood which were material to finding probable cause. In this instance, the victim told responding officers: "the V1 (victim) stated that the SU (suspect) is a previous student possibly named Terry." (Exhibit, ID) It is axiomatic that what the victim reported to the responding police was that he knew and could identify his assailant. This is also clearly exculpatory. Bussa, Detective Donald 08-26-22, (Pages 33:25 to 34:3) At his deposition, Bussa stated he

15

never shared this or any other exculpatory facts with the prosecutor or the magistrate:

Q: And you never shared any exculpatory evidence with the prosecutor or the magistrate in this case, correct?

A.   Correct. **Defense Exhibit A, ECF;ID Bussa transcript.**

The plaintiff was never a student of Mr. Cassani's. **(Exhibit 4, affidavit of Plaintiff)**.

To constitute probable cause in a malicious prosecution case, there must be such reasonable ground of suspicion, supported by circumstances sufficiently strong to warrant an ordinarily cautious man in the belief that the person arrested is guilty of the offence charged.  *Roblyer*, *Id*.

There is no dispute as to the facts available to the Defendant and upon which he relied when they decided to pursue charges against the Plaintiff. The facts were,

_____

Defendant knew that he didn't have any vestige of probable cause for charges against Plaintiff. Probable cause for filing a criminal complaint only exists "if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Henry v United States*, 361 US 98, 102, 80 SCt 168, 4 LEd 2d 134 (1959); accord *Beck v Ohio*, 379 US 89, 91, 85 SCt 223, 13 LEd 2d 142 (1964); *Brinegar v United States*, 338 US 160, 175-76, 69 SCt 1302, 93 LEd 1879 (1949).   Probable cause simply cannot be manufactured. In

this case looking at it from the totality of the circumstances, clear factual disputes as to how it is that the plaintiff was caught up into this nightmare is a question for his jury.

### D. AN ISSUE OF FACT EXISTS CONCERNING THE CONSTITUTIONAL TORT OF MALICIOUS PROSECUTION

In *Sykes*, the 6th Circuit upheld a jury verdict for 4th Amendment malicious prosecution against several officers involved in the arrest and prosecution of two women.  The 6th Circuit established four elements of proof for such a Constitutional malicious prosecution claim:

> 1.  Plaintiff must show a criminal prosecution was initiated against the plaintiff, and that the defendants made, influenced or participated in the decision to prosecute.
> 2.  Plaintiff must show that there was a lack of probable cause for the criminal prosecution.
> 3.  Plaintiff must show that he suffered a deprivation of liberty apart from the initial seizure.
> 4.  The criminal proceeding must have been resolved in the plaintiff's favor.
> *Sykes, supra.* at 309-10.

In the present case, Plaintiff has presented evidence to create an issue of fact on each of the 4th Amendment malicious prosecution elements.  First, a criminal prosecution was initiated against Plaintiff, and Defendant Bussa certainly at the very least participated in that decision.  Defendant Bussa presented one-sided information about Plaintiff.

Second, an issue of fact exists concerning the existence of probable cause to seek a warrant. The only reason Plaintiff became a suspect is due to a known issue

of bias in the use of facial recognition. When he was identified as a "lead" it is the Defendants' point that this created a reasonable suspicion that the Plaintiff was involved in the crime. Plaintiff would contend that there can be no reasonable suspicion if there was a 96% probability the FR search could lead to a wrongful arrest. And if no reasonable suspicion, no probable cause for his arrest.

Third, Plaintiff continued to be deprived of his liberty between the date of his arrest on July 31, 2019 and the date of his exoneration  October 23, 2019. Throughout that timeframe, Defendant Bussa was directly involved in the prosecution.

Fourth, all charges were dismissed against Plaintiff.  Thus, elements one and four are undisputed, and elements two and three have issues of fact sufficient to require a jury determination.  For all these reasons, Plaintiff's 4th Amendment malicious prosecution claim should go to a jury.

