**John Fennessey**
**09/26/2022**

1

UNITED STATES DISTRICT COURT

2

EASTERN DISTRICT OF MICHIGAN

3

SOUTHERN DIVISION

4   MICHAEL OLIVER,

5           Plaintiff,

6     -vs-

7   DONALD BUSSA, In his
    individual and official      Case No. 20-cv-12711
8   capacity, and CITY OF        Hon. Laurie J. Michelson
    DETROIT, Jointly and
9   Severally,

10          Defendants.

11  _____/

12

13                    The Deposition of JOHN FENNESSEY,

    taken before me, Theresa L. Roberts, Certified Shorthand
14
    Reporter (CSR-4870) and Notary Public for the County of
15
    Oakland (acting in the County of Wayne), at 2 Woodward
16
    Avenue, Suite 500, Detroit, Michigan, on Monday,
17
    September 26, 2022, noticed for 10 o'clock A.M.
18  APPEARANCES:

19  For the Plaintiff:    ROBINSON & ASSOCIATES, P.C.
                          By:  David A. Robinson, Esq. (P38754)
20                        28145 Greenfield Road, Suite 100
                          Southfield, Michigan  48076
21                        (248) 423-7234
                          davidrobinsonlaw@gmail.com
22
    For the Defendants:   CITY OF DETROIT LAW DEPARTMENT
23                        By:  Patrick Cunningham, Esq. (P67643)
                          2 Woodward Avenue, Suite 500
24                        Detroit, Michigan  48226
                          (313) 237-5032
25



**John Fennessey**
**09/26/2022**                                                    **Page 2**

```
 1                     I   N   D   E   X
```

```
 2                                                       PAGE

 3    Cross Examination by Mr. Robinson                     3

 4

 5

 6                   E   X   H   I   B   I   T   S

 7                          DESCRIPTION                   PAGE

 8    Deposition Exhibit No. 1   Deposition Notice          4

 9    Deposition Exhibit No. 2   Photo Line-up Images       24

10    Deposition Exhibit No. 3   Inquiry Images             24
```

```
11

12                     (Exhibits attached)

13

14

15

16

17

18

19

20

21

22

23

24

25
```


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

```
 1                    Detroit, Michigan

 2                    Monday, September 26, 2022

 3                    (At about 10:08 A.M.)

 4                    —        —        —

 5              J O H N    F E N N E S S E Y

 6         after having been first duly sworn to tell the

 7         truth, the whole truth and nothing but the truth,

 8         was examined and testified upon his oath as

 9         follows:

10                    MR. ROBINSON:  This deposition is taken

11         pursuant to notice and to be used for any and all

12         purposes under the rules that apply.

13                    CROSS-EXAMINATION

14    BY MR. ROBINSON:

15    Q.   Mr. Fennessey, did I pronounce your last name

16         correctly?

17    A.   Correct, John Fennessey.

18    Q.   And do you have a middle name?

19    A.   Francis.

20    Q.   You and I have met before?

21    A.   Yes.

22    Q.   On the Parnell case.

23    A.   I'm sorry.

24    Q.   On the Parnell case.

25    A.   Yes.
```



John Fennessey
09/26/2022

Page 4

1   Q.      Yeah.

2   **A.      And before that too going back a ways.**

3                          (Deposition Exhibit Number 1

4                          was marked for identification)

5   BY MR. ROBINSON:

6   Q.      All righty.  You have been designated by the City of

7           Detroit to answer certain questions specific to --

8           and I'm just going to read, as I marked Plaintiff's

9           Exhibit Number 1, duces tecum deposition notice.

10          "Pursuant to Federal Rules of Civil Procedure 30 and

11          34, deponent is directed to produce at the time of

12          his or her deposition a person designated by the

13          City of Detroit most knowledgeable in the

14          pre-investigation into the purchase of the facial

15          recognition software from DataWorks Plus along with

16          documents in support of their testimony as outlined

17          below."

18                          "A, produce any and all studies the

19          DPD/City of Detroit relied on to investigate the

20          utility and application of DataWorks' facial

21          recognition company and software specific to the

22          issue of misidentification of people of color prior

23          to the initial purchase and deployment of the

24          software.  B, any and all written directives and

25          policy manual provisions concerning any use and



1  deployment of DataWorks Plus facial recognition
2  software as specified chronologically by the dates
3  of issuance of the directives and manual provisions
4  issued."
5       "C, any and all training material or
6  instructional material that was provided to Detroit
7  Police Department investigators apprising them of
8  the concerns of opponents in the use of facial
9  recognition as it relates its accuracy and
10  identifying persons of color."
11       "D, any and all emails, texts, letters
12  and any other communications between Detroit Police
13  Department/City of Detroit and DataWorks Plus or its
14  Senior Account Executive Randy Hall, that would
15  evidence information, consideration and concern in
16  regard to the accuracy in identifying persons of
17  color."
18       "E, any and all independent DPD research
19  into accuracy in identifying persons of color."
20       "F, any and all board of police
21  commissioner, transcripts of Tawana Petty or other
22  documents provided by her or her agents or other
23  advocates opposing the use of facial recognition in
24  the city of Detroit on the basis of the accuracy in
25  identifying persons of color."



1           "G, please provide any written documents

2      or testimony demonstrating public comments the City

3      received before or just after adopting DataWorks'

4      technology."

5               Now I'm going to hand you this,

6      Mr. Fennessey, and ask whether or not you, number

7      one, were provided with that notice?

8               MR. CUNNINGHAM:  I'll just state for the

9      record, Dave, that Mr. Fennessey is here to speak to

10     letters B and E of the 30(b)(6) deposition.

11  BY MR. ROBINSON:

12  Q.    So can you answer my question, Mr. Fennessey?

13  **A.    So have I seen Exhibit 1?**

14  Q.    Yes.

15  **A.    Yes, sir, I have.**

16  Q.    Okay, all right.  Did you bring with you any of the

17     requested materials in Exhibit 1?

18  **A.    No, because I don't have any of the requested**

19     **materials.  Everything I had regarding the purchase**

20     **of it I've turned over to corporation counsel.**

21  Q.    Okay.  I'm sorry.  According to Mr. Cunningham

22     you're here only in a capacity to talk about B, any

23     and all written directives and policy manual

24     provisions concerning the use and deployment of

25     DataWorks Plus facial recognition software as



John Fennessey
09/26/2022                                    Page 7

1          specified chronologically by the dates of issuance

2          of the directives --

3                     MR. CUNNINGHAM:  Dave, I'm going to stop

4          you before you finish that.  I meant A.  B was a

5          mistake, I meant A.  Produce any and all studies

6          DPD/City of Detroit relied on and E, independent DPD

7          research.

8                     MR. ROBINSON:  Okay.

9    BY MR. ROBINSON:

10   Q.    Okay, what did you bring with you with regard to A

11         and E?

12   A.    May I see Exhibit 1, please?  As to paragraph A,

13         there were no -- there was no studies that the

14         Detroit Police Department relied on prior to the

15         purchase of -- or the RFP, you know this is

16         competitively bid.  RFP, request for product, you

17         know, it's kind of a purchasing term.  They did not

18         have it then.

19   Q.    Okay.  Let's turn to E.

20   A.    Okay, E, that's the one about any and all

21         independent DPD research.  I worked for the

22         Department of Innovation and Technology, the public

23         safety section, so I know -- I don't know of

24         anything that DPD did regarding looking into that

25         issue.



John Fennessey
09/26/2022                                    Page 8

1    Q.    So, again, you're the designee pursuant to our

2          request for a person most knowledgeable on the

3          subject matter of A through G.  And for the record

4          Mr. Cunningham has indicated that you have been

5          produced in response to that request to give

6          testimony and to produce documentation in support of

7    **A.  And that is produce any and all studies the**

8    **DPD/City of Detroit relied on to investigate the**

9    **utility and application of DataWorks' facial**

10   **recognition company and software specific to the**

11   **issue of misidentification of people of color prior**

12   **to the initial purchase and employment of the**

13   **software.**

14   **           It is your testimony today that you are**

15   **unable to produce any documents or to give any**

16   **testimony specific to that request?**

17   **A.  No, I'm saying that there -- there were no studies**

18   **at that time that I'm aware of.**

19   Q.    Okay.  So -- and my question is you can't give

20         any testimony or produce any studies relative to the

21         request in A?

