Nathan James Lloyd Howell
08/23/2022                              30(b)(6)

1

UNITED STATES DISTRICT COURT

2

FOR THE EASTERN DISTRICT OF MICHIGAN

3

SOUTHERN DIVISION

4

5   MICHAEL OLIVER,

6                        Plaintiff,

7
                                    Case No. 20-cv-12711
8            -vs-
                                    Hon. Laurie J. Michelson
9   DONALD BUSSA, in his individual and

10  official capacity, and CITY OF

11  DETROIT, Jointly and Severally,

12                       Defendants.

13  _____/

14  PAGE 1 to 65

15

16      The Deposition of NATHAN JAMES LLOYD HOWELL as the

17      30(b)(6) Designee of the City of Detroit,

18      Taken at 2 Woodward Avenue, Suite 500,

19      Detroit, Michigan,

20      Commencing at 10:13 a.m.

21      Tuesday, August 23, 2022

22      Before Cynthia Ann Chyla, RPR, CSR, 0092.

23

24

25



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

```
 1   APPEARANCES:

 2   MR. DAVID A. ROBINSON   P38754

 3   Robinson & Associates, P.C.

 4   28145 Greenfield Road, Suite 100

 5   Southfield, Michigan   48076

 6   248-423-7234

 7   Davidrobinsonlaw@gmail.com

 8        Appearing on behalf of the Plaintiff.

 9

10   MR. PATRICK CUNNINGHAM   P67643

11   City of Detroit Law Department

12   2 Woodward Avenue, Suite 500

13   Detroit, Michigan   48226

14   313-237-6667

15   Cunninghamp@detroitmi.gov

16        Appearing on behalf of the Defendants.

17

18

19             *     *     *     *     *

20

21

22

23

24

25
```



Nathan James Lloyd Howell
08/23/2022

30(b)(6)
Page 3

1

TABLE OF CONTENTS

2   Witness

3   NATHAN JAMES LLOYD HOWELL                              Page

4   EXAMINATION BY MR. ROBINSON

5   EXAMINATION BY MR. CUNNINGHAM                            4

6                                                          62

7

8

INDEX TO EXHIBITS

9

(Exhibits attached to transcript)

10

11   Exhibit

12   DEPOSITION HOWELL EXHIBIT 1                             Page

13   Deposition notice                                        9

14   DEPOSITION HOWELL EXHIBIT 2

15   DPD Facial Recognition Direct Number 307.5              20

16   DEPOSITION HOWELL EXHIBIT 3

17   Training Directive Number 19-07, Use of Traffic         20

18   Light-Mounted Cameras and Facial Recognition

19   Technology

20

21

22

23

24

25

Nathan James Lloyd Howell
08/23/2022

30 (b) (6)
Page 4

1          Detroit, Michigan

2          Tuesday, August 23, 2022

3          About 10:13 a.m.

4    NATHAN JAMES LLOYD HOWELL,

5    having first been duly sworn, was examined and testified

6    on his oath as follows:

7          MR. ROBINSON:  This deposition is taken

8    pursuant to Notice and to be used for any and all

9    purposes under the rules that apply.

10   EXAMINATION BY MR. ROBINSON:

11   Q.   Would you state your name for the record?

12   A.   Yes.

13          MR. CUNNINGHAM:  Dave, just before we begin,

14   I'd like to say that Mr. Howell's testimony will be

15   limited to the topic of written directives and policy

16   manual provisions, training material or instructional

17   material, independent DPD research into accuracy and

18   some of the Board of Police Commissioners' questions in

19   his capacity as prime analyst with the Detroit Police

20   Department.

21          MR. ROBINSON:  Okay.

22   BY MR. ROBINSON:

23   Q.   Again, sir, would you give me your name?

24   A.   Yes.  Nathan Howell.

25   Q.   And how old are you, sir?



Nathan James Lloyd Howell
08/23/2022

30 (b) (6)
Page 5

1   A.   I am 32 years old.

2   Q.   Okay.  Do you have a middle name?

3   A.   Yes, sir, James Lloyd.

4   Q.   L-L --

5   A.   L-L-O-Y-D, sir.

6   Q.   Nathan James Lloyd?

7   A.   Howell, H-O-W-E-L-L.

8   Q.   And what is your date of birth?

9           MR. CUNNINGHAM:  You don't have to give him

10      that.

11           MR. ROBINSON:  He's a civilian.  He's not a

12      police officer.  Yes, he does.

13           MR. CUNNINGHAM:  What do you need his date of

14      birth for?

15           MR. ROBINSON:  It's discovery.

16   BY MR. ROBINSON:

17   Q.   What's your date of birth?

18           MR. CUNNINGHAM:  You don't have to tell him.

19           MR. ROBINSON:  He does.  He's not a cop, he's

20      not a sworn person.

21           MR. CUNNINGHAM:  He's employed in law

22      enforcement and he gets the same protection.

23           MR. ROBINSON:  Let's do this.  Let's not put

24      it on the record but I want his date of birth.

25           MR. CUNNINGHAM:  No, I'm not going to give you

1   his date of birth.

2   　　　　MR. ROBINSON:  Okay.

3   BY MR. ROBINSON:

4   Q.   What's your address?

5   　　　　MR. CUNNINGHAM:  No, you don't have to give

6   your home address.

7   　　　　MR. ROBINSON:  If this matter proceeds to

8   trial are we agreed that on behalf of this witness that

9   the City of Detroit will accept service for any

10   appearance at trial?

11   　　　　MR. CUNNINGHAM:  I'll either accept service or

12   if he's no longer employed at that point I'll provide

13   you with a last known address so you can serve.

14   　　　　MR. ROBINSON:  Okay.  This probably is going

15   to be an issue for the judge.  There isn't any reason

16   not to have this man's address and his date of birth.

17   　　　　MR. CUNNINGHAM:  I think he's entitled to the

18   same protection as a police officer.  Under Kallstrom he

19   has a due process right to not have his personal

20   information --

21   　　　　MR. ROBINSON:  He's a witness.  Okay.  But

22   that's all right.

23   BY MR. ROBINSON:

24   Q.   You're currently employed with the Detroit Police

25   Department?



Nathan James Lloyd Howell
08/23/2022

30(b)(6)
Page 7

1   A.   Yes, sir.

2   Q.   In what capacity?

3   A.   I am a crime analyst for the Detroit Police Department.

4   Q.   What is a crime analyst?

5   A.   I work on investigations and do a lot of desktop work so
6        that the detectives can go out in the field and
7        interview witnesses out there -- so the detective can be
8        in the field doing video cameras camera scene so they
9        can look for cameras near the crime scenes.  So I try to
10       take away some of the burden of that.

11  Q.   How old are you?

12  A.   I'm 32.

13  Q.   All right.  So that was kind of vague.

14            As a practical matter what does a crime
15       analyst do?  What do you do when you report to work?

16  A.   I work in homicide, so I work on homicide investigations
17       trying to find -- identify suspects.

18  Q.   But what is it that you do?  I mean you're giving me
19       general.  I want specifics.

20  A.   I work on the computer and look up people in Detroit's
21       internal RMS system.  I also look for people involved in
22       the crime social media profiles trying to get a history
23       on the victims and who may possibly have wanted to kill
24       them.

25  Q.   Okay.  Again you're giving me these vague descriptions.



1       I want specifics.

2   A.  I create --

3           MR. CUNNINGHAM:  Well, Dave, ask specific

4       questions if you want specific answers.

5           MR. ROBINSON:  I'm asking him specific

6       questions.

7   BY MR. ROBINSON:

8   Q.  What do you do specifically as a crime analyst?  You're

9       giving me these generalized descriptions.  I want

10      specifics.  When you say I work on computers what do you

11      do specifically?

12  A.  As I stated earlier, I look up victims in our RMS system

13      trying to get --

14  Q.  So stop there.

15  A.  Um-hmm.

16  Q.  You look up victims.

17  A.  Um-hmm.  Yes.

18  Q.  In the RMS system.  Okay.  Give me an example of that.

19  A.  So we had a homicide on Sunday and I looked up the

20      victim in RMS which is our Records Management System and

21      it provided me with several criminal reports the victim

22      was involved in, give me several different contacts the

23      victim had, and with that information I put it into a

24      report and provide it to the officer in charge of the

25      case so they can look through it and observe if there's



Nathan James Lloyd Howell
08/23/2022

30(b)(6)
Page 9

1  any domestic violence, for instance, maybe a girlfriend

2  wanted to harm him, hired someone to kill him.  Maybe

3  it's a friend who they had a disagreement with that's

4  listed in the report and, so, that's something I look

5  for.

6  Q.  All right.  We're going to go back to that but just for

7      the record, we can put this in evidence.

8          DEPOSITION HOWELL EXHIBIT 1

9          Deposition notice

10     WAS MARKED FOR IDENTIFICATION.

11          MR. ROBINSON:  Okay.  I marked as Plaintiff's

12     Exhibit Number 1 the fourth re-notice of taking the

13     deposition, 30(b)(6) deposition duces tecum of the City

14     of Detroit's designate pursuant to the Federal Rules of

15     Civil Procedure 30(b)(6).

16  BY MR. ROBINSON:

17  Q.  You were advised that you were to bring certain

18      documents with you to this deposition, yes or no?

19  A.  Yes.  I believe those are the documents.

20  Q.  Did you bring documents yourself and did you give them

21      to Mr. Cunningham, or did Mr. Cunningham bring documents

22      and present them to you?

23  A.  I believe Mr. Cunningham printed them off the computer.

24  Q.  That's not the question.  The question is:  Did you

25      provide Mr. Cunningham the documents that you brought,



Nathan James Lloyd Howell
08/23/2022

30(b)(6)
Page 10

1       that you were ordered to bring --

2   A.   No, the documents --

3   Q.   -- or did Mr. Cunningham give these documents -- acquire

4        documents?

5   A.   I believe he printed them off from his computer.  I

6        don't believe I brought any documents with me.

7   Q.   Were you instructed to bring any documents with you?

8   A.   I don't recall.  I don't recall.

9   Q.   What do you mean you don't recall?

10  A.   I don't remember.  I thought that he printed them off

11       and brought them.

12  Q.   Okay.  So any and all written directives -- you are not

13       here about producing all studies the Detroit Police

14       Department relied on to investigate the utility and

15       application of Data Works facial recognition company and

16       software specific to the issue of misidentification of

17       people of color prior to the initial purchase and

18       deployment of the software.  You're not here to talk

19       about that; right?

20  A.   Is that -- which letter is that?

21  Q.   A.

22  A.   Oh, okay.  I'm sorry.

23           Okay.  So DPD, we don't have -- conduct any

24       studies regarding that because the algorithm is actually

25       the proprietary intellectual property of Data Works so



Nathan James Lloyd Howell
08/23/2022

30(b)(6)
Page 11

1       we have no way to access it.

2   Q.   So you are offering testimony on Paragraph A?

3   A.   Is that A or D?  I don't think I'm able to because we

4        don't have any of those studies.

5   Q.   What do you mean you don't have any of those studies?

6   A.   The Detroit Police Department is unable to conduct any

7        of those studies because the algorithm that Data Works

8        software uses is proprietary intellectual property of

9        Data Works software.

10  Q.   Okay.

11            MR. CUNNINGHAM:  Let's take a break for a

12       minute.

13            You're talking about this one?

14            MR. ROBINSON:  No, no, no, listen.  You can't

15       take a break here.

16            MR. CUNNINGHAM:  You don't have a question

17       pending.

18            MR. ROBINSON:  Okay.  I know -- you're --

19       don't control the deposition.

20  A.   Oh, okay.

21            MR. CUNNINGHAM:  He's confused.  He's looking

22       at the wrong section.

23  BY MR. ROBINSON:

24  Q.   You said that the DPD does not have studies; right?

25  A.   Is this E I'm responding to?



Nathan James Lloyd Howell
08/23/2022

30(b)(6)
Page 12

1   Q.   Okay.  I'm going over your testimony.  Your testimony

2        was the Detroit Police Department does not have studies

3        because of the proprietary nature of the algorithms to

4        Data Works Plus --

5   A.   **Yes.**

6   Q.   -- is that what you just said?

7   A.   **Yes, sir.**

8   Q.   So there were no studies; is that correct?

9   A.   **No, there are no studies as far as I'm aware of.**

10  Q.   Okay.  And when you talk about studies that you're aware

11       of, there are no studies that was specific to the issue

12       of misidentification of people of color prior to the

13       initial purchase and deployment of the software; is that

14       correct?

15            MR. CUNNINGHAM:  I'll just object because

16       Mr. Howell is here to testify --

17            MR. ROBINSON:  You're doing speaking

18       objections and you know under the Federal Court Rules

19       that's not allowed.

20            MR. CUNNINGHAM:  I'm not making a speaking

21       objection.

22            MR. ROBINSON:  Yes, you are.  You can't do

23       that.  Form, foundation, that's the objection.  You

24       can't do speaking objections.

25            MR. CUNNINGHAM:  Rule 30(b)(6) allows the City



Nathan James Lloyd Howell
08/23/2022

30 (b) (6)
Page 13

1    to designate subject matter about which somebody will

2    testify.  I did that at the beginning of the deposition.

3    This question you're asking him goes outside the scope

4    of that designation.  That's my objection.

5             MR. ROBINSON:  Okay.  That's your objection.

6    So that's like form and foundation.  Okay.

7    BY MR. ROBINSON:

8    Q.   So now you can answer the question.

9    A.   Can you repeat the question.

10             MR. ROBINSON:  Would you read the question

11    back.

12             (Record repeated as requested)

13    A.   Yes, I'm not aware of any of the studies.

14    BY MR. ROBINSON:

15    Q.   Specifically the issue that I just --

16    A.   Yes, sir.  I'm sorry, yes.

17    Q.   In your capacity as a crime analyst do you rely on the

18    facial recognition element that is available to an

19    investigator in homicide or the Detroit Police

20    Department?

21    A.   What do you mean by rely on?

22    Q.   Do you use facial recognition in your job?

23    A.   Yes, I have used facial recognition in my job as a crime

24    analyst.