## E. AN ISSUE OF FACT EXISTS CONCERNING THE CONSTITUTIONAL DUE PROCESS CLAIM

The United States Supreme Court has long held that suggestive photo arrays constitute a violation of due process.   The Due Process Clause prohibits the use of identifications which under the totality of the circumstances are impermissibly suggestive and present an unacceptable risk of irreparable misidentification. See *Manson v. Brathwaite*, 432 U.S. 98 (1997); *Neil v. Biggers*, 409 U.S. 188 (1972). "A conviction based on

identification testimony following pretrial identification violates the

defendant's constitutional right to due process whenever the pretrial

identification procedure is so 'impermissibly suggestive as to give rise to a

very substantial likelihood of irreparable misidentification.'" *Thigpen v.*

*Cory*, 804 F.2d 893, 895 (6th Cir. 1986) (quoting *Simmons v. United States,*

390 U.S. 377, 384 (1968)). The paramount issue is whether the

suggestiveness so undermines the reliability of the identification as to offend

due process. See *Foster v. California*, 394 U.S. 440 (1969).

Following *Bigger*s, a court must consider the following factors in

evaluating reliability: 1) the opportunity of the witness to view the defendant

at the initial observation; 2) the witness' degree of attention; 3) the accuracy

of the witness' prior description of the defendant; 4) the level of certainty

shown by the witness at the pretrial identification; and 5) the length of time

between the initial observation and the identification. 409 U.S. at 199-200.

The degree of reliability of the identification, as indicated by the above-

stated factors, is to be considered in light of the degree of suggestiveness of

the identification procedure and of the totality of the circumstances in

determining whether due process requires suppression of the identification.

See *Manson*, 432 U.S. at 113-14. In this case when viewing this set of facts

from the totality of the circumstances, it should be clear a jury question

exists. The question for the jury will be if Bussa knew the victim could

identify his former student, what happened at the lineup where the victim

picked out the Plaintiff who, beyond dispute, was never his student. What is

the Due Process implication of being picked out in a photo lineup when the

statistics of probability of being picked out as a suspect are effectively 96%?

## F. An Issue of Fact Exists Concerning Qualified Immunity

### 1.  Standard of Review

A claim of qualified immunity presents two closely linked questions:

whether the defendant violated the plaintiffs' rights and whether those rights were

clearly established at the time of the alleged violation. *Saucier v. Katz*, 533 U.S.

194, 150 L Ed 2d 272 (2001); *Phelps v. Coy*, 286 F3d 295, 299 (6th Cir. 2002).

A Court must take the facts in the light most favorable to the plaintiff.

*Phelps v. Coy*, 286 F3d 295, 299 (6th Cir. 2002); *Dickerson v. McClellan*, 101 F3d

1151, 1157 (6th Cir. 1996).  In their lower court motion, Defendants argue for

qualified immunity on Plaintiffs' Fourth Amendment wrongful seizure and

malicious prosecution claims. The standard of review is de novo.

### 2.  An Issue of Fact Exists Concerning Qualified Immunity for Plaintiff's Federal Claims

Qualified immunity is an affirmative defense that shields government

officials performing discretionary functions "from liability for civil damages

insofar as their conduct does not violate clearly established federal statutory or constitutional rights of which a reasonable person would have known." *Harlow v Fitzgerald*, 457 US 800, 818, 102 SCt 2727, 73 LEd 2d 396 (1982); accord *Dorseyv Barber*, 517 F3d 389, 394 (6th Cir 2008). To determine whether qualified immunity applies for particular state officials, a two-step analysis is applied. See *Scott v Harris*, 550 US 372, 127 SCt 1769, 1774, 167 LEd 2d 686 (2007). First, whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right." *Saucier v Katz*, 533 US 194, 201, 121 SCt 2151, 150 LEd 2d 272 (2001). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id*. However, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id*. The ultimate focus of this second inquiry is to determine whether the official "had fair notice that her conduct was unlawful." *Brosseau v Haugen*, 543 US 194, 198, 125 SCt 596, 160 LEd 2d 583 (2004) (per curiam); see also *Champion v Outlook Nashville, Inc*, 380 F3d 893, 905 (6th Cir 2004) (requiring the plaintiff to provide "sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of clearly established constitutional rights"). If the law at the time of the official's conduct "did not

21

clearly establish that the [official's] conduct would violate the Constitution, the [official] should not be subject to liability or, indeed, even the burdens of litigation."*Brosseau*, 543 US at 198.