22   **A.  Correct.**

23   Q.    Is that correct?

24   **A.  Yes.**

25   Q.    And then E asks that you bring any and all



John Fennessey
09/26/2022

1    independent Detroit Police Department research into

2    the accuracy in identifying persons of color.

3    Again, you are the designee for the City of Detroit

4    in order to produce materials and testimony in

5    support of paragraph E, and that is any and all

6    independent DPD research into the accuracy in

7    identifying persons of color.

8        It's your testimony today that you have

9    not any documents in support of any independent

10   research or you cannot provide any testimony as it

11   relates to the accuracy in identifying persons of

12   color independent to any research done by the

13   Detroit Police Department; is that correct?

14   A.   Yeah, I'm not aware of any investigation or anything

15   done by independent agencies for the Detroit Police

16   Department, and I don't have any documentation

17   related to -- I don't know if they did any, but I

18   don't have any documentation.

19   Q.   So Mr. Cunningham has indicated you're here to

20   provide support and elucidation for paragraphs A and

21   E, that isn't true, you can't provide any?

22   A.   For paragraph A, I was part of the RFP committee,

23   and at the time there were -- my understanding of,

24   you know, we rely on -- a lot of times you look at

25   -- like missed the standards and things like that.



John Fennessey
09/26/2022
Page 10

1     That was not something that were studies that were
2     available at the time.  So we didn't -- I know we
3     didn't look at any doc -- any studies, and I don't
4     think there were any studies at the time.

5   Q.   Studies on what?

6   A.   On the application of facial recognition to people
7        of color.

8   Q.   When you say that there weren't any studies, you
9        mean during your involvement you weren't presented
10       with any studies; you're not saying that there were
11       no universal studies out there, right?

12  A.   At the time of the purchase -- the request for --
13       RFP, request for product there, we did not have any
14       studies.

15  Q.   I'm trying to understand --

16  A.   And I don't believe there were any.  Like I know --
17       I'm almost positive NIST did not have anything.

18  Q.   Okay.  What is NIST?

19  A.   National Institute of Standards and Technology.

20  Q.   Okay.  And, again, you, independent of anybody else
21       that was involved in the RFP, did you do any
22       independent research on the issue of the accuracy or
23       inaccuracy of facial recognition identification as
24       it relates to persons of color?

25  A.   At the time of the purchase, no.



1    Q.    Is it your testimony to me today that universally at

2          the time, and I'll get into what time frame that it

3          was, that universally there was no information or

4          literature out there?

5    A.    **I can't speak to universally.  Just what I'm saying**

6          **is, you know, looking at the kind of the studies I**

7          **looked at, which was primarily the NIST, there was**

8          **nothing regarding that.**

9    Q.    Okay, all right.  And you're not saying there wasn't

10         anything out there; you're just saying what you were

11         exposed to in the limitations of what you were

12         exposed to, it did not address the inherent bias as

13         it relates to facial recognition and identifying

14         persons of color at the accuracy?

15   A.    **At the time of the -- at the time purchasing was**

16         **occurring, no, I was not aware of anything.**

17   Q.    Okay.  You know, it's like, you're an attorney too,

18         right?

19   A.    **I am.**

20   Q.    Lawyers.  Again, at the time of purchase -- when was

21         that?

22   A.    **I want to say it was 2016.  I think it was when**

23         **we --**

24   Q.    And who among the committee or the purchase

25         committee or whomever, other than yourself, was


HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO   313.567.8100

John Fennessey
09/26/2022

Page 12

```
 1              involved?

 2    A.        I have to think back.  I believe it was Brad May,

 3              who at the time was director of public safety IT and

 4              cybersecurity and Nick Giaquinto who was a police

 5              commander at the time.  And then they had somebody

 6              from purchasing I can't recall, who was kind of

 7              running the RFP from the purchasing perspective.

 8    Q.        Okay.  And were there meetings held and discussions,

 9              email exchanges, texts and so forth?

10    A.        Well, I'm sure there were.  I know we had product

11              demos where they -- the three companies bid.  One

12              was nonresponsive; that was Flyball, I think it was,

13              and then DataWorks Plus and ID Networks were the

14              companies that responded who did product

15              demonstrations for us.

16    Q.        Were there emails and text exchanges?

17    A.        Oh, I'm sure there were.

18    Q.        Okay.  Because I had asked for those to be produced

19              though.

20    A.        I'm not the keeper of records for emails.  Typically

21              that will go to the department of innovation and

22              technology.  They can do a comprehensive search

23              across everyone's email box to return those.

24    Q.        Okay.  So that wasn't done in this case, although

25              you were provided with that notice?
```



1    A.    I do not know if it was found.  I don't have any

2          control over the email systems.

3    Q.    I understand that.  But you were provided with the

4          notice and the notice was directed to you to provide

5          those materials for this deposition.  Did you

6          address that with your lawyer, Mr. Cunningham?

7    A.    I believe he's a lawyer for the City.  I did not

8          address that with him.  Typically that is handled

9          through other channels within the Department of

10         Innovation and Technology.

11   Q.    Did Mr. Cunningham address it with you?

12               MR. CUNNINGHAM:  You don't have to answer

13         that question.

14               MR. ROBINSON:  Okay.  On the basis of

15         what?

16               MR. CUNNINGHAM:  Attorney/client

17         privilege.

18               MR. ROBINSON:  I just want it for the

19         record.

20   BY MR. ROBINSON:

21   Q.    Okay.  So as we speak today are you aware -- have

22         you been made aware that there are inherent biases

23         in facial recognition, and there have been studies

24         relative to the misidentification of people of color

25         and based on the algorithms that are created by the



1  technicians, as it were, in these facial recognition

2  algorithm software systems?

3  A.  I have read that there is a -- I think depending on

4  how these systems are trained, there may be a lower

5  accuracy rate of identification.

6  Q.  Of people of color?

7  A.  Correct.

8  Q.  Okay, when did you learn that?

9  A.  Oh, I can't recall.  I know --

10  Q.  Was it before 2016 or after?

11  A.  Well after that.  Once again, you know, I like NIST

12  standards.  They have the facial recognition vendor

13  test, I think it's FRVT, and I don't recall them

14  addressing that until some time after 2016.  I don't

15  believe that became a factor until 2017, '18.

16  Q.  Okay.

17  A.  But you'd have to go back through their reports.

18  Q.  Okay.  Subsequent to, let's say, 2016 to the

19  present, to your knowledge has there been any

20  consideration by the Detroit Police Department in

21  its use of facial recognition processes in arrestees

22  or suspects of color given for what is in the

23  industry some understanding that there are

24  shortcomings in the system as it relates to

25  accurately identifying persons of color?



John Fennessey
09/26/2022
Page 15

1  A.   I'm not familiar with what DPD has done for their

2       internal processes and standards.

3  Q.   So to your knowledge no consideration -- to your

4       knowledge no consideration has been adopted as a

5       consequence of what now is an understanding?

6  A.   Not that I'm aware of.

7  Q.   Okay.  And what is your position today with the

8       Detroit Police Department?

9  A.   I work for the Department of Innovation and

10      Technology.

11 Q.   Okay.

12 A.   And so I'm a manager.

13 Q.   The Department of Innovation and Technology?

14 A.   Yes, sir.

15 Q.   And that department falls under whose auspices?

16 A.   The chief information officer.

17 Q.   And the chief information officer works for whom?

18 A.   The mayor.

19 Q.   And that's still a part of the City of Detroit?

20 A.   Correct.

21 Q.   And you're subject to interacting with the Detroit

22      Police Department specifically in your role as the

23      innovation and technology individual?