25    Q.   And tell me how you do that?



Nathan James Lloyd Howell
08/23/2022

30(b)(6)
Page 14

1  A.  You want to know how the process works?

2  Q.  I want to know how you use facial recognition as a crime
3       analyst?

4  A.  Okay.  So I work in homicide.  So if we have someone on
5       camera, a green light, for instance, shooting somebody
6       and their face is visual and it's captured on the green
7       light camera I will, if we're unable to come up with a
8       suspect through witness, talking with witnesses or other
9       means I will take a still image of the individual's face
10      from the green light camera and then I will upload it,
11      submit it into the Data Works program.  From there I hit
12      the button search.  It queries the image and then
13      provides me with a list of possible candidates, and from
14      this list of possible candidates I will select one if
15      one exists that is a good investigative lead.  It then
16      goes to a second analyst who's also trained by the FBI.
17      That person will then look at my lead I've selected and
18      say yes or no.  From there it goes to a supervisor which
19      is a sergeant or above and that individual will approve
20      the investigative lead or deny it.

21 Q.  Um-hmm.

22 A.  And then from there the investigative lead is provided
23      to the individual who requested it.  Most of the times
24      it's the officer in charge of the case, and then from
25      there they have to do a follow-up investigation to



Nathan James Lloyd Howell
08/23/2022

30(b)(6)
Page 15

1    corroborate it as it's just an investigative lead.

2    Q.   Now, how long have you been a crime analyst?

3    A.   I've been a crime analyst for 4 years and roughly 2 1/2

4    weeks, 3 weeks.

5    Q.   And what you just described as the procedure in 2019,

6    was that the same procedure with the review?

7    A.   The review process?

8    Q.   Yes, by other --

9    A.   I don't remember to be honest with you.

10   Q.   Okay.  So, now, you have received training in the use of

11   facial recognition?

12   A.   Yes, sir, from the FBI.

13   Q.   And did you receive any training outside of the FBI?

14   A.   No, sir.

15   Q.   And what did your training consist of?

16   A.   It was what to look for in the still image of a face

17   when comparing it to other faces for positive lead

18   identification.

19   Q.   Okay.  Did you receive any understanding in that FBI

20   training of inherent biases with the use with regard to

21   facial recognition in people of color?

22   A.   They taught us what to look for but I don't recall them

23   teaching us inherent bias in the course that we took.

24   Q.   Did you receive any documents during that training?

25   A.   Yes, I received -- because they were talking about how



HANSON RENAISSANCE
COURT REPORTERS & VIDEO     hansonreporting.com
313.567.8100

1    -- what to look for in the faces, I received

2    documentation regarding what you're supposed to look at

3    with the facial features, sir.

4  Q.  And the documentation did it draw a distinction between

5    the utility of facial recognition as an identifier as it

6    relates to specifically black people or people of color,

7    yes or no?

8  A.  **I don't recall if it did.**

9  Q.  Do you still have the documentation?

10  A.  **I have the documentation from the FBI, yes.**

11  Q.  I'm going to ask that you produce that.

12  A.  **I believe the FBI provided it.  I don't believe I'm**

13    **allowed to transfer that over.**

14       MR. CUNNINGHAM:  He signed a nondisclosure

15    agreement.

16  BY MR. ROBINSON:

17  Q.  And you say you do not recall whether or not that

18    material specifically -- was specific to the utility of

19    facial recognition as it relates to the identification

20    of people of color, black people?

21  A.  **Yes, sir, I don't recall.**

22  Q.  Okay.

23  A.  **Sorry.  Yes.**

24  Q.  And in your employment with the Detroit Police

25    Department as a crime analyst have you received anything



Nathan James Lloyd Howell
08/23/2022

30(b)(6)
Page 17

1    from the Detroit Police Department that is suggestive of

2    the same thing that I'm asking, that is whether or not

3    facial recognition and its utility may have inherent

4    biases as it relates to, you know, identification of

5    people of color, yes or no?

6  A.   **The FBI trained us legally how to run it and what to**

7       **look for.**

8  Q.   You're not answering my question.  I want you to answer

9       my question.

10          MR. CUNNINGHAM:  He is answering your

11       question.

12          MR. ROBINSON:  He's not.

13          MR. CUNNINGHAM:  He is.

14          MR. ROBINSON:  Read the question back.

15          (Record repeated as requested)

16  A.   **No, but the FBI legally trained us on how to run facial**

17       **recognition software and what to look for in the face --**

18       **facial features.  Sorry.**

19  BY MR. ROBINSON:

20  Q.   Okay.  Have you done any independent studies on your own

21       as it relates to the utility of facial recognition as a

22       crime analyst and the inherent biases in identifying

23       people of color, yes or no?

24  A.   **I have not.**

25  Q.   In your work as a crime analyst when you are going about



Nathan James Lloyd Howell
08/23/2022

30(b)(6)
Page 18

1    assisting homicide investigations in -- you're working

2    on cases that involve homicides that occur in the City

3    of Detroit?

4  A.    Yes, they are only homicides in the City of Detroit,

5    sir.

6  Q.    And you are developing leads, as it were, for the

7    homicide.

8          You're shaking your head?

9  A.    Oh, sorry.  They're called investigative leads, sir.

10  Q.   And in the 4 years that you've acted as a crime analyst

11   with homicide can you give me a breakdown of the racial

12   demographics of persons that you have developed leads

13   for in homicide investigations, racial?

14  A.   I don't know.  I'd have to -- I don't know the --

15  Q.   I'd ask you to estimate.  How many cases?

16  A.   I can't estimate.  I can't remember.

17  Q.   How many cases have you worked in?  You can't remember?

18  A.   In homicide?

19  Q.   How many homicides have you worked on?

20  A.   I don't know the exact number.  It's a lot.

21  Q.   Can you estimate?

22  A.   I can't estimate.  I don't want to be wrong.

23  Q.   1,000?

24  A.   I don't know.

25  Q.   2,000?



1    A.    I don't know, sir.

2    Q.    500?

3    A.    I don't know.

4    Q.    Ten?

5    A.    I don't know.

6    Q.    Twenty?

7    A.    I can't estimate, sir.

8    Q.    Are the majority of those suspects African-American or

9    white?

10   A.    I don't know.

11   Q.    You don't know?

12   A.    I believe the majority would be African-American.

13   Q.    Okay.

14   A.    I believe.

15   Q.    Were you at all aware in the course of your work as a

16   crime analyst for the Detroit Police Department about

17   the inherent biases as it relates to identification of

18   people of color and the utilization of facial

19   recognition, yes or no?

20   A.    No, I don't know.  I don't believe so.

21   Q.    I take it you never even heard of that; right?

22   A.    I believe I heard of it but to my knowledge I don't know

23   if it exists within our Data Works program.

24              MR. ROBINSON:  I think it's the court.

25              (An off the record discussion was held)



 1   BY MR. ROBINSON:

 2   Q.   What do you mean you don't know if it exists in the Data

 3        Works program?

 4   **A.   Their algorithms are proprietary intellectual property**

 5   **so I have no way of knowing.**

 6   Q.   What does that mean?

 7   **A.   I don't know.  I don't know how the algorithms function.**

 8   **I have no idea how they developed their program.**

 9   Q.   And has the Detroit Police Department brought to your

10        attention the potential concern that facial recognition

11        processes have inherent biases as it relates to

12        identifying black people or people of color, yes or no?

13   **A.   I have not seen any documentation from DPD.**

14   Q.   Now, what materials did you review in order to prepare

15        for your deposition?

16   **A.   The facial recognition policy.**

17   Q.   Okay.  And did you bring that -- is that with you?

18   **A.   Yes.**

19   Q.   Okay.  May I see that?

20   **A.   Yes, sir.**

21              MR. ROBINSON:  Can we mark these.

22           DEPOSITION HOWELL EXHIBIT 2

23           DPD Facial Recognition Direct Number 307.5

24           DEPOSITION HOWELL EXHIBIT 3

25           Training Directive Number 19-07, Use of Traffic



Nathan James Lloyd Howell                     30(b)(6)
08/23/2022                                     Page 21

1          Light-Mounted Cameras and Facial Recognition

2          Technology

3          WERE MARKED FOR IDENTIFICATION.

4   BY MR. ROBINSON:

5   Q.    I'm going to hand you what has been marked as

6         Plaintiff's Exhibit Number 2.

7              Can you identify that for the record?

8   **A.    Yes.**

9   Q.    What is that?

10  **A.    This is the facial recognition policy from September**

11        **19th, 2019.**

12  Q.    And what is the purpose of that?

13  **A.    To define when -- how to use facial recognition in**

14        **investigation.**

15  Q.    Is that something that you have to rely on in your job

16        as a crime analyst?

17  **A.    Yes, the policy when using facial recognition is**

18        **something I rely upon.**

19  Q.    Okay.  And you've been trained in that policy?

20  **A.    Yes, sir, I've reviewed it and it's been communicated to**

21        **me many times.**

22  Q.    And is there anything in that policy that educates you

23        or trains you on the inherent biases of facial

24        recognition as it relates to identification of people of

25        color, yes or no?



Nathan James Lloyd Howell                    30(b)(6)
08/23/2022                                    Page 22

1   A.   I don't believe -- to my knowledge it's not inherent

2        bias outlined within the -- sorry, outlined within the

3        policy.

4   Q.   There's nothing in the policy that educates you or

5        trains you on the inherent biases?

6   A.   As I recall, I don't believe there's any mention, no.

7   Q.   I'm going to hand you Exhibit Number 3.  Can you

8        identify that for the record?

9   A.   Yes, this appears to be the first instance of the facial

10       recognition policy from April 9th, 2019.

11  Q.   Okay.  And can you tell me what that document is?

12  A.   Yes, it provides when to use facial recognition

13       software.

14  Q.   And you identified that as a Training Directive?

15  A.   It appears to be a, yes, Training Directive, sir.

16  Q.   And it is a document you are familiar with as a crime

17       analyst?

18  A.   Yes, sir.

19  Q.   Is there anything that would educate you or train you as

20       it relates to facial recognition and inherent biases in

21       identifying people of color?

22  A.   I don't believe so, no.

23  Q.   Now, what is the date of the -- effective date of the

24       training policy of facial recognition in Exhibit

25       Number 2?



1  A.   It is September 19th, 2019.

2  Q.   And is that when the first facial recognition policy was

3       enacted or became effective with the Detroit Police

4       Department?

5  A.   **It would be the first document you have there,**

6       **April 4th -- or sorry, April -- does that say 9th?**

7       **Yeah, April 9th.**

8  Q.   So what is the difference between the information

9       contained in Exhibit 3 versus Exhibit 2?

10 A.   **This one expands upon the policy in here, and this one**

11      **is much more encompassing of how to use, when to use the**

12      **facial recognition in an investigation.**

13 Q.   Can you be more specific in terms of --

14 A.   **It offers --**

15            MR. CUNNINGHAM:   Hold on.  Let him finish his

16      question.

17 A.   **Sorry, sorry.**

18 BY MR. ROBINSON:

19 Q.   -- in detail.

20 A.   **It offers more definitions regarding facial recognition,**

21      **such as who Data Works is, biometrics are, the examiner**

22      **defines that there needs to be advanced training, things**

23      **of that nature.  And also offers what crimes facial**

24      **recognition can be run upon.**

25 Q.   The description that you gave earlier about the



Nathan James Lloyd Howell                    30(b)(6)
08/23/2022                                   Page 24

1      redundancy of checking by other members, supervisors,

2      et cetera -- you understand what I'm saying?

**3   A.   Yes, when I outlined the process.**

4   Q.   Is that contained in the new policy?

**5   A.   I believe so.  I recall -- yes, sir.**

6   Q.   Okay.  When you look at Exhibit Number 3 is that process

7        contained in the Training Directive at all?

**8   A.   I don't believe that process is contained in Exhibit**

**9        Number 3, sir.**

10  Q.   Prior to September of 2019 what I have referred to as

11       redundancy, that wasn't what was in practice prior to

12       the new policy being issued in 2019, in September

13       of 2019; is that correct?

**14  A.   That's correct, sir.**

15  Q.   And can you give me any other specific distinctions

16       between the facial recognition policy that was effective

17       in September of 2019 versus the policy that was enacted

18       prior to the Training Directive?

**19  A.   This one?**

20  Q.   Yes.

**21  A.   It provides prohibited uses of facial recognition**

**22        software, such as surveillance, using it as mobile**

**23        facial recognition, live stream or recorded videos and**

**24        predictive analysis, so it prohibits those uses in the**

**25        one from September as opposed to this one not mentioning**



Nathan James Lloyd Howell                     30(b)(6)
           08/23/2022                          Page 25

1          it.  So that would be an example.

2     Q.   What else?  Describe in more detail.

3     A.   It gives definition of personal identification

4          information, identifies what SNAP is, the Statewide

5          Network of Agency Photos, discipline of misuse of facial

6          recognition software, mentions investigative lead and to

7          do a supplemental incident report for that investigative

8          lead if it's a positive lead.

9     Q.   Again, what you're talking about is not contained in --

10    A.   No, sir.  Those are the examples.

11              THE COURT REPORTER:  Is not contained in the

12         what?  You really have to let him finish his question.

13              THE WITNESS:  I'm sorry.

14              THE COURT REPORTER:  What you're talking about

15         is not contained in the, and, I'm sorry, I didn't hear

16         you.

17    BY MR. ROBINSON:

18    Q.   Is not contained in Exhibit 3; is that correct?

19    A.   Yes, sir.

20    Q.   Okay.  Can you continue --

21    A.   Yes, sir.

22    Q.   -- with more distinction.

23    A.   There's government and oversight responsibilities

24         outlined in here in the newer one; the weekly report to

25         the Board of Commissioners which is a public record; the



Nathan James Lloyd Howell        30 (b) (6)
08/23/2022                       Page 26

1       fact that the OPC has to enact all policy changes,

2       security and maintenance of the facial recognition.

3       That's it.

4   Q.  So the difference between the Detroit Police Department

5       facial recognition policy and the Training Directive as

6       far as its utilization and implementation in the Detroit

7       Police Department can you tell me how it is distributed

8       or disseminated?