"The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v Pelzer*, 536 US 730, 736, 122 SCt 2508, 153 LEd. 2d 666 (2002). Construing the facts in the light most favorable to Plaintiff, this Court should find that he has submitted sufficient evidence that Defendant Bussa violated his Fourth Amendment rights by deciding to charge Plaintiff, recommending that a warrant be issued, and filing the criminal complaint– all of which resulted in the criminal prosecution of the Plaintiff and the violation of his Constitutional rights a) not to be deprived of liberty or property without due process of law, as secured by 4th and 14th Amendments to the Constitution of the United States of America; b) the right to be free from unreasonable searches and seizures, and to be secure in his person as provided by the 4th and 14th Amendments to the U.S. Constitution.

Applying this qualified immunity framework to the facts of this case, this Honorable Court should find that Bussa is not entitled to qualified immunity on Plaintiff's Constitutional claims; in the alternative, the issue of qualified immunity may be submitted to the jury only if –the legal question of immunity is completely

dependent upon which view of the [disputed] facts is accepted by the jury.‖

*Humphrey v Mabry*, 482 F3d 840, 846 (6th Cir 2007) (quoting *Brandenburg v
Cureton*, 882 F2d 211, 216 (6th Cir 1989).

## C.   BASIS OF MUNICIPAL LIABILITY

The touchstone of an action against a government body for Constitutional
violation is an allegation that official custom, policy or practice is responsible for a
deprivation of rights protected by the constitution.  See, *Monell v. Dept. of Social
Services*, 436 U.S. 658, 690, 98 S. Ct. 2018, 2036 (1978); *Molton v. City of
Cleveland*, 839 F.2d 240, 244 (6th Cir. 1988); *Russo v. City of Cincinnati*, 953 F2d
1036 (6th Cir, 1992).

Federal courts have established at least four ways to establish custom, policy
and practice:

There are at least four avenues a plaintiff may take to prove the existence of a
municipality's illegal policy or custom. The plaintiff can look to (1) the
municipality's legislative enactments or official agency policies; (2) actions taken
by officials with final decision-making authority; (3) a policy of inadequate training
or supervision; or (4) a custom of tolerance or acquiescence of federal rights
violations.

*Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir., 2005)

In the present case, Plaintiff is pursuing one of these routes: (3) a policy
of inadequate training or supervision.

### 1. A policy of inadequate training or supervision

#### a.  Standard of Review

In inadequate training or supervision cases, Plaintiff must present evidence that a City defendant was deliberately indifferent to a substantial risk of serious harm. *City of Canton v. Harris,* 489 US 378, 109 S Ct 1197 (1989); *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970 (1994*); Board of Bryan County v. Brown*, 520 U.S. 397, 117 S.Ct. 1382 (1997); *Russo v. City of Cincinnati*, 953 F2d 1036 (6th Cir, 1992).

Only where a municipality's failure . . . in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as city "policy or custom" that is actionable under § 1983"

*Canton, supra.* at 389.

The Supreme Court defined deliberate indifference in this context:

Use of "deliberate," for example, arguably requires nothing more than an act (or omission) of indifference to a serious risk that is voluntary, not accidental. [citing *Estelle*, 429 U.S. at 105, 97 S.Ct. at 291-2]

*Farmer, supra*. at 1980.

See also, Farmer, supra. at 1979. considering the duties assigned to specific officers or employees the need for more or different training [supervision, discipline, policy] is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy makers of the city can reasonably be said to have been deliberately indifferent to the need.

*Canton,* supra. at 390.

The test for deliberate indifference is an objective standard:

It would be hard to describe the Canton understanding of deliberate indifference, permitting liability to be premised on obviousness or constructive notice, as anything but objective.