24 A.   The Detroit Police Department, the Detroit Fire

25      Department, EMS, Emergency Medical Services and



John Fennessey
09/26/2022

Page 16

1       Homeland Security.

2    Q.    And you have no knowledge of the arrest of

3          Michael Oliver, correct?

4    A.    Correct.

5    Q.    Or of Robert Williams, correct?

6    A.    Correct.

7    Q.    Did any of your activity as it relates to the RFP

8          for facial recognition software from DataWorks Plus

9          include any consideration that the software and the

10         facial recognition processes would be utilized in a

11         City that was 80 percent people of color?

12   A.    No.

13   Q.    Were you, in the processes of the RFP, made aware of

14         any of the groups of -- advocacy groups against the

15         implementation of facial recognition in the city of

16         Detroit based on the fact that these algorithms are

17         inherently bias, as it relates to the identification

18         of people of color?

19   A.    I was not aware of any advocacy groups opposed to

20         it, the facial recognition.

21   Q.    Did you attend any Board of Police Commissioner

22         meetings?

23   A.    Ever?

24   Q.    I apologize.  As it relates to this specific issue,

25         the RFP for facial recognition?



John Fennessey
09/26/2022

1   A.   Not that I recall.

2   Q.   You ever heard of a person by the name Tawana Petty?

3   A.   I have not.  Well, aside from you mentioned her name

4        earlier.

5   Q.   Right.  What is your understanding from your, NIST,

6        N-I-S-T, right -- what is your understanding of how

7        it is that there is this inherent bias as it relates

8        to the identification of persons of color?

9   A.   My understanding is based on what type of

10       photographs they use to train the system.  They got

11       to teach the algorithm.  And then if you give it a

12       broader sample which has a wider range of people

13       from different ethnic backgrounds, there's not --

14       there's no inaccuracy -- the inaccuracy rate

15       decreases.

16  Q.   Right.  And stated another way, the samples that are

17       used are of the majority population, white people

18       essentially?

19  A.   I can't -- I know the companies have adjusted once

20       this issue was raised, but I don't -- I can't tell

21       you exactly what they used originally.

22  Q.   So you don't have a basis to disagree with what I am

23       saying, right?

24  A.   You said a bunch of stuff.  What I can say is at one

25       point I know they had a higher inaccuracy rate for



John Fennessey
09/26/2022                                    Page 18

1        people of different ethic backgrounds.

2    Q.    Why?

3    A.    Whether it's --

4    Q.    How come?

5              MR. CUNNINGHAM:  Let him answer.  Go

6        ahead, John.

7              THE WITNESS:  Whether it's, you know,

8        Middle Eastern, African-American or, you know, some

9        other ethnic background.  Once the companies became

10       aware of that, my understanding is they started

11       using a broader pool of photographs to train the

12       systems.

13   BY MR. ROBINSON:

14   Q.    Okay.  So you're not disputing the fact that prior

15       to what it is that you're alluding to, the

16       population of samples were pretty much narrowed to

17       white people and the biogenetics, basically white

18       males, correct?

19              MR. CUNNINGHAM:  Object.  That's a

20       compound question.

21   BY MR. ROBINSON:

22   Q.    Correct?

23   A.    I don't think biogenetics applies to facial

24       recognition, but the -- I cannot tell you which --

25       you have an algorithm behind each facial recognition



John Fennessey
09/26/2022                          Page 19

```
 1        system.  I cannot tell you exactly what the
 2        algorithms that were used by ID -- or DataWorks Plus
 3        rather, I can't tell you how those were trained.
 4        What I'm saying is generally in the industry, that's
 5        my understanding of what's going on.
 6   Q.   Okay.  So -- I'm sorry.
 7   A.   Yeah.  Someone would have to go back and find out
 8        what, I believe it was NEC which was the algorithm
 9        company, how they trained the algorithm that was in
10        place at that time.  You know, I'm speaking
11        generally about what's been going on in the
12        industry.  I cannot tell you exactly what ID Net --
13        DataWorks Plus, the algorithm they used, how that
14        was trained.  I think that may be kind of the
15        question you're asking.
16   Q.   So between yourself, Nick Giaquinto and Brad, what's
17        Brad's last name?
18   A.   Brad May.
19   Q.   May?  This discussion was never had between the
20        three of you, this discussion of what goes into the
21        algorithms and to avoid, you know, the inaccuracies
22        of people of color?
23   A.   Correct.
24   Q.   Right.
25   A.   I do not recall discussing that.
```



John Fennessey
09/26/2022                                    **Page 20**

1  Q.  And did you have discussions with DataWorks Plus,

2      the group?  You would have, right?

3  **A.  At the time of the purchase?**

4  Q.  Yeah, right, you would have?

5  **A.  Well, discussions or -- about the -- discussions**

6      **about some of --**

7  Q.  Purchasing, purchasing, you had discussions -- you

8      would have had discussions with DataWorks Plus

9      regarding the purchase of facial recognition

10     software, right?

11 **A.  As opposed to the lower -- because we're, I'm sorry,**

12     **the purchasing, yes, I spoke with them around**

13     **purchasing.  I don't recall ever speaking to anyone**

14     **from DataWorks Plus regarding having a less accurate**

15     **for, you know, minority populations or majority here**

16     **minority nationwide.**

17 Q.  Okay.  So, and that no person from DataWorks Plus

18     that you spoke to raised this issue with you,

19     correct?

20 **A.  Correct.  Of the issue of --**

21 Q.  Yeah, correct.

22 **A.   -- lower accuracy rates.**

23 Q.  Lower accuracy rates.  And are you still involved in

24     any way in a relationship to contract renewals by

25     the City of Detroit for facial recognition software



John Fennessey
09/26/2022

1      from DataWorks Plus?

2   A.    Yes.

3   Q.    Okay.  Since you came into the knowledge of NIST and

4         its appreciation for these inaccuracies that we're

5         talking about, have there been any discussions with

6         DataWorks Plus specific to any modifications in its

7         software -- its employment of their software in the

8         Detroit Police Department as it relates to this

9         specific issue of inaccuracies?

10  A.    I have not been part of any and I'm not aware of

11        any.

12  Q.    Okay, all right, all right, all right.  Now, as the

13        Department of Innovation and Technology, can you

14        give us a broad description of what your role is?

15  A.    Within the Department of Innovation and Technology

16        my current role is primarily working on writing RFIs

17        and working on some special projects.

18  Q.    What's an RFI?

19  A.    That's a request for information.  Either a request

20        for information or RFP where you're trying to

21        determine what's available in the marketplace.

22  Q.    Okay.  And based on your research you would make

23        recommendations for or against something?

24  A.    When I'm part of an RFP committee or RFI committee?

25  Q.    I don't know.



John Fennessey
09/26/2022

Page 22

1   A.      Yeah, I have been a voting member for selections of

2           different types of technology.

3   Q.      And if you were to come into information that would

4           say has the potential to be discriminatory as it

5           relates to citizens in the city of Detroit,

6           African-Americans and people of color, is that

7           something that should concern you and if you were to

8           make or not make a recommendation for purchase?

9   A.      When we're purchasing, we have standards that are

10          presented to us by the department of -- Office of

11          Contracting and Procurement, OCP.  And within those

12          parameters you always want to get the best product

13          for the City of Detroit.

14  Q.      And that is not an answer to my question.

15                  MR. ROBINSON:  Can you reread?

16                  (The pending question was

17                  read back by the reporter)

18                  THE WITNESS:  What I responded is, you

19          know, we have standards that are presented to us by

20          contracting procurement.  You know, I'm not going to

21          buy something that's going to be intentionally

22          discriminatory or recommend.  You know, I don't make

23          -- I'm not the only person making these decisions,

24          but that's -- I have not been confronted with that

25          question where someone -- you know, this product is,



1        you know, de facto discriminatory against anybody

2        with any background.

3    BY MR. ROBINSON:

4    Q.   But it would be certainly information that would be

5         of concern to you if, in fact, you were to come into

6         that information?

7    A.   Yes.  You want to be fair but here we're talking

8         about a lower accuracy rate, not discriminatory.

9         So, you know, I -- like I said, I'm not going to --

10   Q.   Okay, you're opening up a can of worms on that one.

11        A lower accuracy rate but not discriminatory, how do

12        you reconcile that?

13   A.   One's more of a scientific thing.  You know, it's

14        just -- that's -- the readings I have done say that

15        the algorithms for many of the vendors, there's

16        probably like 100, 200 different vendors who make

17        facial recognition algorithms, and some are of

18        higher accuracy with different populations.