9   A.  I don't remember to be honest with you.

10  Q.  In July of 2019 were you working as a crime analyst?

11  A.  Yes, sir.

12  Q.  Did you have any opportunity to review any -- anything

13      in connection with the arrest or let's say facial

14      recognition application leading to the arrest of Michael

15      Oliver?

16  A.  No, sir, I never worked on it.

17  Q.  Do you know anything about Mr. Oliver's arrest?  Do you

18      know anything about Mr. Oliver?

19  A.  Insofar as?

20  Q.  Anything.

21  A.  Only from what I read in the newspapers.

22  Q.  Okay.  What did you read in the newspapers?

23  A.  I read it was a larceny of a phone case or something

24      like that, or of a phone device perhaps that was damaged

25      and the still photo they used came from a cell phone, I



1    believe.  I don't remember the officer in charge, and I

2    think the -- the discrepancy came up with tattoos I

3    think it was as it said in the report, the newspaper

4    report.  That's as much as I can remember.

5  Q.   When did you read the newspaper?

6  A.   It was on the Internet.  I don't recall the exact date,

7       but it was --

8  Q.   Recently?

9  A.   No, no, not recently, sir.

10  Q.   When?

11  A.   I don't know.  A few months ago.

12  Q.   Did you do so in anticipation of this deposition?

13  A.   Yes.  I wanted to at least have a general idea of the

14       incident in question.

15  Q.   In your FBI training you would have discussed and been

16       trained on the quality of what I believe to be probe

17       images?

18  A.   Yes, sir.

19  Q.   Can you discuss that?

20  A.   Yes.  From what I can recall, they most often would tell

21       us that illumination, so the lighting of the photo was a

22       big factor.  Also sometimes the background could cloud

23       the image maybe sort of.  But as far as I can recall it

24       was also the distance, so how far or close to the camera

25       that the face was along with any obstructions on the



1    face.  So glasses, a face mask, for instance, a hat,

2    even, would affect the image quality or probe when

3    utilizing it for facial recognition purposes.

4  Q.   And what would be the concern from your perspective as a

5       crime analyst as relates to using a less than stellar

6       probe image?

7  A.   **You would either receive no results, or the program**

8       **wouldn't accept the image because it can't as far as I'm**

9       **aware read that there's a face there.  Again, I'm not**

10      **sure how the algorithm works and functions to define a**

11      **face, but -- or you would just get a bunch of candidates**

12      **and when you looked through them, you know, there's no**

13      **good investigative lead.**

14 Q.   Is there a potential that you might get the wrong image

15      or the wrong candidate, so to speak?

16 A.   **No, because it's an investigative lead and it has to go**

17      **through those steps.**

18 Q.   I'm not talking about that.  I'm talking about the

19      product of what is produced from the probe image.

20                  MR. CUNNINGHAM:  That's not a question.

21                  MR. ROBINSON:  Yeah, it is a question.

22                  MR. CUNNINGHAM:  That was statement.

23                  MR. ROBINSON:  That is a question.

24 BY MR. ROBINSON:

25 Q.   The product that you would get from the probe image --



1           MR. CUNNINGHAM:  Wait for him to ask a

2      question.  That was not a question, that was a

3      statement.  You said I'm talking about this and that's

4      what you said.  That wasn't a question.

5           MR. ROBINSON:  You're not listening to what I

6      said.  Okay.  I said is it a concern --

7  BY MR. ROBINSON:

8  Q.   Okay.

9           -- with regard to the quality of the probe

10     images that you might get the wrong product from what is

11     spit out from the facial recognition process?

12 **A.   No.  As we go through redundancy --**

13 Q.   I'm not talking about the redundancy.  The redundancy

14     comes after you get the product in the facial

15     recognition.  Okay?  Forget about the background.

16          Do you understand what I'm saying now?  So is

17     there a concern that if you're putting in a bad image

18     you may get the wrong suspect, that the -- you put in a

19     probe image, right, into the facial recognition

20     software?

21 **A.   Yes, sir.**

22 Q.   What comes back?

23 **A.   Several potential candidates.**

24 Q.   Okay.  So is the concern that if you put in a bad image

25     the accuracy of your candidates may be compromised?



1   A.   Yes.

2   Q.   Stop there.

3              MR. CUNNINGHAM:  No, no, no, if you have more

4        to say, say it.

5   A.   **Yes, there is a concern with a poor image quality you**

6        **may receive candidates that are lacking in their**

7        **potential to be a good investigative lead, sir.**

8   BY MR. ROBINSON:

9   Q.   All right.  Okay.  Cropping an image, that would be a

10       concern as well, if you cropped an image, let's say?

11  A.   **No, sir.  You have to -- in order to isolate the face**

12       **you crop the image and then you upload it as a probe to**

13       **the Data Works program.**

14  Q.   What if you cut off part of the image when you crop it?

15  A.   **You would not.**

16  Q.   Well, you should not or you would not?

17  A.   **You would not.**

18  Q.   Okay.  What if you do, should you not use a cropped

19       image that cuts off part of the --

20  A.   **It would be depending on a case-by-case basis.**

21  Q.   What do you mean?

22  A.   **I mean you would have to look at it as a case-by-case**

23       **basis regarding --**

24  Q.   I take a picture of you.  You got your hair --

25             MR. CUNNINGHAM:  Were you done with your



1    answer?

2         THE WITNESS:  I was.

3         MR. CUNNINGHAM:  Okay.

4    BY MR. ROBINSON:

5    Q.   -- and I crop the top of your head off, would you use

6         that image, yes or no?

7    A.   What part of my head?

8    Q.   Your hair?

9    A.   So here?

10   Q.   Um-hmm.

11   A.   Yes, you could use that image.

12   Q.   You can?

13   A.   Yes, sir.  We're told not to look at hair styles as they

14        can change on an individual.

15   Q.   Okay.  If I crop off your forehead you wouldn't use that

16        image?

17   A.   I don't believe I would use an image without a forehead,

18        sir.

19   Q.   Why not?

20   A.   It would obscure -- I mean the face, you would be taking

21        away part of the face to use as comparison to the

22        candidates you receive.

23   Q.   And what with regard to essentially -- what concern

24        might you have in that regard?

25   A.   You would like every probe image to be straight on from



1      that angle.  However, not all probe images are from
2      straight on so you do express some concern with images
3      that are, as an example, top down more, so more from
4      like an angle up here or a lower angle.  So there's a
5      little bit of concern when selecting a probe image
6      that's at an angle.
7   Q.  In the Training Directive in Exhibit 3 which you say was
8       in existence prior to Exhibit 2, does the Training
9       Directive go into the image quality?
10  A.  **No, sir, it does not, the Training Directive does not.**
11  Q.  And, then, are the detectives who are investigating
12      crimes, were they provided with that Training Directive?
13  A.  **I don't know.**
14  Q.  Okay.  Do you know how that distribution takes place
15      within the Detroit Police Department?
16  A.  **No, I don't know, sir.**
17  Q.  Is it available --
18  A.  **Yes, sir.**
19  Q.  -- to give an officer?
20  A.  **Yes, sir, it's on the intranet, I believe so.**
21  Q.  Okay.  So is there a date on the Training Directive?
22  A.  **April 9th, 2019, sir.**
23  Q.  Okay.  So, between April 9th and September of 2019 the
24      only thing that was available as it relates to any sort
25      of training or procedure related to the Detroit Police



Nathan James Lloyd Howell                30(b)(6)
08/23/2022                               Page 33

1      Department's utilization of facial recognition is

2      contained in those two exhibits in Exhibit 2 --

**3   A.   Exhibit 2 or 3.**

4   Q.   -- or 3, I'm sorry.

**5   A.   I believe so.**

6   Q.   Did you bring any documents with you today?

**7   A.   No, sir.**

8   Q.   Your attorney indicated you would be able to give

9        testimony on item E in the -- in the request for your

10       testimony today, item E:  Any and all independent DPD

11       research into the accuracy in identifying persons of

12       color?

**13   A.   Yes.**

14   Q.   Did you bring anything with you to talk about that?

**15   A.   No, sir, I did not.**

16   Q.   Are you able to talk about that, independent DPD

17       research into the accuracy in identifying persons of

18       color, yes or no?

**19   A.   As far as I know because it's proprietary, like I said**

**20        before the algorithm that is used by the Data Works**

**21        program, there's no independent DPD research because**

**22        it's their intellectual property.**

23   Q.   Okay.  I'm trying to -- I understand what you're saying.

24       It's that organization's proprietary property.  And how

25       does that limit the DPD with its concern whether or not



1      there is inherent bias in putting into practice a

2      product that the DPD purchases for the purposes of

3      finding suspects?

4  A.  **We don't have access to their --**

5  Q.  I'm not asking about that.  That's not a question having

6      access to their stuff, their proprietary stuff.  I'm

7      asking whether or not there's any independent DPD

8      research into the accuracy in identifying persons of

9      color, yes or no?

10  A.  **I don't know if we conducted any, no.**

11  Q.  Okay.  F:  Any and all Board of Police Commission

12      transcripts of Twanny Petty or documents provided by her

13      or her agents or other advocates opposing the use of

14      facial recognition in the City of Detroit on the basis

15      of the accuracy of identifying persons of color.

16           Did you bring anything like that here to this

17      deposition?

18  A.  **The BOPC, there's a link on our website for any BOPC**

19      **reports.  I don't have any --**

20  Q.  Did you bring it to this deposition?  That's what I'm

21      asking --

22  A.  **I don't have any --**

23  Q.  -- yes or no.  Did you bring it to this deposition?

24      It's a no.

25  A.  **May I finish, please.**



1                I don't have any with me, sir, no.

2  Q.   Okay.  Because you were asked to bring the stuff with

3       you.  Your attorney said that you can talk about this

4       stuff.

5            MR. CUNNINGHAM:  He just told you it's

6       publicly available.

7            MR. ROBINSON:  Okay.

8  BY MR. ROBINSON:

9  Q.   What can you tell me about Twanny Petty or the documents

10      that she provided?

11 **A.   I don't -- I can't tell you anything about Twanny Petty.**

12 Q.   Do you know her?

13 **A.   I don't know Twanny Petty, sir.**

14 Q.   Have you ever met her?

15 **A.   I don't believe so.**

16 Q.   Have you ever been to a Board of Police Commissioner

17      meeting during the discussion of facial recognition?

18 **A.   I have not, sir.**

19 Q.   G:  Please provide any written documents or testimony

20      demonstrating public comments the City received before

21      or just after adopting the Data Works technology.

22           Did you bring any of that material today?

23 **A.   No, sir, I don't have any of those -- the documents and**

24 **     I don't know if they exist.**

25 Q.   And you can't give me any testimony on that, either, can



1      you?

2  A.   Is that a question?

3  Q.   Yes.

4  A.   Oh.  No, I don't believe I'm ....

5           MR. ROBINSON:  So what is the name of the

6      other individual that's supposed to --

7           MR. CUNNINGHAM:  I believe Trisha Stein is

8      who --

9           MR. ROBINSON:  Trisha.

10           MR. CUNNINGHAM:  Trisha.

11  BY MR. ROBINSON:

12  Q.   Do you know Trisha?

13  A.   Stein?

14  Q.   Yes.

15  A.   No, sir.

16           MR. ROBINSON:  And what's her position?

17           MR. CUNNINGHAM:  She's currently the chief of

18      staff of the mayor.

19           MR. ROBINSON:  How do you spell her name?

20           MR. CUNNINGHAM:  Her first name is

21      T-R-I-S-H-A, last name S-T-E-I-N.

22  BY MR. ROBINSON:

23  Q.   What is your educational background?

24  A.   I have a Bachelors in sociology from Albion College.

25  Q.   What college?



Nathan James Lloyd Howell                 30(b)(6)
08/23/2022                                Page 37

1   A.   Albion College.

2   Q.   When did you receive that?

3   A.   When did I what?

4   Q.   When did you receive that degree?

5   A.   I graduated in 2012.

6   Q.   Okay.  In what area?

7   A.   That's in sociology.

8   Q.   Okay.  And any further advanced degrees?

9   A.   Yes, I have a Masters of Science in Criminal Justice

10        from Wayne State University.

11  Q.   Um-hmm.  Anything else?

12  A.   I don't have any other educational degrees than that.

13  Q.   Do you have any other training in any other areas of --

14        any other area or vocation?

15  A.   I have training in using the Shot Spotter technology

16        that the Detroit Police Department uses.

17  Q.   Shot Spotter?

18  A.   Shot Spotter.

19  Q.   Tell me what that is.

20  A.   Shot spotter are acoustic sensors placed throughout the

21        City that capture gunshots, essentially, and then I can

22        go in there and read through the I think they're called

23        reports or respond IDs of those incidents and use them

24        in conjunction with our homicide investigations.

25  Q.   Tell me:  Are these some mechanical devices or



1      something, Shot Spotters?

2  A.  I believe they are placed on light poles and hear gun

3      shots.  I don't know exactly how they work, but I know

4      they're very useful in identifying number of shots

5      fired, approximate location and time.

6  Q.  Any other training?

7  A.  I'm sorry?

8  Q.  Any other training?

9  A.  I can't recall.

10  Q.  Now, tell me about the scoring of what is produced from

11      the probe image?  Do you understand what I'm saying, the

12      scoring?

13  A.  Yes, sir.

14  Q.  Tell me about that.

15  A.  I believe that each candidate that comes back in

16      response to a probe image is scored.

17  Q.  Um-hmm.

18  A.  However, I don't know, and I hate to reference it, how

19      the algorithm works, so I don't know how the program

20      comes up with the score when it's given the candidates.

21  Q.  Now, you literally, as the crime analyst, you would

22      review, let's say, the green light image or a green

23      light video or whatever?

24          MR. CUNNINGHAM:  Talking about a probe image.

25          MR. ROBINSON:  No.


HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO    313.567.8100

 1  BY MR. ROBINSON:

 2  Q.   You would review a particular green light video, let's

 3       say?

 4  **A.   Yes, I review -- yes, green light images.**

 5  Q.   And if you saw someone, you know, an image you would

 6       stop the video and then create a still picture of it?

 7  **A.   If they're a suspect in --**

 8  Q.   If they're a suspect?

 9  **A.   If they're a suspect in a part 1 violent crime or --**

10           (The witness and Mr. Robinson speaking

11       simultaneously)

12  Q.   That's what you would do?

13  **A.   Yes, if we're ....**

14  Q.   And would you, you individually take a probe image and

15       input that image into the facial recognition system?