24

*Farmer, supra*. at 1981.

A plaintiff can show "deliberate indifference" through use of circumstantial evidence.

Whether an official had the requisite knowledge of a substantial risk I[s] a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence. . .

*Farmer, supra*. at 1981.

The City need not be aware of a specific danger to a specific citizen to be liable.  The City must be aware of the risk:

It does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a person faces an excessive risk of [injury] for reasons personal to him or because all persons in his situation face such a risk.
*Farmer, supra*. at 1982.

Based on *Canton*, federal courts have established two (2) types of failure to train cases.  In Type I cases, a Plaintiff may establish a failure to train officials in a specific area where there is an obvious need for training to avoid Constitutional violations.  See, e.g., *Doe v. Estes*, 926 F. Supp. 979, 988 (D Nev, 1996); *Bolon v. Rolla Public Schools*, 917 F. Supp. 1423, 1431 (ED Mo. 1996); *Reynolds v. Borough of Avalon*, 799 F. Supp. 442, 447 (DNJ, 1990).

In Type II cases, a Plaintiff may establish a pattern of conduct that is so pervasive as to imply actual or constructive knowledge by policy makers who fail to act on the obvious need for training.  Several courts establish criteria for that kind of

pervasive pattern.  See, e.g., *Beck v. City of Philadelphia,* 89 F3d 966 (3rd Cir.

1996).

In Type I cases, a plaintiff need not show any pattern of misconduct nor any

evidence of other complaints. *Gregory v. City of Louisville*, 444 F.3d 725, 755 (6th

Cir., 2006).  A plaintiff can show that a municipality's failure to train its employees

is actionable "deliberate indifference" under Type I Failure to Train when (1) "a

policymaker `knows to a moral certainty' that her employees will confront a given

situation;" (2) that "the situation either presents the employee with a difficult choice

of the sort that training or supervision will make less difficult or that there is a

history of employees `mishandling' the situation"; and (3) that mishandling those

situations "will frequently cause the deprivation of a citizen's constitutional rights."

See, e.g., *Cash v. County of Erie,* 654 F.3d 324, 334 (2nd Cir., 2011); *Wise v. NYC

Police Department*, 928 F.Supp. 355, 366 (SDNY, 1996).

**b. Plaintiff's Evidence in This Case**

At deposition Bussa testified there was no DPD policy on FR at the time of

Plaintiff's arrest:

Bussa, Detective Donald 08-26-22, (Page 34:4 to 34:8)

Q. Now, you had indicated, I think, that prior to or at the time rather of

your investigation into Mr. Cassani's claim that there was no facial recognition

policy, is that correct?

A.   Correct.  **Defense exhibit B, ECF;ID.**

Another 30(b)(6) deponent[13], James Lloyd Howell, testified in all his training

there was no discussion of inherent bias in FR and people  of color:

Howell, Nathan James Lloyd 08-23-22, (Page 15:19 to 15:23)

---

[13] Pursuant to Federal Rules of Civil Procedure 30 and 34, Deponent is directed

to produce at the time of his/her deposition a person designated by the City of Detroit most knowledgeable on the pre-investigation into and purchase of the Facial Recognition software from Data Works Plus along with documents in support of their testimony as outlined below:

a.   Produce any and all studies the DPD/City of Detroit relied on to investigate the utility and application of Data Works facial recognition company and software specific to the issue of misidentification of people of color prior to the initial purchase and deployment of the software;

b.   Any and all written directives and policy manual provisions concerning any use and deployment of the Data Works Plus FR software as specified chronologically by the dates of issuance of the directives and manual provisions issued;

c.   Any and all training material or instructional material that was provided to DPD investigators apprising them of the concerns of opponents in the use of facial recognition as relates its accuracy in identifying persons of color;

d.   Any and all emails, texts, letters and any other communications between the DPD/City of Detroit and Data Works Plus or it's senior account executive Randy Hall that would evidence information, consideration and concern in regard to the accuracy in identifying persons of color;

e.   Any and all independent DPD research into accuracy in identifying persons of color;

f.   Any and all  BOPC transcripts of Twanny Petty or documents provided by her or her agents or other advocates opposing the use of facial recognition in the City of Detroit on the basis of the accuracy in identifying persons of color.

g.   Please provide any written documents or testimony demonstrating public comments the City received before or just after adopting the Data Works technology.