19   Q.   And again, only information that you gave

20        consideration to at the time of purchase in 2016

21        would have been the NIST information; is that

22        correct?

23   A.   No.  At the time -- because it's an RFP, a request

24        for product, OCP, Office of Contract and Procurement

25        has a grid on the factors that we consider and give



John Fennessey
09/26/2022

Page 24

1   -- award points.  That's how the decision was made

2   to go with the DataWorks Plus over ID networks.  I

3   can't recall what, you know, the Office of Contract

4   and Procurement probably still have the -- have the

5   grid, but it's just, you know, just doesn't -- price

6   is always a factor, quality, solution.  You know,

7   sometimes the factors are like the -- you know, the

8   background of the people who are working on the

9   project, things like that.  But that's how -- that's

10  how purchasing is done.  It's just, you know, here's

11  the factors you consider, award points and then they

12  add them up, and that's how the contracts are

13  awarded.

14                  MR. ROBINSON:  Mark these two for me.

15                  (Deposition Exhibit Number 2 and

16                  3 were marked for identification)

17  BY MR. ROBINSON:

18  Q.    Now, with regard to the images that may be used to

19        -- images that are submitted, let's say, to the

20        facial recognition system for the Detroit Police

21        Department, were there discussions that you had

22        concerning image quality?

23  A.    Do you mean the photographs, the probe photographs

24        or do you mean the templates that are being matched

25        against?



John Fennessey
09/26/2022                                    Page 25

1    Q.    Well, let's do this.  Explain the process to me?

2    A.    The way the Detroit Police Department facial

3          recognition system works is all mugshots are

4          processed and kind of -- you know, they're digital

5          photographs, but the algorithm runs against those

6          images and creates like a template.  And then you

7          will take a probe photograph like someone from a

8          crime scene from a -- the party store or someone

9          takes -- gets a picture of something that happens.

10               You have that photograph is run against

11         the existing mugshot photographs.  And that -- what

12         the system will do is say, I have this probe

13         photograph which I digitized and ran the algorithm

14         against, and it looks for the closest match or

15         matches within the existing mugshot photographs.

16   Q.    So the probe photograph or the probe image, the

17         quality of the probe image in and of itself, what is

18         the ideal situation there?

19   A.    The higher resolution, the better.  I can't recall

20         the exact figures, but for facial recognition you

21         want to have a certain number of pixels.  It's the

22         instantaneous field of view where pixels on target

23         which is like the number of pixels that are made up

24         of -- I can't recall the exact numbers, but the

25         higher the better.


HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO   313.567.8100

John Fennessey
09/26/2022
Page 26

1    Q.    When you increase an image, then that decreases the

2          pixelation?

3    A.    **When you say increase, what do you mean?**

4    Q.    I mean, when you blow something up.  You blow an

5          image up, don't you decrease the pixelation?

6    A.    **The number of pixels are set at the time the image**

7          **is captured.  When you zoom in on a picture you're**

8          **seeing -- you're more likely to see pixelization,**

9          **which means you're seeing more individual pixels.**

10         **So it's not -- the zooming in doesn't pixelate it.**

11         **It's just you have an existing -- you have a picture**

12         **that's, let's say, 1080p which is kind of like a**

13         **standard pixelization.  If you zoom in on it you'll**

14         **see more pixels, but even the highest resolution**

15         **photographs, if you zoom in close enough you'll see**

16         **pixels.  That's just what pictures are made of -- or**

17         **digital pictures, rather.**

18   Q.    When you increase the image don't you lose some of

19         the -- some of the -- something?

20   A.    **No.**

21   Q.    The image quality?

22   A.    **No, the image is made up of pixels.  You have --**

23         **it's taken with a certain pixelization.  Like you**

24         **have 1080p, you've got 2k.  As you get more pixels**

25         **you can zoom in closer before you see or, you know,**


HANSON RENAISSANCE
COURT REPORTERS & VIDEO    hansonreporting.com
313.567.8100

John Fennessey
09/26/2022

1    when you can get in close with the picture before

2    you see pixelization.  It's kind of whatever you

3    take is what you get and then --

4  Q.   So are you saying that if we were to blow this image

5        up here --

6  A.   I can't see it.

7  Q.   That image up here, to the size of that

8        eight-and-a-half by eleven page, you're saying you

9        wouldn't lose quality?

10 A.   Yeah, I'm looking at --

11 Q.   Plaintiff's Exhibit Number 3?

12 A.   -- Plaintiff's Exhibit 3.

13 Q.   And you're looking at the middle photograph in that

14       imagery.  Are you saying that if you were to blow

15       that let's say, inch-and-a-half by inch-and-a-half

16       photograph up to eight-and-a-half by eleven, the

17       size of that piece of paper, that you wouldn't lose

18       quality?

19 A.   What I'm saying is the picture would be the same,

20       but you're going to have -- you're -- because you're

21       blowing it up the pixels will be -- the individual

22       pixels will be larger, so more readily apparent.

23 Q.   Okay.  The image quality is going to change, yes or

24       no?

25 A.   No.



John Fennessey
09/26/2022                                    Page 28

1   Q.    Okay.  What would change?

2   A.    **Because you're enlarging each individual pixels --**

3         **pixel, the pixels would be more readily apparent.**

4   Q.    Well would they be bigger?  Would they be, you know

5         -- would the focus be less or something?  It would

6         have to change.

7   A.    **No.  The focus, you know -- the focus of when the**

8         **picture was taken would be whatever the focus of the**

9         **camera was at that time.  Because you're expanding**

10        **the size of the picture, the individual pixels**

11        **become more readily apparent to you.**

12  Q.    So how does that change the image at all?  How does

13        that change the quality of the image of what you're

14        using.  You've got to -- I mean it's like, you know,

15        it's like I'm not smart like you, you know, I'm

16        struggling here, so you got to give it to me.

17              MR. CUNNINGHAM:  Tell him what a pixel

18        is.

19              **THE WITNESS:  A pixel is like -- when I**

20        **say 1080P, it's like 1080 --**

21  BY MR. ROBINSON:

22  Q.    Let's not be technical.  Let's just be real.  You

23        blow a photograph up, it changes, it changes the

24        quality?

25              MR. CUNNINGHAM:  He's trying --



John Fennessey
09/26/2022                              Page 29

1                     MR. ROBINSON:  Hold on.

2    BY MR. ROBINSON:

3    Q.    It changes something in the quality, the image.

4          What you see is different than what you originally

5          had, yes or no?

6    A.    No.

7    Q.    Okay.  It just makes it bigger.  Does it make it

8          bigger and better?

9    A.    An analogy, like a non-technical analogy.  It's like

10         when you get really close on a newspaper, you can

11         see the individual dots when you print something.

12         Monet's paintings are the same way.  You know, from

13         a distance I see, you know, we both been in the DIA,

14         I'm sure you know, you see the -- it's a river side.

15         You get up close and there's the individual dots and

16         it's exactly the same thing with a picture.  By --

17         you're not really enlarging -- you're making the

18         picture -- you're essentially getting -- by

19         expanding it like, let's say you had a picture and

20         you pasted it in a word document and you make it

21         bigger and the resolution decreases.

22                    You're just getting a -- you're seeing

23         more of the individual pixels.  Same image, it's

24         just you're changing how close you are to it, in

25         essence.



John Fennessey
09/26/2022

Page 30

1   Q.   You're changing something, right?

2   A.   **Just the size.**

3   Q.   Your testimony, right, your size, right, whatever.

4        Your testimony is that that image quality is the

5        exact same; that if you were to increase

6        one-and-a-half by one-and-a-half image in that

7        middle page in Plaintiff's Exhibit Number 3, the

8        eight-and-a-half by eleven and then you submitted

9        that eight-and-a-half by eleven as a probe image,

10       that's okay because it didn't change anything,

11       that's your testimony?