16  **A.   Yes, sir.**

17  Q.   In the Detroit Police Department?

18  **A.   Yes, sir.**

19  Q.   Where is that system?

20  **A.   Its physical location?**

21  Q.   Yes.

22  **A.   I don't know.  It's Data Works system.**

23  Q.   So you have a computer or something, I take it?

24  **A.   Yes, sir.**

25  Q.   And you would just upload it, the image, is that --


HANSON RENAISSANCE  *hansonreporting.com*
COURT REPORTERS & VIDEO      313.567.8100

1   A.   Yes, sir.

2   Q.   -- accurate?

3            Other than uploading the image is there

4        anything else that you would have to do in order to

5        properly process that program?

6   A.   Prior to uploading it or --

7   Q.   Yes, prior to uploading it.

8   A.   It has to be -- just the face of the suspect?  Other

9        than just selecting just the face and then uploading it

10       there's nothing else I would need to do to that image.

11  Q.   Okay.  Once you've got a suspect back what would you --

12       you would get the scoring information from Data Works,

13       is that how that happens?

14  A.   They would provide me with a list of candidates and then

15       underneath those candidates there's -- the scoring

16       system is.

17  Q.   Can you describe that scoring system?

18  A.   Don't know exactly how they score them.  However, I know

19       that we're told to ignore the scoring system and use the

20       training we received from the FBI in order to select a

21       good investigative lead from the list of candidates that

22       Data Works provides.

23  Q.   Can you repeat that?

24  A.   Yes, sir.  So the scoring system does exist underneath

25       the candidates.  However, I don't know how the program



Nathan James Lloyd Howell                    30(b)(6)
08/23/2022                                   Page 41

1    scores those candidates, but we're told to ignore that

2    scoring system and use the training we have received

3    from the FBI in order to select or not select a good

4    viable investigative lead.

5  Q.   And who told you to do that?

6  A.   Stephen Lamoreaux when I asked him how -- if we did any

7       studies but then he went into the whole intellectual

8       proprietary and said that we don't do it because of the

9       intellectual proprietary of the algorithm and we're told

10      to use our training.

11  Q.   Who is Stephen -- what's his last name?

12  A.   I don't know how to spell it and I hope I'm pronouncing

13      it correctly, it's Lamoreaux.  He's a project manager

14      and analyst specialist at the Crime Intelligence Unit.

15  Q.   And prior to working for the Detroit Police Department

16      where were you employed?

17  A.   I was working at Wayne State Center for Urban Studies

18      and Jefferson East, Incorporated.

19  Q.   What did you do for Wayne State?

20  A.   For Wayne State I worked as a -- I can't recall the

21      exact title of my position, but I worked in the

22      CompStat, Public CompStat Facing Department, I guess,

23      and I would create CompStat reports and attend community

24      meetings where law enforcement personnel would be

25      present and go through crime in that specific area.



Nathan James Lloyd Howell          30(b)(6)
08/23/2022                         Page 42

1  Q.  And from what period to what period did you have that

2      job?

3  A.  Oh, geez.  It was -- I held that position for 1 year

4      and, so, I want to say July roughly -- sorry, July 2017

5      to July 2018ish.

6  Q.  You mentioned another job.  What was that?

7  A.  Jefferson East, Incorporated.  It's a nonprofit

8      organization that focuses on rebuilding the community

9      along the Jefferson corridor and the Warehouse District

10     in the I think it's like the 7th precinct area.

11 Q.  What did you do prior to that job and your job at Wayne

12     State?

13 A.  I was an AmeriCorps volunteer through Wayne State's

14     Center for Urban Studies doing the AmeriCorps work

15     there.  I was tasked with victim hardening practices, so

16     making people less likely to become victims of crime

17     through our community outreach.

18 Q.  How long did you do that?

19 A.  That was prior to Wayne State and that was a stipend-

20     bound volunteer position.

21 Q.  Did you have a position of employment that you got paid

22     for prior to that?

23 A.  Oh, geez.  I worked at Pet Supplies Plus for 3 months I

24     think prior to that.

25 Q.  Okay.  And what did you do prior to that?



1   A.   Prior to Pet Supplies Plus.  I was unemployed for I

2        believe almost 10 months I want to say prior to that.

3   Q.   Okay.  Prior to that what other jobs have you ever held

4        that was, you know, where you could call it a

5        substantial employment position?

6   A.   I was a desktop investigator for Robison Group.

7   Q.   For what?

8   A.   Robison Group over in Troy.

9   Q.   What is a desktop -- desktop what?

10  A.   Investigator.

11  Q.   What does a desktop investigator do?

12  A.   I worked on the computer on a lot of insurance fraud

13       cases essentially.

14  Q.   How long did you do that?

15  A.   Oh, geez.  I don't remember how long, but I know it

16       wasn't a year.  I know it wasn't a year.  It was shorter

17       than a year.

18  Q.   Prior to that?

19  A.   I was a project manager with Marketing Associates which

20       is now called OneMagnify.  I worked there for 4 years

21       and I was a project manager.

22  Q.   Project manager, what sort of projects were you

23       managing?

24  A.   I was on the Ford Commercial Connection account.  And,

25       so, I helped manage a lot of their direct mail pieces,



Nathan James Lloyd Howell                30(b)(6)
08/23/2022                               Page 44

1      emails out to the dealerships, Ford dealers.

2  Q.  You did that for how long?

3  A.  I believe it was 4 years.

4  Q.  Okay.  Where did you graduate from high school?

5  A.  I graduated from Berkley High School.

6  Q.  When was that?

7  A.  2008.

8  Q.  Are you married?

9  A.  I am married, yes.

10 Q.  What does your wife do?

11 A.  My wife where I met her still works at OneMagnify.

12 Q.  Do you have children?

13 A.  I do not have children.

14 Q.  Andrea Tucker, are you familiar with that person?

15 A.  I don't remember Andrea Tucker.  I should be, I think,

16     but I don't remember who she was.

17 Q.  Okay.

18 A.  Oh, is she one of the homicide victims?  I don't recall,

19     though.

20 Q.  She's a homicide victim, yes.

21 A.  Okay, yes, I recall that case.  I know -- I think that

22     that case was the one I had my photo taken and it's on

23     Facebook, I believe.

24 Q.  Okay.  What did you do in connection with her murder?

25 A.  I assisted in finding out a possible suspect for that



Nathan James Lloyd Howell                    30(b)(6)
08/23/2022                                    Page 45

1    homicide.

2  Q.  What specifically did you do?

3  A.  I looked at the boyfriend, her boyfriend's on computer

4      prison record and looked at his contacts that he had

5      through the Michigan Department of Corrections.

6  Q.  Can you be a little more descriptive?  Once you looked

7      at that what did you do with it?

8  A.  I looked at his people who had came to visit him in

9      prison.

10 Q.  Um-hmm.

11 A.  And observed that his son whose name I can't recall,

12     unfortunately, had come to visit him in prison I believe

13     a couple times, and from there provide the information

14     to the officer in charge of the investigation of who

15     came to visit him in prison, his son, and what he -- who

16     he was.

17 Q.  Once you developed that information and turned it over

18     to the detectives --

19 A.  Yes, sir.

20 Q.  -- did you have any other -- did you do anything else

21     with regard to that case other than what you just

22     indicated?

23 A.  Yes.  I tracked the suspect vehicle on the green light

24     cameras and license plate reader systems as it drove

25     towards the crime scene, away from the crime scene, and



Nathan James Lloyd Howell                  30(b)(6)
08/23/2022                                  Page 46

```
 1        around the Greater City of Detroit.

 2   Q.   And how were you instrumental in catching that crook?

 3   A.   After further investigation by -- I'm on the Eastern

 4        Homicide Squad, so after further investigation by our

 5        squad we developed the son from the visits in prison as

 6        a viable suspect and simply because I guess I was the

 7        one who helped provide the information to the officer in

 8        charge that's how I became the -- I'm sorry, I forgot

 9        what words you used, the individual who helped close the

10        case.

11   Q.   License plate reader?

12   A.   Yes, sir.

13   Q.   What is that?

14   A.   License plate reader is a, I believe it's a camera that

15        captures license plates and then gives you the --

16        because they're placed throughout the city so it

17        provides you with the location, date, time, license

18        plate of the vehicle as it passes by.

19   Q.   So what location did you read the license plate in order

20        to lead you to this son who was the suspect?

21   A.   It was I believe Seven Mile and Kelly area on the east

22        side.

23   Q.   What led you to that?

24   A.   The homicide occurred north of there.  I can't recall

25        the exact street where she was murdered, but it occurred
```



Nathan James Lloyd Howell          30(b)(6)
                    08/23/2022                         Page 47

1      north of there off of Kelly and that's the closest

2      license plate reader to the homicide scene, I believe,

3      so ....

4  Q.  So this is kind of like random?

5  A.  Well, it's how an investigation works.  We try to look

6      at the resources I have available to me close to the

7      homicide scene, and that happened to be a good resource.

8  Q.  Um-hmm.  Other than green lights, social media -- you

9      look at social media?

10 A.  Yes, sir.

11 Q.  Okay.  You look at -- what else do you look at?

12 A.  I look at green lights, social media, the license plate

13     readers -- they're technically separate than the green

14     lights -- Shot Spotter, and previous, previous reports

15     of the victims, witnesses, suspects as well are

16     utilized.  There's other ones I'm sure but I can't

17     recall what they are.

18 Q.  How did you come to be employed by the Detroit Police

19     Department?

20 A.  I applied back when I was still working at Wayne State

21     and Jefferson East and took a written test and then was

22     selected -- took a written test and then took an essay

23     test and then had a, I guess an interview, but it was

24     three people.  Kind of like an oral board interview, and

25     then from there was put into the pool of potential



Nathan James Lloyd Howell                    30(b)(6)
08/23/2022                                   Page 48

1     candidates and was I believe graded high and, so, I was

2     selected from that pool.

3  Q.  It was a crime analyst position you were applying for?

4  A.  Yes, sir.

5  Q.  So other than your Masters Degree in criminal justice

6     had you had any other experience in law enforcement?

7  A.  The CompStat position I had wasn't law enforcement from

8     a -- not with the law enforcement agency, mind you, but

9     from a law enforcement perspective with regards to

10    making the community safer.

11 Q.  What did you do to make the community safer?

12 A.  We held meetings with residents of the community and the

13    Detroit Police Department personnel present and we would

14    advise them on the crime happening in the area, so we

15    sort of gave them the hot spot areas in their location

16    and then would advise them of the dates and times those

17    crimes were occurring and give them sort of assistance

18    on what to do in certain scenarios perhaps, like when

19    you were leaving your car somewhere we gave them the

20    wheel wells to advise them not to -- not wheel wells,

21    the wheel lock -- steering wheel lock devices so that

22    their car would be less likely to be targeted by someone

23    trying to steal a car, for instance, things of that

24    nature.

25 Q.  Okay.  Your Facebook post or the Facebook post says



Nathan James Lloyd Howell                30(b)(6)
08/23/2022                              Page 49

1          Analyst Howell was able to identify key evidence that

2          supported the defendant's involvement in this crime.

3                      What key evidence?

4     A.   **That would be the license plate reader hits from that**

5          **Seven Mile and Kelly LPR location near the homicide**

6          **scene along with the actual Project Green Light video of**

7          **the car utilized by the suspect driving towards the**

8          **homicide scene, away from the homicide scene and then**

9          **actually getting out of the vehicle on another camera**

10         **and removing a paper bag from the back seat that had**

11         **covered up the rear passenger side broken window and**

12         **getting back in the car and tracking it to the arson**

13         **site where the car ultimately was burned.**

14    Q.   Facial recognition had nothing whatsoever to do with

15         this?

16    A.   **No, sir.**

17    Q.   Okay.  When was this?

18    A.   **I apologize, I work on a lot of homicide cases.  It was**

19         **last year and, I'm sorry, I don't recall the actual**

20         **month.  I have not reviewed that case in --**

21    Q.   Have you had to testify in court?

22    A.   **I have not testify in court to that case yet, sir.**

23    Q.   Do you testify in court?

24    A.   **I have testified one time in court.**

25    Q.   And what did you testify about?



Nathan James Lloyd Howell                    30(b)(6)
08/23/2022                                  Page 50

1    A.    I testified to the tether points or hits of a victim.

2    Q.    Tell me about the tether points.  What are you talking

3          about?

4    A.    Sorry.  So the victim -- well, any individual can be

5          placed on a tether for a crime as the court sees fit,

6          and our victim was placed on a tether, and we used the

7          points, or, actually, I should say the family used the

8          points to send officers to a location where he was,

9          where the tether points were saying he was and they

10         located his body at that location at the time deceased,

11         and from there we can then request additional tether

12         points.  I don't recall the court that he was on

13         probation or parole with, but we can get the tether

14         points back and then track his movements prior to his

15         death.

16   Q.    So that's one of the other tools I guess that you have

17         available, you can check points?

18   A.    Yes, sir.

19   Q.    Okay.  How are you accessing these tether points?

20   A.    We have to request tether points from the Wayne County

21         system and the -- there's other ones we can access on

22         our own through Smart View and I have a log-in for that.

23   Q.    Where is your office?

24   A.    I am located on the 5th floor of the Headquarters off of

25         Michigan and Third.  The address is 1301 Third Street.



1  Q.   How do you interact with the detective once you've

2       turned over your findings?

3  **A.   Do you mean like in person?**

4  Q.   Yes.

5  **A.   In person.**

6  Q.   Okay.  So does the detective say -- after you gave the

7       detective something and they come back to you and say we

8       want you to do this, do that, something like that?

9  **A.   Yes, sir.**

10 Q.   Have you ever had to contact Data Works Plus for

11      anything?

12 **A.   No, I have not.**

13 Q.   How long was your training with the FBI for facial

14      recognition?

15 **A.   I don't remember to be honest.  It was a while ago.**

16 Q.   When?

17 **A.   I think it was about 2 years ago, sir.**

18 Q.   Okay.  And prior to your training with the FBI did you

19      work as a crime analyst in the Detroit area?