27

Q.  Okay.  Did you receive any understanding in that FBI

training of inherent biases with the use with regard to facial recognition in people of

color?

A.   They taught us what to look for but I don't recall teaching us

inherent bias in the course that we took. **[Exhibit 12, deposition of Howell]**

Another 30(b)(6) deponent, Joseph dablitz, stated the DPD only established a

FR policy and only began to train officers on that policy after Plaintiff's arrest:

Q. You worked in Detroit, okay.· So did the department ever come to

you with any sort of written policy or directive or memo or discussion or conference

to you to say, Officer Dablitz, you have to be concerned when you run facial

recognition that -- of image  quality?

A.· · ·At some point after this particular -- after this date, of whatever

date this was.

Q.· · ·July of 2019.

A.· · ·July.· After this date the department did come out with a directive

and did come out with training. But after this I had left crime intel and went to

fugitive apprehension.

Q.· · ·What training did they come out with after?

A.· · ·I don't remember who put it on, but DataWorks actually sent

some federal officers to Detroit to do  the training here at headquarters.

Q.· · ·About facial recognition and how you were actually  supposed to be concerned about image quality and pixelation?

A.· · ·I don't remember the exact training and it was a  weeklong training.

Q.· · ·Did you get the training?· You didn't get it?

A.· · ·I got that training, yes.

Q.· · ·When?

A.· · ·It was

Q.· · ·Substantially after 2019?

A.· · ·Yes.· It was probably 2000 -- it might have been in 2019 after this.

Q.· · ·But it was after?

A.· · ·Yes.

Q.· · ·Okay. **[Exhibit  13, deposition of Dablitz]**

Attached as **Exhibit 15** is the DPD  FR policy which was approved well after Plaintiff's arrest. This policy required Bussa to "uncover evidence that either supports or eliminates the suspect identification. Further, it requires the detective to, "caution the witness that the person they are about to see ***may or may not***  be the perpetrator." In this case just the opposite happened. Also, the DPD acknowledges, in the use of photographs for identification purposes, the totality of the circumstances is

the standard by which to judge the propriety of a given lineup.

### i. Type I Failure to Train, Supervise and/or Discipline

Plaintiff has presented proofs that based on these factors, an issue of fact exists on the City's custom, policy and practice.  The City could and should have trained officers, supervisors and investigators in properly using facial recognition software.

### ii. Type II Failure to Train

Plaintiff has also provided proofs of a widespread pattern of disregarding the limitations of facial recognition software.

WHEREFORE Plaintiff respectfully prays this Honorable court deny the Defendants' motion awarding reasonable costs and attorney fees.

Respectfully submitted,

  /s/ David A. Robinson
David A. Robinson (P38754)
Attorneys for Plaintiff
28145 Greenfield
Southfield, MI 48076
(248) 423-7234/423-7227 Fax
davidrobinsonlaw@gmail.com

Dated:  April 10, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2023, I electronically filed the foregoing document and accompanying exhibits with the Clerk of the Court using the ECF system, which will send notification of such filing to all attorneys of record.

By:  /s/ David A. Robinson

Dated: April 10, 2023

## INDEX OF EXHIBITS

1. Article Washington Post

2. Plaintiff's Complaint

3. Ferndale police report &

4. Michael Oliver Affidavit

5. Probe Image Of The Perpetrator

6. Deposition of Jack Fennessey

7. DPD Eyewitness Identification and Lineups

8. Michael Oliver Affidavit

9. Color Photo of the Perpetrator Friend, Andre Jackson

10. Plaintiff's Arms Tattoos

11. WCPO Case File

12. Deposition James Lloyd Howell

13. Deposition of Joseph Dablitz