12  A.   **No, that's like a different scenario.  If you took a**

13       **photograph, pasted it into a word document,**

14       **stretched it and saved that image and submitted it,**

15       **that's an entirely different image.**

16  Q.   That's what I'm talking about.  That's exactly what

17       I'm talking about.

18  A.   **Right, well that's -- with facial recognition you**

19       **want to have the best quality photograph.  I don't**

20       **believe that anyone at the Detroit Police Department**

21       **or anywhere is pasting a picture in a word document,**

22       **stretching it out, taking, saving that image and**

23       **then submitting it.**

24  Q.   How do you know?

25  A.   **Someone, somewhere could be thoughtless enough to do**



John Fennessey
09/26/2022

Page 31

1  that, but I would be very surprised.

2  Q.  How about Mr. Dablitz?

3  A.  I don't know what his practices are.

4  Q.  Because he's given testimony that he blew up that
5  image?

6  A.  I'm looking at Exhibit 3, there's original image,
7  there's an inquiry image, and what I see was he
8  cropped that picture as opposed to made it bigger.

9  Q.  You're not going to dispute what Mr. Dablitz said in
10  his deposition, are you?

11  A.  I don't know what he said.

12  Q.  Okay.

13  A.  But looking at these images, there's the original
14  image which was a photograph -- looked like a
15  photograph from inside of a car.  Then a cropped
16  image which appears to be the same photograph.

17  Q.  It looks like part of the forehead is cropped off
18  too, right?

19  A.  No, it looks like the young man is fortunate enough
20  to still have all his hair, so I can't see where his
21  forehead is.

22  Q.  Do you see --

23  A.  Oh, yeah, you're right, you're right, that's the
24  car.

25  Q.  Right.  It's cut off, correct?



John Fennessey
09/26/2022                                    Page 32

1   A.   Yes, because the first image he's -- it looks like

2        it's taken inside of a vehicle and the upper portion

3        of the window cropped off the -- I can't tell if

4        it's his hairline or slightly below his hairline.

5   Q.   Okay.  And if you look at the ears, don't the top of

6        those ears kind of point out to you, on this image

7        in the middle, the top of the ears?

8   A.   The --

9   Q.   Kind of like your ears.

10  A.   -- yeah, the -- what I can tell you is he had his

11       head at an angle, and so you can see both of his

12       ears.

13  Q.   Don't the ears right at the top crop out like yours?

14  A.   Crop out or stick out?

15  Q.   Stick out, just like yours.

16  A.   I'd have to think about -- I'd have to -- I'm not

17       trying to be silly, but I'd have to look at my ears.

18       I've never really been that self-conscious.  But,

19       no, his -- I will be self-conscious in the future, I

20       will admit that.

21  Q.   Take a look.

22  A.   I will take my phone and reverse it.

23  Q.   So your ears crop out at the top?

24  A.   Stick out or crop out?

25  Q.   Whichever way you want to look at it.  They're not



John Fennessey
09/26/2022                                    Page 33

```
 1            like tucked into your -- to the side of your head
 2            just like his, right?
 3     A.     I don't want to pick on this fellow, but I think his
 4            ears stick out a little bit more, but his head's at
 5            an angle.
 6     Q.     How about these ears on this guy, do those ears crop
 7            out?
 8     A.     I'm looking at Exhibit --
 9     Q.     2?
10     A.     -- 2, which appears to be a photo line-up.
11     Q.     And you're looking at the second row?
12     A.     I'm looking at -- this is a six-pack with six
13            photographs.  I would say number 5, which is a
14            head-on photo.
15     Q.     The ears look like they're tucked in more, right?
16     A.     I'm comparing a photograph where his head's at an
17            angle to a photograph where the head's straight
18            ahead.  So, I can't tell you.  The photos are not
19            the same.  They're dissimilar in the angles.
20     Q.     I'm just talking about the ears.
21     A.     Yeah, if you turn your head at an angle, your ears
22            are going to stick out more readily apparent than a
23            straight on photograph.
24     Q.     Mr. Fennessey, I'm looking at you right now, and if
25            you turn profile your ears would still stick out
```



John Fennessey
09/26/2022

1       like that, okay.  And I'm not talking about your

2       ears, my ear lobes are funny, people tell me.

3       That's just human characteristics.  Those aren't the

4       biometrics that these algorithms are supposed to be,

5       you know, looking at, true, yes or no?

6    A.    **The facial recognition algorithms do not look at the**

7          **ears.**

8    Q.    By whom?

9    A.    **Biometric, biometric --**

10   Q.    That's not true, that's not true, they look at your

11         whole face.

12   A.    **Based on my understanding of facial recognition**

13         **algorithms is they do not look at yours ears.  Ears**

14         **are not biometrically certain identifier.  Biometric**

15         **identifiers are things like fingerprints, retinal**

16         **scans, DNA, where you're using someone's biometric**

17         **-- something that's fixed to identify somebody.  So**

18         **facial recognition, and I may be misusing the term.**

19         **I don't believe that's a biometric certain**

20         **identification.**

21   Q.    What about the human ability of just examining, just

22         observing?  I mean that's part of this whole thing

23         too, isn't it, to identify a person?  Because if the

24         ears are different, then that should clue you in to

25         maybe it's a different person, right?  Shouldn't

John Fennessey
09/26/2022                                          Page 35

1    that work -- are you saying that if you're talking

2    about facial recognition that you're supposed to

3    cancel out, you know, the human ability to call

4    distinctions between differences, yes or no?

5    **A.    Couple different things raised there.  One is like**

6    **people recognizing each other is one thing.  Facial**

7    **recognition technology, based on my understanding of**

8    **it, does not rely on ears.  Ears at one point were**

9    **relied on by and going back in my history here, some**

10   **French guy back in the 1800's thought you could use**

11   **ears to uniquely identify people.  But everyone**

12   **stopped using that by the 20th century,**

13   **19th century.**

14   Q.   You can go to facial recognition and I mean, and the

15        biometrics and so forth of ears.  My question went

16        to human, you know, propensity, the propensity to

17        examine two different pictures and make visual

18        comparisons based on, you know, the skills of what

19        our eyeballs afford us.  And when you look at those

20        two pictures, the ears are different regardless of

21        the angle as you tried to indicate.

22             MR. CUNNINGHAM:  That's not a question.

23             MR. ROBINSON:  And that's a question.

24             MR. CUNNINGHAM:  That is not a question.

25        It's a statement.



John Fennessey
09/26/2022

Page 36

1    BY MR. ROBINSON:

2    Q.    Isn't that true?

3    A.    No, when I looked at the inquiry image on Exhibit 3,

4          you have someone's head is at an angle in an upward

5          tilt.  When I look plaintiff's Exhibit Number 2,

6          image number five and the six-pack, you have someone

7          who's got a straight-on photograph where there's no

8          tilt or angle.

9    Q.    Would you allow me in this deposition to take your

10         photograph?

11   A.    I prefer you don't.

12                 MR. CUNNINGHAM:  Let's not do that, Dave.

13   BY MR. ROBINSON:

14   Q.    All right, but I want to see your ears, I want to

15         see how your ears are cropped out.  Will you allow

16         me to do that, Mr. Fennessey?

17                 MR. CUNNINGHAM:  No, no, his ears are not

18         in evidence in this case.

19                 MR. ROBINSON:  His testimony is.

20                 MR. CUNNINGHAM:  Yes, so ask him

21         questions.

22                 MR. ROBINSON:  I'm asking him questions,

23         would you allow me to do that, yes or no?

24                 MR. CUNNINGHAM:  No.

25                 THE WITNESS:  I prefer not to have my



1    image taken.

2            MR. ROBINSON:  All right.  I don't have

3    anything else.

4            MR. CUNNINGHAM:  I don't have any

5    questions.  E. trans.

6            MR. ROBINSON:  E trans.

7            (Deposition concluded about 11:01 A.M.)

8            —       —       —

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



John Fennessey
09/26/2022

1  CERTIFICATE OF NOTARY PUBLIC - COURT REPORTER

2            I do certify that the attached

3  deposition was taken before me in the above-entitled

4  matter; that the witness was first sworn to testify

5  the truth; that the testimony contained herein was

6  by me reduced to writing in the presence of the

7  witness by means of stenography, and afterwards

8  transcribed upon a computer.  The attached pages are

9  a true and complete transcript of the testimony and

10  proceedings.