20 **A.   Yes, sir.**

21 Q.   Detroit prior to your training with the FBI 2 years ago

22      was utilizing facial recognition; right?

23 **A.   I believe so, sir.**

24 Q.   Okay.  Did you use facial recognition as a crime analyst

25      prior to your training with the FBI?



 1  A.   I believe so.

 2  Q.   Okay.  So you probably would have been using it for at

 3       least 2 years prior to your training because you were

 4       there for 4 years?

 5  A.   I don't believe I had access or a log-in -- I don't

 6       recall when I got a log-in, but I know I didn't use it

 7       at first because there's only a few individuals that

 8       used it.

 9  Q.   Who else?

10  A.   The one I recall is Peter Hokich, but I don't remember

11       the other ones because I believe they left.

12  Q.   Who are the other crime analysts that you work with?

13  A.   I work in homicide and they are Nadia Dixon.

14  Q.   Does she work in homicide also?

15  A.   Yes.  Everybody I'm about to name works up in homicide.

16            Christopher Magnin, Maloch Sarohr, and

17       Christian Kerr.

18  Q.   And they all do the same job as you do?

19  A.   Yes, sir, they're all crime analysts.

20  Q.   And are there crime analysts that work in other

21       department units like maybe rape or domestic violence?

22  A.   Yes, sir.

23  Q.   Okay.  Now, any training that you had, or received,

24       rather, to be a crime analyst, would that have been just

25       on-the-job training?



Nathan James Lloyd Howell                     30(b)(6)
08/23/2022                                    Page 53

1  A.   I do recall going to courses Foundations of Intelligence

2       Analysts Training while at DPD.  That's the one that I

3       can recall that I've attended.

4  Q.   Prior to that did you know anything about being a crime

5       analyst?

6  A.   Only from what I learned at Wayne State when I was doing

7       the CompStat work.

8  Q.   Tell me a little bit more about the CompStat work.

9  A.   So we would analyze the crimes for their time of

10      occurrence and location, so somewhat spatial and

11      temporal analysis, to figure out areas to notify the

12      residents about.  That would be, you know, times there

13      were dangerous to go to this area or visit this store

14      because it's within that hot spot.  So that was mainly

15      that focus of crime analysis.

16 Q.   Okay.  Now, I asked you earlier about how many cases

17      that you have worked on and you said that you don't

18      recall.

19 A.   I don't remember how many.

20 Q.   Is it fair to say that it was numerous, it has been

21      numerous?

22 A.   Numerous is a fair assessment.

23 Q.   And you think you did indicate that while you don't

24      recall the specifics of the demographics so to speak,

25      you admit that the majority of the suspects that you are



1      involved with are African-American?

2   A.   I believe I said that, yes.

3   Q.   Can you give me a percentage?

4   A.   I wouldn't unfortunately be able to give a percentage,

5        only that the, what I said before, most would be.

6   Q.   And, again, these are crimes of homicide that are

7        restricted to the City of Detroit?

8   A.   Yes, sir.

9   Q.   Do you know the population racial between

10       African-Americans and white people in Detroit?

11  A.   I do not, sir.  Sorry.

12  Q.   How often do you use facial recognition?

13  A.   I can't give a percentage or a number.  It's not -- it's

14       100 percent not every case, I can tell you that much,

15       but I don't know -- I can't give a percentage,

16       unfortunately.

17  Q.   Do you know why the facial recognition systems are

18       inherently bias with relationship to people of color?

19  A.   I don't know why.

20  Q.   As a crime analyst if, in fact, facial recognition

21       systems are inherently bias as relates to the

22       identification of African-Americans or people of color,

23       does that concern you?

24  A.   I've been trained by the FBI.  It does not concern me as

25       I have training on how to utilize it effectively and I



Nathan James Lloyd Howell                    30(b)(6)
08/23/2022                    Page 55

1     believe that would prevent the bias from occurring.

2   Q.   If you don't know why the facial recognition systems are

3        inherently bias and your totally trusting in the FBI but

4        you received no training from the FBI with regard to the

5        inherent biasness of facial recognition systems; right?

6   A.   I trust my training.

7   Q.   You trust your FBI?

8   A.   Yes, sir.

9   Q.   Okay.  These scores you say you ignore or you've been

10       told to ignore, did you from the beginning always ignore

11       the scores?

12  A.   I believe so because they're not -- I don't want to look

13       at them and just assume, I want to use the training I

14       have received.

15  Q.   Hmm?

16  A.   I want to use the training I received and I myself be

17       the one who says yea or nay on the candidates.

18  Q.   Do you know Officer Bussa or Bussa?

19  A.   I don't know that officer.

20  Q.   You probably don't know the particular algorithm that

21       Data Works uses; right?

22  A.   I'm not familiar with it, no.

23  Q.   Are you familiar with Robert Williams?

24  A.   No, I'm not familiar with Robert Williams.  Is that the

25       Shinola incident?



Nathan James Lloyd Howell                30(b)(6)
08/23/2022                               Page 56

1   Q.   Um-hmm.

2   A.   I read that one in the paper, online.

3   Q.   Since either of the cases of Robert Williams or my

4        client, Michael Oliver, incidents, have there been any

5        changes that you know of in the utilization of facial

6        recognition in the Detroit Police Department other than

7        the policy in September?

8   A.   When did the incident occur?  I don't recall, the

9        Michael Oliver one.

10  Q.   July of 2019.

11  A.   No, I believe this would be the newest, the one

12       afterwards.  So no would be my answer.

13  Q.   Have there been any discussions that you are aware of

14       that -- that you've been a part of at least with regard

15       to facial recognition and its application within the

16       Detroit Police Department based on either the incident

17       with Michael Oliver or Robert Williams?

18  A.   I haven't been a part of any of those discussions if

19       they occurred.

20  Q.   Who is your supervisor?

21  A.   My supervisor is Sergeant Reginald Beasley.

22  Q.   And who is the command officer for crime analysis?

23  A.   The command officer of the Crime Intelligence Unit?

24  Q.   The Crime Intelligence Unit, yes.

25  A.   I believe that is Commander Kari Sloan.



Nathan James Lloyd Howell                    30(b)(6)
08/23/2022                                   Page 57

1  Q.  And what hours do you work?

2  A.  I work from 7:00 a.m. to 3:00 p.m. Monday through

3      Friday.  However, I am on call 24/7 essentially.

4  Q.  Let's go over the process again after the facial

5      recognition gives you a suspect.  What happens?

6  A.  So it provides me with a set of candidates.

7  Q.  A set of candidates.

8  A.  And I will go and look through those candidates for a

9      viable investigative lead.

10 Q.  Okay.  Slow down.

11            A viable investigative lead.  How would you

12     make that determination?

13 A.  Based on the training I received from the FBI looking at

14     the facial features of the candidates in comparison to

15     the probe image that I uploaded to Data Works.

16 Q.  Okay.  So that's just a judgmental thing?

17 A.  Based on --

18 Q.  Based on your perception?

19 A.  Based on the training from the FBI.

20 Q.  Tell me that training.  I mean what does that -- I mean

21     is there any sort of special thing?  I mean are you

22     looking for a nose, the shape of a nose and comparing

23     the two images and whether the ears flare out, or what

24     kind of training?  I mean other than what I'm suggesting

25     is there anything special?



Nathan James Lloyd Howell                    30(b)(6)
        08/23/2022                          Page 58

1   A.   They tell you what to look at on the face specifically

2        and, for instance, the nose, the shape of the ears, the

3        earlobes, the eyebrows, how they are shaped.

4   Q.   Um-hmm.

5   A.   The nostrils, the shape of the nostrils, the eyes, the

6        creases of the eyes, like the inside here, features of

7        the face like that, the vermilion, which is that space

8        above the lip, the coloring, along with the skull shape

9        of the head, the shape of the chin, how the chin

10       appears, you know, the creases, dimple I guess you could

11       say and other things.  They do use the technical terms

12       which I have to refer to the material because it's not

13       terms I use every day through my discussion but

14       essentially that's what it is.

15                  Training, you avoid using things like the

16       lighting, disregard that, keep in mind that that

17       changes, as I discussed earlier, the angling, you know,

18       taking that into account, things like that that could

19       obscure the image and the candidates as well.

20  Q.   Okay.  So, again, we're at the time where you get the

21       suspect image from facial recognition.  You're saying

22       you're comparing the two pictures, the probe image with

23       that which was provided through the facial recognition?

24  A.   Yes, with the candidates provided.

25  Q.   The candidates.  And is there a number of candidates



1    that are -- that you can limit it to, you know, so you

2    say you only want five candidates as opposed to 10,000

3    candidates?

4  A.  **No, the program provides the candidates.  I don't have**

5      **any ability to modify.**

6  Q.  So if it's 10,000, you're going to compare all 10,000 to

7      this one probe image?

8  A.  **You're going to look through them.**

9  Q.  And then it's up to you individually as a human being to

10     say this one is an imagine and the other 9,999 are --

11 A.  **Yes, you would select the good candidate.**

12 Q.  And then you're going by what you just testified to,

13     what the FBI says that you should look for?

14 A.  **Yes.**

15 Q.  And then you make that determination?

16 A.  **Yes.**

17 Q.  What do you do next?

18 A.  **I would have a second trained analyst look at my**

19     **selection.**

20 Q.  And among the trained analysts that you gave me the

21     names of would you be using one in particular?

22 A.  **No.  They're all trained as far as I'm aware, they're**

23     **all trained, they should all be trained by the FBI.**

24 Q.  But they would be the same rank and qualification as

25     you; right?



Nathan James Lloyd Howell                    30(b)(6)
08/23/2022                                   Page 60

1   A.   Yes.

2   Q.   This is just a second pair of eyes?

3   A.   **With the same training.**

4   Q.   And then they can agree or they can disagree?

5   A.   **They can agree or disagree, yes.**

6   Q.   What if they disagree, what happens?

7   A.   **Then it's a bad candidate and that concludes my use of**

8       **facial recognition.**

9   Q.   Can a detective override that?

10  A.   **I don't believe so.**

11  Q.   If there's agreement what happens?

12  A.   **If there's agreement?**

13  Q.   Yes.

14  A.   **Then it goes to a supervisor or -- which would be a**

15      **sergeant or higher to --**

16  Q.   Okay.  And that person, are they also trained?

17  A.   **I don't believe they have to be trained.  I don't know.**

18      **I don't believe so.**

19  Q.   Okay.  So what do they do?  Do they essentially look at

20      it and say okay, looks good to me?

21  A.   **No, they can also disagree and say no.**

22  Q.   I understand, I understand.

23            But other than -- if they don't have any

24      training they're just, you know, looking at it and

25      saying okay, looks good to me?



1  A.   No, they can also disagree with the pick that we have

2       selected.

3  Q.   I understand that.  If they -- if they agree or

4       disagree, it's not based on any sort of specialized

5       training you say, it's just --

6  A.   I believe it would be based on their experience, but

7       they don't have the same -- they don't go through the

8       same training as I do.  Not all of them, some are.

9  Q.   After the supervisor looks at it then what happens?

10 A.   The pick, the good candidate information is provided to

11      the officer in charge of that homicide and then they

12      have to do further investigation as it's just an

13      investigative lead to use any of that information that

14      we provide to them.

15 Q.   Um-hmm.

16 A.   So they have to do, whatever they do in their

17      investigation to confirm that it's, in fact, that

18      individual who is involved in the homicide.

19 Q.   All right.  So prior to the September 2019 policy

20      Exhibit 2 --

21 A.   Um-hmm.

22 Q.   -- that process would not be followed; right?  So it

23      would be just random?

24 A.   I believe it was followed even though it doesn't outline

25      in here as far as I'm aware.



Nathan James Lloyd Howell
08/23/2022

30(b)(6)
Page 62

1  Q.  When you say you believe, you don't know, you're just

2      guessing?

3  A.  I know --

4  Q.  I don't want you to guess.

5  A.  Sorry.  I'm not exactly sure of every time I guess, so

6      no.

7  Q.  As far as you know there may not even have been, you

8      know, the guy that gets the suspect prior to September

9      of 2019 and comparing the candidates with the probe

10     image they may have just said Okay, well, this is what

11     was spit back and this is a hit and move on from there

12     as far as you know?

13 A.  As far as I know, it would I guess potentially, as far

14     as I know.  You know, I don't know every single one that

15     ....

16 Q.  Okay.

17          MR. ROBINSON:  I think that's all I have.

18          MR. CUNNINGHAM:  I just have a few questions.

19          MR. ROBINSON:  That scoring thing, I still

20     want that.

21          MR. CUNNINGHAM:  Yes.  I'm trying to get it

22     from him today.  We'll see.  I'll get it to you by

23     Friday.

24 EXAMINATION BY MR. CUNNINGHAM:

25 Q.  Were you involved in the investigation involving Michael



1      Oliver at all?

**2  A.   I was not.**

3  Q.   Did you do any analysis of facial recognition images in

4        connection with that case?

**5  A.   I did not.**

6  Q.   Are you aware of the procedures that were followed by

7        the staff in the Crime Intelligence Unit during the

8        course of that investigation?

**9  A.   No, I have not.**

10  Q.   Have you ever worked in the Crime Intelligence Unit?

**11  A.   I have, yes.**

12  Q.   When was the last time you worked in the Crime

13        Intelligence Unit?

**14  A.   I worked in the Crime Intelligence Unit for a year and I**

**15        was moved up to Homicide in August 2019, I believe.**

16  Q.   Okay.

**17  A.   2019.**

18  Q.   Were you involved at all in the decisions or processes

19        of procuring the Data Works software from the vendor?

**20  A.   I was not.**

21  Q.   And are you -- do you have any information that suggests

22        to you that Data Works facial recognition technology is

23        inherently biased?