11            I do further certify that I am not

12  connected by blood or marriage with any of the

13  parties, their attorneys or agents, and that I am

14  not an employee of either of them, nor interested,

15  directly or indirectly, in the matter of

16  controversy.

17            IN WITNESS WHEREOF, I have hereunto set

18  my hand and affixed my notarial seal at West

19  Bloomfield, Michigan, County of Oakland, this 8th

20  day of October 2022.

21

22  Theresa L. Roberts, CSR

23  Certified Shorthand Reporter - CSR-4870

24  Notary Public - Oakland County, MI

25  My commission expires 10-4-2027

John Fennessey
09/26/2022

1

| 1 | A | |
|---|---|---|

**1** 4:3,9 6:13,17 7:12

**100** 23:16

**1080** 28:20

**1080p** 26:12,24 28:20

**10:08** 3:3

**11:01** 37:7

**18** 14:15

**1800's** 35:10

**19th** 35:13

**2**

**2** 24:15 33:9,10 36:5

**200** 23:16

**2016** 11:22 14:10,14,18 23:20

**2017** 14:15

**2022** 3:2

**20th** 35:12

**26** 3:2

**2k** 26:24

**3**

**3** 24:16 27:11,12 30:7 31:6 36:3

**30** 4:10

**30(b)(6)** 6:10

**34** 4:11

**5**

**5** 33:13

**8**

**80** 16:11

**A**

**A.M.** 3:3 37:7

**ability** 34:21 35:3

**Account** 5:14

**accuracy** 5:10,19,24 9:2,6, 11 10:22 11:14 14:5 20:22,23 23:8,11,18

**accurate** 20:14

**accurately** 14:25

**activity** 16:7

**add** 24:12

**address** 11:12 13:6,8,11

**addressing** 14:14

**adjusted** 17:19

**admit** 32:20

**adopted** 15:4

**adopting** 6:3

**advocacy** 16:14,19

**advocates** 5:23

**afford** 35:19

**African-american** 18:8

**African-americans** 22:6

**agencies** 9:15

**agents** 5:22

**ahead** 18:6 33:18

**algorithm** 14:2 17:11 18:25 19:8,9,13 25:5,13

**algorithms** 13:25 16:16 19:2, 21 23:15,17 34:4,6,13

**alluding** 18:15

**analogy** 29:9

**angle** 32:11 33:5,17,21 35:21 36:4,8

**angles** 33:19

**apologize** 16:24

**apparent** 27:22 28:3,11 33:22

**appears** 31:16 33:10

**application** 4:20 8:9 10:6

**applies** 18:23

**apply** 3:12

**appreciation** 21:4

**apprising** 5:7

**arrest** 16:2

**arrestees** 14:21

**asks** 8:25

**attend** 16:21

**attorney** 11:17

**Attorney/client** 13:16

**auspices** 15:15

**avoid** 19:21

**award** 24:1,11

**awarded** 24:13

**aware** 8:18 9:14 11:16 13:21, 22 15:6 16:13,19 18:10 21:10

**B**

**back** 4:2 12:2 14:17 19:7 22:17 35:9,10

**background** 18:9 23:2 24:8

**backgrounds** 17:13 18:1

**based** 13:25 16:16 17:9 21:22 34:12 35:7,18

**basically** 18:17

**basis** 5:24 13:14 17:22

**bias** 11:12 16:17 17:7

**biases** 13:22

**bid** 7:16 12:11

**bigger** 28:4 29:7,8,21 31:8

**biogenetics** 18:17,23

**biometric** 34:9,14,16,19

**John Fennessey**
**09/26/2022**

biometrically 34:14

biometrics 34:4 35:15

bit 33:4

blew 31:4

blow 26:4 27:4,14 28:23

blowing 27:21

board 5:20 16:21

box 12:23

Brad 12:2 19:16,18

Brad's 19:17

bring 6:16 7:10 8:25

broad 21:14

broader 17:12 18:11

bunch 17:24

buy 22:21

---
**C**

call 35:3

camera 28:9

cancel 35:3

capacity 6:22

captured 26:7

car 31:15,24

case 3:22,24 12:24 36:18

century 35:12,13

change 27:23 28:1,6,12,13
30:10

changing 29:24 30:1

channels 13:9

characteristics 34:3

chief 15:16,17

chronologically 5:2 7:1

citizens 22:5

city 4:6,13 5:24 6:2 9:3 13:7
15:19 16:11,15 20:25 22:5,13

Civil 4:10

close 26:15 27:1 29:10,15,24

closer 26:25

closest 25:14

clue 34:24

color 4:22 5:10,17,19,25 8:11
9:2,7,12 10:7,24 11:14 13:24
14:6,22,25 16:11,18 17:8
19:22 22:6

commander 12:5

comments 6:2

commissioner 5:21 16:21

committee 9:22 11:24,25
21:24

communications 5:12

companies 12:11,14 17:19
18:9

company 4:21 8:10 19:9

comparing 33:16

comparisons 35:18

competitively 7:16

compound 18:20

comprehensive 12:22

concern 5:15 22:7 23:5

concerns 5:8

concluded 37:7

confronted 22:24

consequence 15:5

consideration 5:15 14:20
15:3,4 16:9 23:20

contract 20:24 23:24 24:3

contracting 22:11,20

contracts 24:12

control 13:2

corporation 6:20

correct 3:17 8:22,23 9:13 14:7

15:20 16:3,4,5,6 18:18,22
19:23 20:19,20,21 23:22
31:25

correctly 3:16

counsel 6:20

Couple 35:5

created 13:25

creates 25:6

crime 25:8

crop 32:13,14,23,24 33:6

cropped 31:8,15,17 32:3
36:15

CROSS-EXAMINATION 3:13

Cunningham 6:8,21 7:3 8:4
9:19 13:6,11,12,16 18:5,19
28:17,25 35:22,24 36:12,17,
20,24 37:4

current 21:16

cut 31:25

cybersecurity 12:4

---
**D**

Dablitz 31:2,9

Dataworks 4:15 5:1,13 6:25
12:13 16:8 19:2,13 20:1,8,14,
17 21:1,6 24:2

Dataworks' 4:20 6:3 8:9

dates 5:2 7:1

Dave 6:9 7:3 36:12

de 23:1

decision 24:1

decisions 22:23

decrease 26:5

decreases 17:15 26:1 29:21

demonstrating 6:2

demonstrations 12:15

demos 12:11

department 5:7 7:14,22 9:1,
13,16 12:21 13:9 14:20 15:8,
9,13,15,22,24,25 21:8,13,15
22:10 24:21 25:2 30:20

Department/city 5:13

depending 14:3

deployment 4:23 5:1 6:24

deponent 4:11

deposition 3:10 4:3,9,12 6:10
13:5 24:15 31:10 36:9 37:7

description 21:14

designated 4:6,12

designee 8:1 9:3

determine 21:21

Detroit 3:1 4:7,13,19 5:6,12,
13,24 7:6,14 8:8 9:1,3,13,15
14:20 15:8,19,21,24 16:16
20:25 21:8 22:5,13 24:20 25:2
30:20

DIA 29:13

differences 35:4

digital 25:4 26:17

digitized 25:13

directed 4:11 13:4

directives 4:24 5:3 6:23 7:2

director 12:3

disagree 17:22

discriminatory 22:4,22 23:1,8,
11

discussing 19:25

discussion 19:19,20

discussions 12:8 20:1,5,7,8
21:5 24:21

dispute 31:9

disputing 18:14

dissimilar 33:19

distance 29:13

distinctions 35:4

DNA 34:16

doc 10:3

document 29:20 30:13,21

John Fennessey
09/26/2022

documentation 7:6,6 9:16,18

documents 4:16 5:22 6:1 8:15
9:9

dots 29:11,15

DPD 5:18 7:6,21,24 9:6 15:1

DPD/CITY 4:19 7:6 8:8

duces 4:9

duly 3:6

---

**E**

ear 34:2

earlier 17:4

ears 32:5,6,7,9,12,13,17,23
33:4,6,15,20,21,25 34:2,7,13,
24 35:8,11,15,20 36:14,15,17