**24  A.   I do not.**

25              MR. ROBINSON:  Okay.  I want to order this.



1    MR. CUNNINGHAM:  Me, too, please.

2    (The deposition was concluded at 12:08 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF NOTARY

2

3   STATE OF MICHIGAN  )

4                     )  SS

5   COUNTY OF OAKLAND  )

6

7            I, Cynthia Ann Chyla, Certified Shorthand

8   Reporter, a Notary Public in and for the above county

9   and state, do hereby certify that the above deposition

10  was taken before me at the time and place hereinbefore

11  set forth; that the witness was by me first duly sworn

12  to testify to the truth, and nothing but the truth, that

13  the foregoing questions asked and answers made by the

14  witness were duly recorded by me stenographically and

15  reduced to computer transcription; that this is a true,

16  full and correct transcript of my stenographic notes so

17  taken; and that I am not related to, nor of counsel to

18  either party nor interested in the event of this cause.

19

20

21  _____

22            Cynthia Ann Chyla, CSR-0092

23            Notary Public,

24            Oakland County, Michigan

25  My Commission expires:  05-12-2023



**1**

**1** 9:8,12 39:9 42:3

**1,000** 18:23

**1/2** 15:3

**10** 43:2

**10,000** 59:2,6

**100** 54:14

**10:13** 4:3

**12:08** 64:2

**1301** 50:25

**19-07** 20:25

**19th** 21:11 23:1

**2**

**2** 15:3 20:22 21:6 22:25 23:9
  32:8 33:2,3 51:17,21 52:3
  61:20

**2,000** 18:25

**2008** 44:7

**2012** 37:5

**2017** 42:4

**2018ish** 42:5

**2019** 15:5 21:11 22:10 23:1
  24:10,12,13,17 26:10 32:22,
  23 56:10 61:19 62:9 63:15,17

**2022** 4:2

**23** 4:2

**24/7** 57:3

**3**

**3** 15:4 20:24 22:7 23:9 24:6,9
  25:18 32:7 33:3,4 42:23

**30(b)(6)** 9:13,15 12:25

**307.5** 20:23

**32** 5:1 7:12

**3:00** 57:2

**4**

**4** 15:3 18:10 43:20 44:3 52:4

**4th** 23:6

**5**

**500** 19:2

**5th** 50:24

**7**

**7:00** 57:2

**7th** 42:10

**9**

**9,999** 59:10

**9th** 22:10 23:6,7 32:22,23

**A**

**a.m.** 4:3 57:2

**ability** 59:5

**accept** 6:9,11 28:8

**access** 11:1 34:4,6 50:21 52:5

**accessing** 50:19

**account** 43:24 58:18

**accuracy** 4:17 29:25 33:11,17
  34:8,15

**accurate** 40:2

**acoustic** 37:20

**acquire** 10:3

**acted** 18:10

**actual** 49:6,19

**additional** 50:11

**address** 6:4,6,13,16 50:25

**admit** 53:25

**adopting** 35:21

**advanced** 23:22 37:8

**advise** 48:14,16,20

**advised** 9:17

**advocates** 34:13

**affect** 28:2

**African-american** 19:8,12
  54:1

**African-americans** 54:10,22

**agency** 25:5 48:8

**agents** 34:13

**agree** 60:4,5 61:3

**agreed** 6:8

**agreement** 16:15 60:11,12

**Albion** 36:24 37:1

**algorithm** 10:24 11:7 28:10
  33:20 38:19 41:9 55:20

**algorithms** 12:3 20:4,7

**allowed** 12:19 16:13

**Americorps** 42:13,14

**analysis** 24:24 53:11,15 56:22
  63:3

**analyst** 4:19 7:3,4,15 8:8
  13:17,24 14:3,16 15:2,3 16:25
  17:22,25 18:10 19:16 21:16
  22:17 26:10 28:5 38:21 41:14
  48:3 49:1 51:19,24 52:24 53:5
  54:20 59:18

**analysts** 52:12,19,20 53:2
  59:20

**analyze** 53:9

**Andrea** 44:14,15

**angle** 32:1,4,6

**angling** 58:17

**answering** 17:8,10

**answers** 8:4

anticipation 27:12

apologize 49:18

appearance 6:10

appears 22:9,15 58:10

application 10:15 26:14 56:15

applied 47:20

apply 4:9

applying 48:3

approve 14:19

approximate 38:5

April 22:10 23:6,7 32:22,23

area 37:6,14 41:25 42:10
   46:21 48:14 51:19 53:13

areas 37:13 48:15 53:11

arrest 26:13,14,17

arson 49:12

assessment 53:22

assistance 48:17

assisted 44:25

assisting 18:1

Associates 43:19

assume 55:13

attend 41:23

attended 53:3

attention 20:10

attorney 33:8 35:3

August 4:2 63:15

avoid 58:15

aware 12:9,10 13:13 19:15
   28:9 56:13 59:22 61:25 63:6

---

B

Bachelors 36:24

back 9:6 13:11 17:14 29:22
   38:15 40:11 47:20 49:10,12

50:14 51:7 62:11

background 27:22 29:15
   36:23

bad 29:17,24 60:7

bag 49:10

based 56:16 57:13,17,18,19
   61:4,6

basis 30:20,23 34:14

Beasley 36:12

begin 4:13

beginning 13:2 55:10

behalf 6:8

Berkley 44:5

bias 15:23 22:2 34:1 54:18,21
   55:1,3

biased 63:23

biases 15:20 17:4,22 19:17
   20:11 21:23 22:5,20

biasness 55:5

big 27:22

biometrics 23:21

birth 5:8,14,17,24 6:1,16

bit 32:5 53:8

black 16:6,20 20:12

board 4:18 25:25 34:11 35:16
   47:24

body 50:10

BOPC 34:18

bound 42:20

boyfriend 45:3

boyfriend's 45:3

break 11:11,15

breakdown 18:11

bring 9:17,20,21 10:1,7 20:17
   33:6,14 34:16,20,23 35:2,22

broken 49:11

brought 9:25 10:6,11 20:9

bunch 28:11

burden 7:10

burned 49:13

Bussa 55:18

button 14:12

---

C

call 43:4 57:3

called 18:9 37:22 43:20

camera 7:8 14:5,7,10 27:24
   46:14 49:9

cameras 7:8,9 21:1 45:24

candidate 28:15 38:15 59:11
   60:7 61:10

candidates 14:13,14 28:11
   29:23,25 30:6 31:22 38:20
   40:14,15,21,25 41:1 48:1
   55:17 57:6,7,8,14 58:19,24,25
   59:2,3,4 62:9

capacity 4:19 7:2 13:17

capture 37:21

captured 14:6

captures 46:15

car 48:19,22,23 49:7,12,13

case 8:25 14:24 26:23 44:21,
   22 45:21 46:10 49:20,22
   54:14 63:4

case-by-case 30:20,22

cases 18:2,15,17 43:13 49:18
   53:16 56:3

catching 46:2

cell 26:25

Center 41:17 42:14

cetera 24:2

change 31:14

charge 8:24 14:24 27:1 45:14



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

46:8 61:11

check 50:17

checking 24:1

chief 36:17

children 44:12,13

chin 58:9

Christian 52:17

Christopher 52:16

city 6:9 9:13 12:25 18:2,4
34:14 35:20 37:21 46:1,16
54:7

Civil 9:15

civilian 5:11

client 56:4

close 27:24 46:9 47:6

closest 47:1

cloud 27:22

college 36:24,25 37:1

color 10:17 12:12 15:21 16:6,
20 17:5,23 19:18 20:12 21:25
22:21 33:12,18 34:9,15 54:18,
22

coloring 58:8

command 56:22,23

Commander 56:25

comments 35:20

Commercial 43:24

Commission 34:11

Commissioner 35:16

Commissioners 25:25

Commissioners' 4:18

communicated 21:20

community 41:23 42:8,17
48:10,11,12

company 10:15

compare 59:6

comparing 15:17 57:22 58:22
62:9

comparison 31:21 57:14

compromised 29:25

Compstat 41:22,23 48:7 53:7,
8

computer 7:20 9:23 10:5
39:23 43:12 45:3

computers 8:10

concern 20:10 28:4 29:6,17,
24 30:5,10 31:23 32:2,5 33:25
54:23,24

concluded 64:2

concludes 60:7

conduct 10:23 11:6

conducted 34:10

confirm 61:17

confused 11:21

conjunction 37:24

connection 26:13 43:24 44:24
63:4

consist 15:15

contact 51:10

contacts 8:22 45:4

contained 23:9 24:4,7,8 25:9,
11,15,18 33:2

continue 25:20

control 11:19

cop 5:19

correct 12:8,14 24:13,14
25:18

Corrections 45:5

correctly 41:13

corridor 42:9

corroborate 15:1

County 50:20

couple 45:13

courses 53:1

court 12:18 19:24 25:11,14
49:21,22,23,24 50:5,12

covered 49:11

creases 58:6,10

create 8:2 39:6 41:23

crime 7:3,4,9,14,22 8:8 13:17,
23 14:2 15:2,3 16:25 17:22,25
18:10 19:16 21:16 22:16
26:10 28:5 38:21 39:9 41:14,
25 42:16 45:25 48:3,14 49:2
50:5 51:19,24 52:12,19,20,24
53:4,15 54:20 56:22,23,24
63:7,10,12,14

crimes 23:23 32:12 48:17 53:9
54:6

criminal 8:21 37:9 48:5

crook 46:2

crop 30:12,14 31:5,15

cropped 30:10,18

Cropping 30:9

Cunningham 4:13 5:9,13,18,
21,25 6:5,11,17 8:3 9:21,23,
25 10:3 11:11,16,21 12:15,20,
25 16:14 17:10,13 23:15
28:20,22 29:1 30:3,25 31:3
35:5 36:7,10,17,20 38:24
62:18,21,24 64:1

cut 30:14

cuts 30:19

---

### D

damaged 26:24

dangerous 53:13

Data 10:15,25 11:7,9 12:4
14:11 19:23 20:2 23:21 30:13
33:20 35:21 39:22 40:12,22
51:10 55:21 57:15 63:19,22

date 5:8,13,17,24 6:1,16 22:23

Nathan James Lloyd Howell                30(b)(6)
08/23/2022                                      4

27:6 32:21 46:17

**dates** 48:16

**Dave** 4:13 8:3

**day** 58:13

**dealers** 44:1

**dealerships** 44:1

**death** 50:15

**deceased** 50:10

**decisions** 63:18

**defendant's** 49:2

**define** 21:13 28:10

**defines** 23:22

**definition** 25:3

**definitions** 23:20

**degree** 37:4 48:5

**degrees** 37:8,12

**demographics** 18:12 53:24

**demonstrating** 35:20

**deny** 14:20

**department** 4:20 6:25 7:3
10:14 11:6 12:2 13:20 16:25
17:1 19:16 20:9 23:4 26:4,7
32:15 37:16 39:17 41:15,22
45:5 47:19 48:13 52:21 56:6,
16

**Department's** 33:1

**depending** 30:20

**deployment** 10:18 12:13

**deposition** 4:7 9:8,9,13,18
11:19 13:2 20:15,22,24 27:12
34:17,20,23 64:2

**describe** 25:2 40:17

**description** 23:25

**descriptions** 7:25 8:9

**descriptive** 45:6

**designate** 9:14 13:1

**designation** 13:4

**desktop** 7:5 43:6,9,11

**detail** 23:19 25:2

**detective** 7:7 51:1,6,7 60:9

**detectives** 7:6 32:11 45:18

**determination** 57:12 59:15

**Detroit** 4:1,19 6:9,24 7:3 10:13
11:6 12:2 13:19 16:24 17:1
18:3,4,9,13 20:9 23:3 26:4,6
32:15,25 34:14 37:16 39:17
41:15 46:1 47:18 48:13 51:19,
21 54:7,10 56:6,16

**Detroit's** 7:20 9:14

**developed** 18:12 20:8 45:17
46:5

**developing** 18:6

**device** 26:24

**devices** 37:25 48:21

**difference** 23:8 26:4

**dimple** 58:10

**direct** 20:23 43:25

**Directive** 20:25 22:14,15 24:7,
18 26:5 32:7,9,10,12,21

**directives** 4:15 10:12

**disagree** 60:4,5,6,21 61:1,4

**disagreement** 9:3

**discipline** 25:5

**discovery** 5:15

**discrepancy** 27:2

**discuss** 27:19

**discussed** 27:15 58:17

**discussion** 19:25 35:17 58:13

**discussions** 56:13,18

**disregard** 58:16

**disseminated** 26:8

**distance** 27:24

**distinction** 16:4 25:22

**distinctions** 24:15

**distributed** 26:7

**distribution** 32:14

**District** 42:9

**Dixon** 52:13

**document** 22:11,16 23:5

**documentation** 16:2,4,9,10
20:13

**documents** 9:18,19,20,21,25
10:2,3,4,6,7 15:24 33:6 34:12
35:9,19,23

**domestic** 9:1 52:21

**DPD** 4:17 10:23 11:24 20:13,
23 33:10,16,21,25 34:2,7 53:2

**draw** 16:4

**driving** 49:7

**drove** 45:24

**duces** 9:13

**due** 6:19

**duly** 4:5

---

**E**

**earlier** 8:12 23:25 53:16 58:17

**earlobes** 58:3

**ears** 57:23 58:2

**east** 41:18 42:7 46:21 47:21

**Eastern** 46:3

**educate** 22:19

**educates** 21:22 22:4

**educational** 36:23 37:12

**effective** 22:23 23:3 24:16

**effectively** 54:25

**element** 13:18

**emails** 44:1

Nathan James Lloyd Howell
08/23/2022

30 (b) (6)
5

employed 5:21 6:12,24 41:16 47:18

employment 16:24 42:21 43:5

enact 26:1

enacted 23:3 24:17

encompassing 23:11

enforcement 5:22 41:24 48:6, 7,8,9

entitled 6:17

essay 47:22

essentially 31:23 37:21 43:13 57:3 58:14 60:19

estimate 18:15,16,21,22 19:7

evidence 9:7 49:1,3

exact 18:20 27:6 41:21 46:25

EXAMINATION 4:10 62:24

examined 4:5

examiner 23:21

examples 25:10

Exhibit 9:8,12 20:22,24 21:6 22:7,24 23:9 24:6,8 25:18 32:7,8 33:2,3 61:20

exhibits 33:2

exist 35:24 40:24

existence 32:8

exists 14:15 19:23 20:2

expands 23:10

experience 48:6 61:6

express 32:2

eyebrows 58:3

eyes 58:5,6 60:2

**F**

face 14:6,9 15:16 17:17 27:25 28:1,9,11 30:11 31:20,21 40:8,9 58:1,7

Facebook 44:23 48:25

faces 15:17 16:1

facial 10:15 13:18,22,23 14:2 15:11,21 16:3,5,19 17:3,16, 18,21 19:18 20:10,16,23 21:1, 10,13,17,23 22:9,12,20,24 23:2,12,20,23 24:16,21,23 25:5 26:2,5,13 28:3 29:11,14, 19 33:1 34:14 35:17 39:15 49:14 51:13,22,24 54:12,17, 20 55:8,9,10,15 57:4,14 58:21,23 60:8 63:3,22