Eastern 18:8

eight-and-a-half 27:8,16 30:8,
9

eleven 27:8,16 30:8,9

elucidation 9:20

email 12:9,23 13:2

emails 5:11 12:16,20

Emergency 15:25

employment 8:12 21:7

EMS 15:25

enlarging 28:2 29:17

essence 29:25

essentially 17:18 29:18

ethic 18:1

ethnic 17:13 18:9

everyone's 12:23

evidence 5:15 36:18

exact 25:20,24 30:5

examine 35:17

examined 3:8

examining 34:21

exchanges 12:9,16

Executive 5:14

Exhibit 4:3,9 6:13,17 7:12
24:15 27:11,12 30:7 31:6 33:8
36:3,5

existing 25:11,15 26:11

expanding 28:9 29:19

Explain 25:1

exposed 11:11,12

eyeballs 35:19

---

**F**

face 34:11

facial 4:14,20 5:1,8,23 6:25
8:9 10:6,23 11:13 13:23 14:1,
12,21 16:8,10,15,20,25 18:23,
25 20:9,25 23:17 24:20 25:2,
20 30:18 34:6,12,18 35:2,6,14

fact 16:16 18:14 23:5

facto 23:1

factor 14:15 24:6

factors 23:25 24:7,11

fair 23:7

falls 15:15

familiar 15:1

Federal 4:10

fellow 33:3

Fennessey 3:15,17 6:6,9,12
33:24 36:16

field 25:22



4

figures 25:20

find 19:7

fingerprints 34:15

finish 7:4

Fire 15:24

fixed 34:17

Flyball 12:12

focus 28:5,7,8

forehead 31:17,21

fortunate 31:19

found 13:1

frame 11:2

Francis 3:19

French 35:10

FRVT 14:13

funny 34:2

future 32:19

**G**

gave 23:19

generally 19:4,11

Giaquinto 12:4 19:16

give 8:5,15,19 17:11 21:14
23:25 28:16

grid 23:25 24:5

group 20:2

groups 16:14,19

guy 33:6 35:10

**H**

hair 31:20

hairline 32:4

Hall 5:14

hand 6:5

handled 13:8

head 32:11 33:1,21 36:4

head's 33:4,16,17

head-on 33:14

heard 17:2

held 12:20

higher 17:25 23:18 25:19,25

highest 26:14

history 35:9

Hold 29:1

Homeland 16:1

human 34:3,21 35:3,16

**I**

ID 12:13 19:2,12 24:2

ideal 25:18

identification 4:4 10:23 14:5
16:17 17:8 24:16 34:20

identifier 34:14

identifiers 34:15

identify 34:17,23 35:11

identifying 5:10,16,19,25 9:2,
7,11 11:13 14:25

image 24:22 25:16,17 26:1,5,
6,18,21,22 27:4,7,23 28:12,13
29:3,23 30:4,6,9,14,15,22
31:5,6,7,14,16 32:1,6 36:3,6
37:1

imagery 27:14

images 24:18,19 25:6 31:13

implementation 16:15

inaccuracies 19:21 21:4,9

inaccuracy 10:23 17:14,25

inch-and-a-half 27:15

include 16:9

increase 26:1,3,18 30:5

independent 5:18 7:6,21 9:1,
6,9,12,15 10:20,22

individual 15:23 26:9 27:21
28:2,10 29:11,15,23

industry 14:23 19:4,12

information 5:15 11:3 15:16,
17 21:19,20 22:3 23:4,6,19,21

inherent 11:12 13:22 17:7

inherently 16:17

initial 4:23 8:12

innovation 7:22 12:21 13:10
15:9,13,23 21:13,15

inquiry 31:7 36:3

inside 31:15 32:2

instantaneous 25:22

Institute 10:19

instructional 5:6

intentionally 22:21

interacting 15:21

internal 15:2

investigate 4:19 8:8

investigation 9:14

investigators 5:7

involved 10:21 12:1 20:23

involvement 10:9

issuance 5:3 7:1

issue 4:22 7:25 8:11 10:22
16:24 17:20 20:18,20 21:9

issued 5:4

**J**

John 3:17 18:6

**K**

keeper 12:20

kind 7:17 11:6 12:6 19:14 25:4

John Fennessey
09/26/2022

5

26:12 27:2 32:6,9

knowledge 14:19 15:3,4 16:2
21:3

knowledgeable 4:13 8:2

_____

**L**

larger 27:22

lawyer 13:6,7

Lawyers 11:20

learn 14:8

letters 5:11 6:10

limitations 11:11

line-up 33:10

literature 11:4

lobes 34:2

looked 11:7 31:14 36:3

lose 26:18 27:9,17

lot 9:24

lower 14:4 20:11,22,23 23:8,
11

_____

**M**

made 13:22 16:13 24:1 25:23
26:16,22 31:8

majority 17:17 20:15

make 21:22 22:8,22 23:16
29:7,20 35:17

makes 29:7

making 22:23 29:17

males 18:18

man 31:19

manager 15:12

manual 4:25 5:3 6:23

Mark 24:14

marked 4:4,8 24:16

marketplace 21:21

match 25:14

matched 24:24

matches 25:15

material 5:5,6

materials 5:17,19 9:4 13:5

matter 8:3

mayor 15:18

means 26:9

meant 7:4,5

Medical 15:25

meetings 12:8 16:22

member 22:1

mentioned 17:3

met 3:20

Michael 16:3

Michigan 3:1

middle 3:18 18:8 27:13 30:7
32:7

minority 20:15,16

misidentification 4:22 8:11
13:24

missed 9:25

mistake 7:5

misusing 34:18

modifications 21:6

Monday 3:2

Monet's 29:12

mugshot 25:11,15

mugshots 25:3

_____

**N**

N-I-S-T 17:6

narrowed 18:16

National 10:19

nationwide 20:16

NEC 19:8

Net 19:12

networks 12:13 24:2

newspaper 29:10

Nick 12:4 19:16

NIST 10:17,18 11:7 14:11 17:5
21:3 23:21

non-technical 29:9

nonresponsive 12:12

notice 3:11 4:9 6:7 12:25 13:4

number 4:3,9 6:6 24:15 25:21,
23 26:6 27:11 30:7 33:13
36:5,6

numbers 25:24

_____

**O**

oath 3:8

Object 18:19

observing 34:22

occurring 11:16

OCP 22:11 23:24

Office 22:10 23:24 24:3

officer 15:16,17

Oliver 16:3

One's 23:13

one-and-a-half 30:6

opening 23:10

opponents 5:8

opposed 16:19 20:11 31:8

opposing 5:23

order 9:4

original 31:6,13

originally 17:21 29:4

outlined 4:16

John Fennessey
09/26/2022

6

**P**

paintings 29:12

paper 27:17

paragraph 7:12 9:5,22

paragraphs 9:20

parameters 22:12

Parnell 3:22,24

part 9:22 15:19 21:10,24 31:17 34:22

party 25:8

pasted 29:20 30:13

pasting 30:21

pending 22:16

people 4:22 8:11 10:6 13:24 14:6 16:11,18 17:12,17 18:1,17 19:22 22:6 24:8 34:2 35:6,11

percent 16:11

person 4:12 8:2 17:2 20:17 22:23 34:23,25

persons 5:10,16,19,25 9:2,7,11 10:24 11:14 14:25 17:8

perspective 12:7

Petty 5:21 17:2

phone 32:22

photo 33:10,14

photograph 25:7,10,13,16 27:13,16 28:23 30:13,19 31:14,15,16 33:16,17,23 36:7,10

photographs 17:10 18:11 24:23 25:5,11,15 26:15 33:13

photos 33:18

pick 33:3

picture 25:9 26:7,11 27:1,19 28:8,10 29:16,18,19 30:21 31:8

pictures 26:16,17 35:17,20

piece 27:17

pixel 28:3,17,19

pixelate 26:10

pixelation 26:2,5

pixelization 26:8,13,23 27:2

pixels 25:21,22,23 26:6,9,14,16,22,24 27:21,22 28:2,3,10 29:23

place 19:10

plaintiff's 4:8 27:11,12 30:7 36:5

point 17:25 32:6 35:8

points 24:1,11

police 5:7,12,20 7:14 9:1,13,15 12:4 14:20 15:8,22,24 16:21 21:8 24:20 25:2 30:20