Facing 41:22

fact 26:1 54:20 61:17

factor 27:22

fair 53:20,22

familiar 22:16 44:14 55:22,23, 24

family 50:7

FBI 14:16 15:12,13,19 16:10, 12 17:6,16 27:15 40:20 41:3 51:13,18,21,25 54:24 55:3,4,7 57:13,19 59:13,23

features 16:3 17:18 57:14 58:6

Federal 9:14 12:18

field 7:6,8

figure 53:11

find 7:17

finding 34:3 44:25

findings 51:2

finish 23:15 25:12 34:25

fired 38:5

fit 50:5

flare 57:23

floor 50:24

focus 53:15

focuses 42:8

follow-up 14:25

Ford 43:24 44:1

forehead 31:15,17

Forget 29:15

forgot 46:8

form 12:23 13:6

foundation 12:23 13:6

foundations 53:1

fourth 9:12

fraud 43:12

Friday 57:3 62:23

friend 9:3

function 20:7

functions 28:10

**G**

gave 23:25 48:15,19 51:6 59:20

geez 42:3,23 43:15

general 7:19 27:13

generalized 8:9

girlfriend 9:1

give 4:23 5:9,25 6:5 8:18,22 9:20 10:3 18:11 24:15 32:19 33:8 35:25 48:17 54:3,4,13,15

giving 7:18,25 8:9

glasses 28:1

good 14:15 28:13 30:7 40:21 41:3 47:7 59:11 60:20,25 61:10

government 25:23

graded 48:1

graduate 44:4

graduated 37:5 44:5

Greater 46:1

green 14:5,6,10 38:22 39:2,4

Nathan James Lloyd Howell
08/23/2022

30 (b) (6)
6

45:23 47:8,12,13 49:6

**Group** 43:6,8

**guess** 41:22 46:6 47:23 50:16
58:10 62:4,5,13

**guessing** 62:2

**gun** 38:2

**gunshots** 37:21

**guy** 62:8

---

### H

**H-O-W-E-L-L** 5:7

**hair** 30:24 31:8,13

**hand** 21:5 22:7

**happened** 47:7

**happening** 48:14

**hardening** 42:15

**harm** 9:2

**hat** 28:1

**hate** 38:18

**head** 18:8 31:5,7 58:9

**Headquarters** 50:24

**hear** 25:15 38:2

**heard** 19:21,22

**held** 19:25 42:3 43:3 48:12

**helped** 43:25 46:7,9

**high** 44:4,5 48:1

**higher** 60:15

**hired** 9:2

**history** 7:22

**hit** 14:11 62:11

**hits** 49:4 50:1

**Hmm** 55:15

**Hokich** 52:10

**Hold** 23:15

**home** 6:6

**homicide** 7:16 8:19 13:19 14:4
18:1,7,11,13,18 37:24 44:18,
20 45:1 46:4,24 47:2,7 49:5,8,
18 52:13,14,15 54:6 61:11,18
63:15

**homicides** 18:2,4,19

**honest** 15:9 26:9 51:15

**hope** 41:12

**hot** 48:15 53:14

**hours** 57:1

**Howell** 4:4,24 5:7 9:8 12:16
20:22,24 49:1

**Howell's** 4:14

**human** 59:9

---

### I

**idea** 20:8 27:13

**identification** 9:10 15:18
16:19 17:4 19:17 21:3,24 25:3
54:22

**identified** 22:14

**identifier** 16:5

**identifies** 25:4

**identify** 7:17 21:7 22:8 49:1

**identifying** 17:22 20:12 22:21
33:11,17 34:8,15 38:4

**IDS** 37:23

**ignore** 40:19 41:1 55:9,10

**illumination** 27:21

**image** 14:9,12 15:16 27:23
28:2,6,8,14,19,25 29:17,19,24
30:5,9,10,12,14,19 31:6,11,
16,17,25 32:5,9 38:11,16,22,
24 39:5,14,15,25 40:3,10
57:15 58:19,21,22 59:7 62:10

**images** 27:17 29:10 32:1,2
39:4 57:23 63:3

**imagine** 59:10

**implementation** 26:6

**incident** 25:7 27:14 55:25
56:8,16

**incidents** 37:23 56:4

**Incorporated** 41:18 42:7

**independent** 4:17 17:20
33:10,16,21 34:7

**individual** 14:19,23 31:14 36:6
46:9 50:4 61:18

**individual's** 14:9

**individually** 39:14 59:9

**individuals** 52:7

**information** 6:20 8:23 23:8
25:4 40:12 45:13,17 46:7
61:10,13 63:21

**inherent** 15:20,23 17:3,22
19:17 20:11 21:23 22:1,5,20
34:1 55:5

**inherently** 54:18,21 55:3
63:23

**initial** 10:17 12:13

**input** 39:15

**inside** 58:6

**instance** 9:1 14:5 22:9 28:1
48:23 58:2

**instructed** 10:7

**instructional** 4:16

**instrumental** 46:2

**insurance** 43:12

**intellectual** 10:25 11:8 20:4
33:22 41:7,9

**Intelligence** 41:14 53:1 56:23,
24 63:7,10,13,14

**interact** 51:1

**internal** 7:21

**Internet** 27:6



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**interview** 7:7 47:23,24

**intranet** 32:20

**investigate** 10:14

**investigating** 32:11

**investigation** 14:25 21:14 23:12 45:14 46:3,4 47:5 61:12,17 62:25 63:8

**investigations** 7:5,16 18:1,13 37:24

**investigative** 14:15,20,22 15:1 18:9 25:6,7 28:13,16 30:7 40:21 41:4 57:9,11 61:13

**investigator** 13:19 43:6,10,11

**involve** 18:2

**involved** 7:21 8:22 54:1 61:18 62:25 63:18

**involvement** 49:2

**involving** 62:25

**isolate** 30:11

**issue** 6:15 10:16 12:11 13:15

**issued** 24:12

**item** 33:9,10

**J**

**James** 4:4 5:3,6

**Jefferson** 41:18 42:7,9 47:21

**job** 13:22,23 21:15 42:2,6,11 52:18

**jobs** 43:3

**judge** 6:15

**judgmental** 57:16

**July** 26:10 42:4,5 56:10

**justice** 37:9 48:5

**K**

**Kallstrom** 6:18

**Kari** 56:25

**Kelly** 46:21 47:1 49:5

**Kerr** 52:17

**key** 49:1,3

**kill** 7:23 9:2

**kind** 7:13 47:4,24 57:24

**knowing** 20:5

**knowledge** 19:22 22:11

**L**

**L-L** 5:4

**L-L-O-Y-D** 5:5

**lacking** 30:6

**Lamoreaux** 41:6,13

**larceny** 26:23

**law** 5:21 41:24 48:6,7,8,9

**lead** 14:15,17,20,22 15:1,17 25:6,8 28:13,16 30:7 40:21 41:4 46:20 57:9,11 61:13

**leading** 26:14

**leads** 18:6,9,12

**learned** 53:6

**leaving** 48:19

**led** 46:23

**left** 52:11

**legally** 17:6,16

**letter** 10:20

**license** 45:24 46:11,14,15,17, 19 47:2,12 49:4

**light** 14:5,7,10 38:2,22,23 39:2,4 45:23 49:6

**Light-mounted** 21:1

**lighting** 27:21 58:16

**lights** 47:8,12,14

**limit** 33:25 59:1

**limited** 4:15

**link** 34:18

**lip** 58:8

**list** 14:13,14 40:14,21

**listed** 9:4

**listen** 11:14

**listening** 29:5

**literally** 38:21

**live** 24:23

**Lloyd** 4:4 5:3,6

**located** 50:10,24

**location** 38:5 39:20 46:17,19 48:15 49:5 50:8,10 53:10

**lock** 48:21

**log-in** 50:22 52:5,6

**long** 15:2 42:18 43:14,15 44:2 51:13

**longer** 6:12

**looked** 8:19 28:12 45:3,4,6,8

**lot** 7:5 18:20 43:12,25 49:18

**lower** 32:4

**LPR** 49:5

**M**

**Magnin** 52:16

**mail** 43:25

**maintenance** 26:2

**majority** 19:8,12 53:25

**make** 48:11 57:12 59:15

**making** 12:20 42:16 48:10

**Maloch** 52:16

**man's** 6:16

**manage** 43:25

**Management** 8:20

**manager** 41:13 43:19,21,22

Nathan James Lloyd Howell
08/23/2022

30(b)(6)
8

managing 43:23

manual 4:16

mark 20:21

marked 9:10,11 21:3,5

Marketing 43:19

married 44:8,9

mask 28:1

Masters 37:9 48:5

material 4:16,17 16:18 35:22
  58:12

materials 20:14

matter 6:7 7:14 13:1

mayor 36:18

means 14:9

mechanical 37:25

media 7:22 47:8,9,12

meeting 35:17

meetings 41:24 48:12

members 24:1

mention 22:6

mentioned 42:6

mentioning 24:25

mentions 25:6

met 35:14 44:11

Michael 26:14 56:4,9,17 62:25

Michigan 4:1 45:5 50:25

middle 5:2

Mile 46:21 49:5

mind 48:8 58:16

minute 11:12

misidentification 10:16 12:12

misuse 25:5

mobile 24:22

modify 59:5

Monday 57:2

month 49:20

months 27:11 42:23 43:2

move 62:11

moved 63:15

movements 50:14

murder 44:24

murdered 46:25

**N**

Nadia 52:13

names 59:21

Nathan 4:4,24 5:6

nature 12:3 23:23 48:24

nay 55:17

Network 25:5

newer 25:24

newest 56:11

newspaper 27:3,5

newspapers 26:21,22

nondisclosure 16:14

nonprofit 42:7

north 46:24 47:1

nose 57:22 58:2

nostrils 58:5

notice 4:8 9:9

notify 53:11

number 9:12 18:20 20:23,25
  21:6 22:7,25 24:6,9 38:4
  54:13 58:25

numerous 53:20,21,22

**O**

oath 4:6

object 12:15

objection 12:21,23 13:4,5

objections 12:18,24

obscure 31:20 58:19

observe 8:25

observed 45:11

obstructions 27:25

occur 18:2 56:8

occurred 46:24,25 56:19

occurrence 53:10

occurring 48:17 55:1

offering 11:2

offers 23:14,20,23

office 50:23

officer 5:12 6:18 8:24 14:24
  27:1 32:19 45:14 46:7 55:18,
  19 56:22,23 61:11

officers 50:8

Oliver 26:15,18 56:4,9,17 63:1

Oliver's 26:17

on-the-job 52:25

Onemagnify 43:20 44:11

online 56:2

OPC 26:1

opportunity 26:12

opposed 24:25 59:2

opposing 34:13

oral 47:24

order 20:14 30:11 40:4,20
  41:3 46:19 63:25

ordered 10:1

organization 42:8

organization's 33:24

outline 61:24

outlined 22:2 24:3 25:24

outreach 42:17

Nathan James Lloyd Howell
08/23/2022

30(b)(6)
9

override 60:9

oversight 25:23

---

**P**

---

p.m. 57:2 64:2

paid 42:21

pair 60:2

paper 49:10 56:2

Paragraph 11:2

parole 50:13

part 30:14,19 31:7,21 39:9
56:14,18

passenger 49:11

passes 46:18

pending 11:17

people 7:20,21 10:17 12:12
15:21 16:6,20 17:5,23 19:18
20:12 21:24 22:21 42:16 45:8
47:24 54:10,18,22

percent 54:14

percentage 54:3,4,13,15

perception 57:18

period 42:1

person 5:20 14:17 44:14 51:3,
5 60:16

personal 6:19 25:3

personnel 41:24 48:13

persons 18:12 33:11,17 34:8,
15

perspective 28:4 48:9

Pet 42:23 43:1

Peter 52:10

Petty 34:12 35:9,11,13

phone 26:23,24,25

photo 26:25 27:21 44:22

Photos 25:5

physical 39:20

pick 61:1,10

picture 30:24 39:6

pictures 58:22

pieces 43:25

place 32:14

Plaintiff's 9:11 21:6

plate 45:24 46:1,14,18,19
47:2,12 49:4

plates 46:15

point 6:12

points 50:1,2,7,8,9,12,14,17,
19,20

poles 38:2

police 4:18,19 5:12 6:18,24
7:3 10:13 11:6 12:2 13:19
16:24 17:1 19:16 20:9 23:3
26:4,7 32:15,25 34:11 35:16
37:16 39:17 41:15 47:18
48:13 56:6,16

policy 4:15 20:16 21:10,17,19,
22 22:3,4,10,24 23:2,10 24:4,
12,16,17 26:1,5 56:7 61:19

pool 47:25 48:2

poor 30:5

population 54:9

position 36:16 41:21 42:3,20,
21 43:5 48:3,7

positive 15:17 25:8

possibly 7:23

post 48:25

potential 20:10 28:14 29:23
30:7 47:25

potentially 62:13

practical 7:14

practice 24:11 34:1

practices 42:15

precinct 42:10

predictive 24:24

prepare 20:14

present 9:22 41:25 48:13

prevent 55:1

previous 47:14

prime 4:19

printed 9:23 10:5,10

prior 10:17 12:12 24:10,11,18
32:8 40:6,7 41:15 42:11,19,
22,24,25 43:1,2,3,18 50:14
51:18,21,25 52:3 53:4 61:19
62:8

prison 45:4,9,12,15 46:5

probation 50:13

probe 27:16 28:2,6,19,25
29:9,19 30:12 31:25 32:1,5
38:11,16,24 39:14 57:15
58:22 59:7 62:9

procedure 9:15 15:5,6 32:25

procedures 63:6

proceeds 6:7

process 6:19 14:1 15:7 24:3,6,
8 29:11 40:5 57:4 61:22

processes 20:11 63:18

procuring 63:19

produce 16:11

produced 28:19 38:10

producing 10:13

product 28:19,25 29:10,14
34:2

profiles 7:22

program 14:11 19:23 20:3,8
28:7 30:13 33:21 38:19 40:5,
25 59:4

prohibited 24:21

prohibits 24:24

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Nathan James Lloyd Howell
08/23/2022