policy 4:25 6:23

pool 18:11

population 17:17 18:16

populations 20:15 23:18

portion 32:2

position 15:7

positive 10:17

potential 22:4

practices 31:3

pre-investigation 4:14

prefer 36:11,25

present 14:19

presented 10:9 22:10,19

pretty 18:16

price 24:5

primarily 11:7 21:16

print 29:11

prior 4:22 7:14 8:11 18:14

privilege 13:17

probe 24:23 25:7,12,16,17 30:9

Procedure 4:10

process 25:1

processed 25:4

processes 14:21 15:2 16:10,13

procurement 22:11,20 23:24 24:4

produce 4:11,18 7:5 8:6,7,15,20 9:4

produced 8:5 12:18

product 7:16 10:13 12:10,14 22:12,25 23:24

profile 33:25

project 24:9

projects 21:17

pronounce 3:15

propensity 35:16

provide 6:1 9:10,20,21 13:4

provided 5:6,22 6:7 12:25 13:3

provisions 4:25 5:3 6:24

public 6:2 7:22 12:3

purchase 4:14,23 6:19 7:15 8:12 10:12,25 11:20,24 20:3,9 22:8 23:20

purchasing 7:17 11:15 12:6,7 20:7,12,13 22:9 24:10

purposes 3:12

pursuant 3:11 4:10 8:1

**Q**

quality 24:6,22 25:17 26:21 27:9,18,23 28:13,24 29:3 30:4,19

question 6:12 8:19 13:13 18:20 19:15 22:14,16,25

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

John Fennessey
09/26/2022

7

35:15,22,23,24

questions  4:7 36:21,22 37:5

---

**R**

raised  17:20 20:18 35:5

ran  25:13

Randy  5:14

range  17:12

rate  14:5 17:14,25 23:8,11

rates  20:22,23

read  4:8 14:3 22:17

readily  27:22 28:3,11 33:22

readings  23:14

real  28:22

recall  12:6 14:9,13 17:1 19:25
    20:13 24:3 25:19,24

received  6:3

recognition  4:15,21 5:1,9,23
    6:25 8:10 10:6,23 11:13 13:23
    14:1,12,21 16:8,10,15,20,25
    18:24,25 20:9,25 23:17 24:20
    25:3,20 30:18 34:6,12,18
    35:2,7,14

recognizing  35:6

recommend  22:22

recommendation  22:8

recommendations  21:23

reconcile  23:12

record  6:9 8:3 13:19

records  12:20

regard  5:16 7:10 24:18

related  9:17

relates  5:9 9:11 10:24 11:13
    14:24 16:7,17,24 17:7 21:8
    22:5

relationship  20:24

relative  8:20 13:24

relied  4:19 7:6,14 8:8 35:9

rely  9:24 35:8

renewals  20:24

reporter  22:17

reports  7:4,17

request  7:16 8:2,5,16,21
    10:12,13 21:19 23:23

requested  6:17,18

reread  22:15

research  5:18 7:7,21 9:1,6,10,
    12 10:22 21:22

resolution  25:19 26:14 29:21

responded  12:14 22:18

response  8:5

retinal  34:15

return  12:23

reverse  32:22

RFI  21:18,24

RFIS  21:16

RFP  7:15,16 9:22 10:13,21
    12:7 16:7,13,25 21:20,24
    23:23

righty  4:6

river  29:14

Robert  16:5

ROBINSON  3:10,14 4:5 6:11
    7:8,9 13:14,18,20 18:13,21
    22:15 23:3 24:14,17 28:21
    29:1,2 35:23 36:1,13,19,22
    37:2,6

role  15:22 21:14,16

row  33:11

rules  3:12 4:10

run  25:10

running  12:7

runs  25:5

---

**S**

safety  7:23 12:3

sample  17:12

samples  17:16 18:16

saved  30:14

saving  30:22

scans  34:16

scenario  30:12

scene  25:8

scientific  23:13

search  12:22

section  7:23

Security  16:1

selections  22:1

self-conscious  32:18,19

Senior  5:14

September  3:2

Services  15:25

set  26:6

shortcomings  14:24

side  29:14 33:1

silly  32:17

sir  6:15 15:14

situation  25:18

six-pack  33:12 36:6

size  27:7,17 28:10 30:2,3

skills  35:18

slightly  32:4

smart  28:15

software  4:15,21,24 5:2 6:25
    8:10,13 14:2 16:8,9 20:10,25
    21:7

solution  24:6

John Fennessey
09/26/2022

8

someone's 34:16 36:4
speak 6:9 11:5 13:21
speaking 19:10 20:13
special 21:17
specific 4:7,21 8:10,16 16:24 21:6,9
specifically 15:22
spoke 20:12,18
standard 26:13
standards 9:25 10:19 14:12 15:2 22:9,19
started 18:10
state 6:8
stated 17:16
statement 35:25
stick 32:14,15,24 33:4,22,25
stop 7:3
stopped 35:12
store 25:8
straight 33:17,23
straight-on 36:7
stretched 30:14
stretching 30:22
struggling 28:16
studies 4:18 7:5,13 8:7,17,20 10:1,3,4,5,8,10,11,14 11:6 13:23
stuff 17:24
subject 8:3 15:21
submitted 24:19 30:8,14
submitting 30:23
Subsequent 14:18
support 4:16 8:6 9:5,9,20
supposed 34:4 35:2
surprised 31:1

suspects 14:22
sworn 3:6
system 14:24 17:10 19:1 24:20 25:3,12
systems 13:2 14:2,4 18:12

John Fennessey
09/26/2022

**T**

takes 25:9
taking 30:22
talk 6:22
talking 21:5 23:7 30:16,17 33:20 34:1 35:1
target 25:22
Tawana 5:21 17:2
teach 17:11
technical 28:22
technicians 14:1
technology 6:4 7:22 10:19 12:22 13:10 15:10,13,23 21:13,15 22:2 35:7
tecum 4:9
template 25:6
templates 24:24
term 7:17 34:18
test 14:13
testified 3:8
testimony 4:16 6:2 8:6,14,16, 20 9:4,8,10 11:1 30:3,4,11 31:4 36:19
text 12:16
texts 5:11 12:9
thing 23:13 29:16 34:22 35:6
things 9:25 24:9 34:15 35:5
thought 35:10
thoughtless 30:25
tilt 36:5,8

time 4:11 8:18 9:23 10:2,4,12, 25 11:2,15,20 12:3,5 14:14 19:10 20:3 23:20,23 26:6 28:9
times 9:24
today 8:14 9:8 11:1 13:21 15:7
top 32:5,7,13,23
train 17:10 18:11
trained 14:4 19:3,9,14
training 5:5
trans 37:5,6
transcripts 5:21
true 9:21 34:5,10 36:2
truth 3:7
tucked 33:1,15
turn 7:19 33:21,25
turned 6:20
type 17:9
types 22:2
Typically 12:20 13:8

**U**

unable 8:15
understand 10:15 13:3
understanding 9:23 14:23 15:5 17:5,6,9 18:10 19:5 34:12 35:7
uniquely 35:11
universal 10:11
universally 11:1,3,5
upper 32:2
upward 36:4
utility 4:20 8:9
utilized 16:10

John Fennessey
09/26/2022

9

| V | |
|---|---|

vehicle 32:2
vendor 14:12
vendors 23:15,16
view 25:22
visual 35:17
voting 22:1

| W | |
|---|---|

ways 4:2
Whichever 32:25
white 17:17 18:17
whomever 11:25
wider 17:12
Williams 16:5
window 32:3
word 29:20 30:13,21
work 15:9 35:1
worked 7:21
working 21:16,17 24:8
works 15:17 25:3
worms 23:10
writing 21:16
written 4:24 6:1,23

| Y | |
|---|---|

young 31:19

| Z | |
|---|---|

zoom 26:7,13,15,25
zooming 26:10

John Fennessey
09/26/2022



HANSON RENAISSANCE   Court Reporters & Video   hansonreporting.com   313.567.8100