30 (b) (6)
10

project 41:13 43:19,21,22
49:6

projects 43:22

pronouncing 41:12

properly 40:5

property 10:25 11:8 20:4
33:22,24

proprietary 10:25 11:8 12:3
20:4 33:19,24 34:6 41:8,9

protection 5:22 6:18

provide 6:12 8:24 9:25 35:19
40:14 45:13 46:7 61:14

provided 8:21 14:22 16:12
32:12 34:12 35:10 58:23,24
61:10

provisions 4:16

public 25:25 35:20 41:22

publicly 35:6

purchase 10:17 12:13

purchases 34:2

purpose 21:12

purposes 4:9 28:3 34:2

pursuant 4:8 9:14

put 5:23 8:23 9:7 29:18,24
47:25

putting 29:17 34:1

### Q

qualification 59:24

quality 27:16 28:2 29:9 30:5
32:9

queries 14:12

question 9:24 11:16 13:3,8,9,
10 17:8,9,11,14 23:16 25:12
27:14 28:20,21,23 29:2,4 34:5
36:2

questions 4:18 8:4,6 62:18

### R

racial 18:11,13 54:9

random 47:4 61:23

rank 59:24

rape 52:21

re-notice 9:12

read 15:1,9 17:14 26:21,22,23
27:5 28:9 37:22 46:19 56:2

reader 45:24 46:11,14 47:2
49:4

readers 47:13

rear 49:11

reason 6:15

rebuilding 42:8

recall 10:8,9 15:22 16:8,17,21
22:6 24:5 27:6,20,23 38:9
41:20 44:18,21 45:11 46:24
47:17 49:19 50:12 52:6,10
53:1,3,18,24 56:8

receive 15:13,19,24 28:7 30:6
31:22 37:2,4

received 15:10,25 16:1,25
35:20 40:20 41:2 52:23 55:4,
14,16 57:13

recently 27:8,9

recognition 10:15 13:18,22,23
14:2 15:11,21 16:5,19 17:3,
17,21 19:19 20:10,16,23 21:1,
10,13,17,24 22:10,12,20,24
23:2,12,20,24 24:16,21,23
25:6 26:2,5,14 28:3 29:11,15,
19 33:1 34:14 35:17 39:15
49:14 51:14,22,24 54:12,17,
20 55:2,5 56:6,15 57:5 58:21,
23 60:8 63:3,22

record 4:11 5:24 9:7 13:12
17:15 19:25 21:7 22:8 25:25
45:4

recorded 24:23

Records 8:20

redundancy 24:1,11 29:12,13

refer 58:12

reference 38:18

referred 24:10

regard 15:20 29:9 31:23,24
45:21 55:4 56:14

Reginald 56:21

related 32:25

relates 16:6,19 17:4,21 19:17
20:11 21:24 22:20 28:5 32:24
54:21

relationship 54:18

relied 10:14

rely 13:17,21 21:15,18

remember 10:10 15:9 18:16,
17 26:9 27:1,4 43:15 44:15,16
51:15 52:10 53:19

removing 49:10

repeat 13:9 40:23

repeated 13:12 17:15

report 7:15 8:24 9:4 25:7,24
27:3,4

REPORTER 25:11,14

reports 8:21 34:19 37:23
41:23 47:14

request 33:9 50:11,20

requested 13:12 14:23 17:15

research 4:17 33:11,17,21
34:8

residents 48:12 53:12

resource 47:7

resources 47:6

respond 37:23

responding 11:25

response 38:16

Nathan James Lloyd Howell
08/23/2022

30 (b) (6)
11

responsibilities 25:23

restricted 54:7

results 28:7

review 15:6,7 20:14 26:12
38:22 39:2,4

reviewed 21:20 49:20

RMS 7:21 8:12,18,20

Robert 55:23,24 56:3,17

Robinson 4:7,10,21,22 5:11,
15,16,19,23 6:2,3,7,14,21,23
8:5,7 9:11,16 11:14,18,23
12:17,22 13:5,7,10,14 16:16
17:12,14,19 19:24 20:1,21
21:4 23:18 25:17 28:21,23,24
29:5,7 30:8 31:4 35:7,8 36:5,
9,11,16,19,22 38:25 39:1,10
62:17,19 63:25

Robison 43:6,8

roughly 15:3 42:4

Rule 12:25

rules 4:9 9:14 12:18

run 17:6,16 23:24

**S**

S-T-E-I-N 36:21

safer 48:10,11

Sarohr 52:16

scenarios 48:18

scene 7:8 45:25 47:2,7 49:6,8

scenes 7:9

school 44:4,5

Science 37:9

scope 13:3

score 38:20 40:18

scored 38:16

scores 41:1 55:9,11

scoring 38:10,12 40:12,15,17,
19,24 41:2 62:19

search 14:12

seat 49:10

section 11:22

security 26:2

sees 50:5

select 14:14 40:20 41:3 59:11

selected 14:17,47:22 48:2
61:2

selecting 32:5 40:9

selection 59:19

send 50:8

sensors 37:20

separate 47:13

September 21:10 23:1 24:10,
12,17,25 32:23 56:7 61:19
62:8

sergeant 14:19 56:21 60:15

serve 6:13

service 6:9,11

set 57:6,7

shaking 18:8

shape 57:22 58:2,5,8,9

shaped 58:3

Shinola 55:25

shooting 14:5

shorter 43:16

Shot 37:15,17,18,20 38:1
47:14

shots 38:3,4

side 46:22 49:11

signed 16:14

simply 46:6

simultaneously 39:11

single 62:14

sir 4:23,25 5:3,5 7:1 12:7
13:16 15:12,14 16:3,21 18:5,9
19:1,7 20:20 21:20 22:15,18
24:5,9,14 25:10,19,21 26:11,
16 27:9,18 29:21 30:7,11
31:13,18 32:10,16,18,20,22
33:7,15 35:1,13,18,23 36:15
38:13 39:16,18,24 40:1,24
45:19 46:12 47:10 48:4 49:16,
22 50:18 51:9,17,20,23 52:19,
22 54:8,11 55:8

site 49:13

skull 58:8

Sloan 56:25

Slow 57:10

Smart 50:22

SNAP 25:4

social 7:22 47:8,9,12

sociology 36:24 37:7

software 10:16,18 11:8,9
12:13 17:17 22:13 24:22 25:6
29:20 63:19

son 45:11,15 46:5,20

sort 27:23 32:24 43:22 48:15,
17 57:21 61:4

space 58:7

spatial 53:10

speak 28:15 53:24

speaking 12:17,20,24 39:10

special 57:21,25

specialist 41:14

specialized 61:4

specific 8:3,4,5 10:16 12:11
16:18 23:13 24:15 41:25

specifically 8:8,11 13:15 16:6,
18 45:2 58:1

specifics 7:19 8:1,10 53:24

spell 36:19 41:12

spit 29:11 62:11

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Nathan James Lloyd Howell
08/23/2022

30 (b) (6)
12

spot 48:15 53:14

spotter 37:15,17,18,20 47:14

Spotters 38:1

squad 46:4,5

staff 36:18 63:7

state 4:11 37:10 41:17,19,20
42:12,19 47:20 53:6

State's 42:13

stated 8:12

statement 28:22 29:3

Statewide 25:4

steal 48:23

steering 48:21

Stein 36:7,13

stellar 28:5

Stephen 41:6,11

steps 28:17

stipend- 42:19

stop 8:14 30:2 39:6

store 53:13

straight 31:25 32:2

stream 24:23

street 46:25 50:25

studies 10:13,24 11:4,5,7,24
12:2,8,9,10,11 13:13 17:20
41:7,17 42:14

stuff 34:6 35:2,4

styles 31:13

subject 13:1

submit 14:11

substantial 43:5

suggesting 57:24

suggestive 17:1

suggests 63:21

Sunday 8:19

supervisor 14:18 56:20,21
60:14 61:9

supervisors 24:1

supplemental 25:7

Supplies 42:23 43:1

supported 49:2

supposed 16:2 36:6

surveillance 24:22

suspect 14:8 29:18 39:7,8,9
40:8,11 44:25 45:23 46:6,20
49:7 57:5 58:21 62:8

suspects 7:17 19:8 34:3 47:15
53:25

sworn 4:5 5:20

system 7:21 8:12,18,20 39:15,
19,22 40:16,17,19,24 41:2
50:21

systems 45:24 54:17,21 55:2,
5

---

### T

T-R-I-S-H-A 36:21

takes 32:14

taking 9:12 31:20 58:18

talk 10:18 12:10 33:14,16 35:3

talking 11:13 14:8 15:25 25:9,
14 28:18 29:3,13 38:24 50:2

targeted 48:22

tasked 42:15

tattoos 27:2

taught 15:22

teaching 15:23

technical 58:11

technically 47:13

technology 21:2 35:21 37:15
63:22

tecum 9:13

temporal 53:11

Ten 19:4

terms 23:13 58:11,13

test 47:21,22,23

testified 4:5 49:24 50:1 59:12

testify 12:16 13:2 49:21,22,23,
25

testimony 4:14 11:2 12:1
33:9,10 35:19,25

tether 50:1,2,5,6,9,11,13,19,
20

thing 17:2 32:24 57:16,21
62:19

things 23:22 48:23 58:11,15,
18

thought 10:10

time 38:5 46:17 49:24 50:10
53:9 58:20 62:5 63:12

times 14:23 21:21 45:13 48:16
53:12

title 41:21

today 33:6,10 35:22 62:22

told 31:13 35:5 40:19 41:1,5,9
55:10

tools 50:16

top 31:5 32:3

topic 4:15

totally 55:3

track 50:14

tracked 45:23

tracking 49:12

Traffic 20:25

train 22:19

trained 14:16 17:6,16 21:19
27:16 54:24 59:18,20,22,23
60:16,17

training 4:16 15:10,13,15,20,
24 20:25 22:14,15,24 23:22


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

24:7,18 26:5 27:15 32:7,8,10,
12,21,25 37:13,15 38:6,8
40:20 41:2,10 51:13,18,21,25
52:3,23,25 53:2 54:25 55:4,6,
13,16 57:13,19,20,24 58:15
60:3,24 61:5,8

**trains** 21:23 22:5

**transcripts** 34:12

**transfer** 16:13

**trial** 6:8,10

**Trisha** 36:7,9,10,12

**Troy** 43:8

**trust** 55:6,7

**trusting** 55:3

**Tucker** 44:14,15

**Tuesday** 4:2

**turned** 45:17 51:2

**Twanny** 34:12 35:9,11,13

**Twenty** 19:6

---

**U**

**ultimately** 49:13

**Um-hmm** 8:15,17 14:21 31:10
37:11 38:17 45:10 47:8 56:1
58:4 61:15,21

**unable** 11:6 14:7

**underneath** 40:15,24

**understand** 24:2 29:16 33:23
38:11 60:22 61:3

**understanding** 15:19

**unemployed** 43:1

**Unit** 41:14 56:23,24 63:7,10,
13,14

**units** 52:21

**University** 37:10

**upload** 14:10 30:12 39:25

**uploaded** 57:15

**uploading** 40:3,6,7,9

**Urban** 41:17 42:14

**utility** 10:14 16:5,18 17:3,21

**utilization** 19:18 26:6 33:1
56:5

**utilize** 54:25

**utilized** 47:16 49:7

**utilizing** 28:3 51:22

Nathan James Lloyd Howell
08/23/2022

---

**V**

**vague** 7:13,25

**vehicle** 45:23 46:18 49:9

**vendor** 63:19

**vermilion** 58:7

**versus** 23:9 24:17

**viable** 41:4 46:6 57:9,11

**victim** 8:20,21,23 42:15 44:20
50:1,4,6

**victims** 7:23 8:12,16 42:16
44:18 47:15

**video** 7:8 38:23 39:2,6 49:6

**videos** 24:23

**View** 50:22

**violence** 9:1 52:21

**violent** 39:9

**visit** 45:8,12,15 53:13

**visits** 46:5

**visual** 14:6

**vocation** 37:14

**volunteer** 42:13,20

---

**W**

**Wait** 29:1

**wanted** 7:23 9:2 27:13

**Warehouse** 42:9

**Wayne** 37:10 41:17,19,20
42:11,13,19 47:20 50:20 53:6

**website** 34:18

**weekly** 25:24

**weeks** 15:4

**wells** 48:20

**whatsoever** 49:14

**wheel** 48:20,21
30(b)(6)

**white** 19:9 54:10

**wife** 44:10,11

**Williams** 55:23,24 56:3,17

**window** 49:11

**witnesses** 7:7 14:8 47:15

**words** 46:9

**work** 7:5,15,16,20 8:10 14:4
17:25 19:15 38:3 42:14 49:18
51:19 52:12,13,14,20 53:7,8
57:1,2

**worked** 18:17,19 26:16 41:20,
21 42:23 43:12,20 53:17
63:10,12,14

**working** 18:1 26:10 41:15,17
47:20

**works** 10:15,25 11:7,9 12:4
14:1,11 19:23 20:3 23:21
28:10 30:13 33:20 35:21
38:19 39:22 40:12,22 44:11
47:5 51:10 52:15 55:21 57:15
63:19,22

**written** 4:15 10:12 35:19
47:21,22

**wrong** 11:22 18:22 28:14,15
29:10,18

---

**Y**

**yea** 55:17

**year** 42:3 43:16,17 49:19
63:14

**years** 5:1 15:3 18:10 43:20

Nathan James Lloyd Howell                    30(b)(6)
08/23/2022                                        14

44:3 51:17,21 52:3,4

Nathan James Lloyd Howell          30(b)(6)
08/23/2022