UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL OLIVER,

     Plaintiff,

v.

DONALD BUSSA, in his individual and official
capacity, and CITY OF DETROIT, jointly and
severally,

     Defendants.

Case No. 20-12711

Hon. Laurie J. Michelson

**AMICI CURIAE BRIEF OF THE AMERICAN CIVIL LIBERTIES UNION,
THE AMERICAN CIVIL LIBERTIES UNION OF MICHIGAN, AND
ROBERT WILLIAMS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Michael J. Steinberg (P43085)
Ben Mordechai-Strongin*
Lauren Yu*
William Ellis*
Mickey Terlep*
Julia Kahn*
Civil Rights Litigation Initiative
University of Michigan Law School
701 S. State Street, Suite 2020
Ann Arbor, MI 48109
(734) 763-1983
mjsteinb@umich.edu

*Student Attorney practicing
pursuant to Local Rule 83.21*

Ramis J. Wadood (P85791)
Philip Mayor (P81691)
Daniel S. Korobkin (P72842)
American Civil Liberties Union
  Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6803
rwadood@aclumich.org

Nathan Freed Wessler
American Civil Liberties Union
  Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
nwessler@aclu.org

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

INTEREST OF AMICI CURIAE .............................................................. 1

INTRODUCTION ....................................................................................... 2

RELEVANT FACTS FROM *WILLIAMS* .................................................. 3

ARGUMENT ............................................................................................... 8

I.    FRT is always unreliable, and is especially likely to result in false arrests when used without training and policy guardrails ........................................... 10

II.   Witness identifications from lineups in which the suspect was included solely because of an FRT match are inherently suggestive and cannot support probable cause, particularly when, as in both *Williams* and *Oliver*, the investigator conceals exculpatory evidence about the lineup .................. 16

III.  Detective Bussa's unconstitutional conduct was enabled by DPD's consistent failure to train on the use and reliability of FRT and on policing in general ........................................................................ 22

CONCLUSION ......................................................................................... 25

BRIEF FORMAT CERTIFICATION FORM ....................................... 27

i

# TABLE OF AUTHORITIES

## CASES

*Berg v. Cnty. of Allegheny*,
219 F.3d 261 (3d Cir. 2000)................................................................15

*Edrei v. City of N.Y.*,
254 F. Supp. 3d 565 (S.D.N.Y. 2017).............................................15

*Gregory v. City of Louisville*,
444 F.3d 725 (6th Cir. 2006)..........................................................24

*Maryland v. Pringle*,
540 U.S. 366 (2003) .......................................................................21

*Monell v. Dep't of Soc. Servs. of N.Y.*,
436 U.S. 658 (1978) .........................................................9, 15, 16

*Ouza v. City of Dearborn Heights*,
969 F.3d 265 (6th Cir. 2020)..........................................................23

*Sykes v. Anderson*,
625 F.3d 294 (6th Cir. 2010).........................................................22

*Williams v. City of Detroit*,
No. 2:21-cv-10827-LJM-DRG (E.D. Mich.) ............................passim

## OTHER AUTHORITIES

Am. Law Inst., *Principles of the Law, Policing* § 10.03 (2023) ......................5, 17

David White et al., *Error Rates in Users of Automatic Face Recognition Software*,
10 PLoS ONE e0139827 (2015) ......................................................13

David White et al., *Human Oversight of Facial Recognition Technology in Forensic Applications* (U.K. Parliament 2021)..........................13, 18

Drew Harwell, *Federal Study Confirms Racial Bias of Many Facial-Recognition Systems, Casts Doubt on Their Expanding Use*, Wash. Post (Dec. 19, 2019) ................................................................................12

Gary L. Wells et al., *Eyewitness Identification: Bayesian Information Gain, Base-Rate Effect Equivalency Curves, and Reasonable Suspicion*, 39 L. & Hum. Behav. 99 (2015) ...............................................17

Henry H. Perritt Jr., *Defending Face-Recognition Technology (And Defending Against It)*, 25 J. Tech. L. & Pol'y 42 (2021) ...............................................19

Kate Crookes & Gillian Rhodes, *Poor Recognition of Other-Race Faces Cannot Always Be Explained by a Lack of Effort*, 25 Visual Cognition 430 (2017)...........................................12

Khari Johnson, *The Hidden Role of Facial Recognition Tech in Many Arrests*, Wired (Mar. 7, 2022) ......................................................11

Laura Moy, *Facing Injustice: How Face Recognition Technology May Increase the Incidence of Misidentifications and Wrongful Convictions*, 30 Wm. & Mary Bill Rts. J. 337 (2021)............................................18

Margaret Bull Kovera & Andrew J. Evelo, *The Case for Double-Blind Lineup Administration*, 23 Psychol. Pub. Pol'y & L. 421 (2017)....................................20, 21

Mich. State Bar, Eyewitness Identification Task Force, *Law Enforcement and Eyewitness Identifications: A Policy Writing Guide* (2012) .............................19

Patrick Grother et al., Nat'l Inst. Standards & Tech. ("NIST"), *Face Recognition Vendor Test (FRVT) Part 2: Identification* (2019) .................5, 11

Patrick Grother et al., NIST, *Face Recognition Vendor Test (FRVT) Part 3: Demographic Effects* (2019) ......................................................5, 11

Raja Parasuraman & Dietrich Manzey, *Complacency and Bias in Human Use of Automation: An Attentional Integration*, 52 Hum. Factors 381 (2010) ...................................................13, 15

Rebecca Darin Goldberg, *You Can See My Face, Why Can't I? Facial Recognition and* Brady,
    5 Colum. Hum. Rts. L. Rev. Online 261 (2021) ........................................10, 18

*The Handbook of Eyewitness Psychology*: *Volume 1 Memory for Events*
    (Michael P. Toglia et al. eds., 2007) ................................................................12

Thomas D. Albright, *Why Eyewitnesses Fail*,
    114 Proc. Nat'l Acad. Scis. 7758 (2017) .........................................................20

iv

## INTEREST OF AMICI CURIAE

The American Civil Liberties Union ("ACLU") is a nationwide, nonprofit, nonpartisan organization dedicated to the principles embodied in the United States Constitution and our nation's civil rights laws. The American Civil Liberties Union of Michigan is a state affiliate of the ACLU. The ACLU has appeared before courts throughout the country in cases involving the dangers posed by unfettered police use of emerging technologies, including facial recognition technology. Attorneys associated with the ACLU and ACLU of Michigan represent Robert Williams in *Williams v. City of Detroit*, No. 2:21-cv-10827-LJM-DRG (E.D. Mich.), currently pending before this Court, alleging that the misuse of facial recognition technology led to his wrongful arrest.

Mr. Williams, a husband and father of two young girls, was arrested in January 2020 based on misidentifications by flawed facial recognition technology and by a non-eyewitness in a grossly unreliable photo lineup. His lawsuit against Detective Donald Bussa and the City of Detroit is currently in discovery, with dispositive motions due in October 2023. Mr. Williams's experience is strikingly similar to Mr. Oliver's: both are Black men who were wrongly accused of and arrested for a crime they did not commit because of the same Detroit Police Department ("DPD") detective's reliance on incorrect "matches" by facial recognition algorithms. Because of the similarities between Mr. Williams's and Mr. Oliver's cases, Mr.

Williams has an interest in ensuring that the Court's resolution of this case does not prejudice resolution of his suit.

## INTRODUCTION

This case presents serious questions about the constitutionality of the DPD's reliance on facial recognition technology ("FRT") in its criminal investigations and its woefully inadequate training of its investigators.

Amici write to highlight the dangers of FRT and apprise the Court of relevant facts learned through robust discovery in *Williams*, which illuminate three important points regarding Defendants' unconstitutional conduct in this case. First, FRT is unreliable and severely misused by DPD, which failed to train its officers in the technology or adopt appropriate policies regarding its use. Second, the photo lineups in this case and in *Williams* were tainted by the false matches produced by FRT and by additional deficiencies and biases, none of which DPD disclosed to the magistrate in the arrest warrant applications. Third, as discovery in *Williams* confirms, the false arrest in this case was made possible by the DPD's deficient or absent policies and failure to train on FRT, algorithmic bias, photo lineup procedures, the obligation to include exculpatory information in warrant requests, the probable cause standard, and more.

In other words, the *Oliver* case shares a number of troubling factual and legal issues with the *Williams* case. Thus, amici believe that their experience in *Williams*

2

will provide the Court with helpful context in its consideration of the factual and legal issues in *Oliver*. Because the record in *Oliver* raises genuine issues of material fact as to the constitutionality of Defendants' actions, amici urge this Court to deny Defendants' motion for summary judgment. In the alternative, amici encourage the Court to consider staying further proceedings in this matter until summary judgment motions in *Williams* are fully briefed, so that the Court may consider the cases concurrently.

## RELEVANT FACTS FROM *WILLIAMS*

As noted above, several components of the record developed in *Williams* are highly relevant to the Court's consideration of this case. Through discovery in *Williams*, amici have learned of a rampant failure to train detectives at the time Donald Bussa—who submitted the arrest warrant applications for both Mr. Oliver and Mr. Williams—was promoted to that position. The *Williams* record also exposes systemic deficiencies in DPD's use of and reliance on FRT that will demonstrate the serious threat to constitutional rights posed by the technology.

When Mr. Williams files his dispositive motion, his record will show that DPD has relied on FRT since at least 2016, but failed to implement *any* policies or restrictions on FRT until April 2019 (after the FRT search that identified Mr. Williams). In April 2019, DPD issued a threadbare department-wide directive that merely provided that use of FRT required an "active or ongoing criminal or

homeland security investigation." It was not until September 2019—after the FRT search and arrest in *Oliver*—that DPD updated the department-wide policy on the use of FRT, but this policy still provides no explanation of the technology, warnings of its risks, or directives to investigators about appropriate next steps upon receiving an FRT investigative lead. Additionally, DPD's training for investigators relying on FRT is similarly lacking. DPD has made no effort to train detectives on the FRT request process, the importance of image quality in generating more reliable results, what questions to ask an examiner about an FRT search result, what investigative steps are appropriate once a detective receives an investigative lead, or the racially disparate performance of the technology.

But the lack of training goes much deeper: The record in *Williams* will also show that, at the times relevant to the *Williams* and *Oliver* investigations, DPD did not require *any* specific training for officers when they were promoted from beat patrol officer to an investigative position (e.g., detective). Instead, new detectives were left to their own devices to figure out not only how properly to request FRT searches or use FRT results, but also how to conduct a wide range of consequential investigative duties. Relevant here, detectives were not trained on minimal standards for conducting a photo lineup, on warrant procedures (including the duty to provide exculpatory information to the magistrate), on probable cause, and other topics.

Detective Bussa's conduct in the *Oliver* and *Williams* investigations demonstrates the disastrous impact of DPD's deficient policies and training. For example, it is widely acknowledged that the quality of the image submitted for an FRT search (known as the "probe image") has a dramatic effect on the accuracy and reliability of FRT search results, and that the technology has a higher rate of false matches when used to identify Black people and other people of color. *See, e.g.*, Patrick Grother et al., Nat'l Inst. Standards & Tech. ("NIST"), *Face Recognition Vendor Test (FRVT) Part 2: Identification* 9–10 (2019), https://perma.cc/BR6Y-6X6D; Patrick Grother et al., NIST, *Face Recognition Vendor Test (FRVT) Part 3: Demographic Effects* 6–8 (2019), https://perma.cc/R9RE-HHD9. Detective Bussa was not trained to know how imprecise FRT is or that it misidentifies people of color at higher rates. Detective Bussa's deposition from *Williams* will show that he had no sense of the importance of probe image quality on FRT returns. Indeed, like other detectives, he was (and remains) completely ignorant as to how FRT works. Nor was he trained or told that relying on an FRT search result, alone, is a far cry from "a substantial basis to believe that the suspect committed the crime" required to initiate a lineup. Am. Law Inst., *Principles of the Law, Policing* § 10.03 (2023), https://perma.cc/B9V4-P4DU; *see infra* Argument, Section II. As a result, he conducted no confirmatory investigation before including Mr. Williams's photo—a false match generated by the FRT search—in a photo lineup.

Indeed, as a result of a lack of training, Detective Bussa repeatedly failed to investigate crimes through means *other* than FRT. The record in *Williams* will show that in virtually every case where Detective Bussa used facial recognition, he essentially did nothing *other* than use FRT—closing the case when FRT did not return a lead and pursuing no one other than the FRT investigative lead when it did.

Further, Detective Bussa, like *all* new detectives at the time of the Oliver and Williams investigations, was not trained on minimal standards for conducting a photo lineup. DPD detectives were unaware of the proper method of conducting an unbiased photo lineup and did not understand the risks associated with unduly suggestive eyewitness identification. In *Williams,* the record will demonstrate that the witness who performed the lineup was a loss prevention contractor who had not actually witnessed the crime, who was permitted during the administration of the lineup to look back and forth between a low-quality picture of the suspect and the six-pack photo array, and who was informed prior to the lineup that FRT had been used to generate a lead in the case. Bussa was so poorly trained that even at the time of his deposition he still saw no problem with allowing this non-eyewitness to review a photo of the suspect while she was performing the lineup. None of these facts prevented Detective Bussa from seeking a warrant for Mr. Williams's arrest.

Detectives were also barely trained on warrant procedures or probable cause. Detective Bussa, for example, testified that he was last trained on the topics in the

6

police academy—over a decade before his promotion to detective. Multiple detectives deposed in *Williams* could not properly define probable cause (several defined it as "reasonable suspicion"). Detectives were also untrained in drafting warrant applications, including the importance of reciting *all* relevant information in the application, especially exculpatory facts.

In part because of this lack of training, Bussa omitted all the crucial exculpatory information described above in his request for a warrant in *Williams* and in *Oliver*—and perhaps in countless other cases.

The failures to train and the dangerous practices of over-reliance on FRT, suggestive photo lineup procedures, and poor investigative work will be further expounded upon by expert testimony in *Williams*. Such testimony will explain in detail how FRT functions and the many factors that render FRT searches like the ones used in *Williams* and *Oliver* unreliable. It will also establish that DPD violated professional policing standards by relying heavily on a new investigative tool, FRT, without training its investigators and without adopting policies for use of the technology. Experts will also testify that DPD's lineup procedures, both as they involve FRT and standing on their own, violated minimum legal and professional standards. And experts will opine that DPD's lack of training for detectives was woefully inadequate and created an obvious risk of false arrests as a result.

# ARGUMENT

Wrongful arrests are not trivial; seizure by police and time in jail, even for a shorter period of time, can have life-altering effects—as it has for Mr. Williams, whose entire family was traumatized by watching him be arrested on his front lawn for a crime he did not commit. In both *Williams* and *Oliver* such harms flowed directly, and predictably, from DPD's misuse of FRT, its careless adoption of the technology without adequate policies, and its failure to train its detectives about its use and flaws—or indeed about *any* aspect of conducting investigations.

In their motion for summary judgment, Defendants ask this Court to insulate them from liability because a magistrate found probable cause to issue a warrant. ECF No. 43, PageID.457. Mr. Williams expects to confront similar arguments in his case. But when officers seek an eyewitness to identify a suspect based upon FRT alone, without any other investigative work, and when they fail to include exculpatory evidence in their application for a warrant, including both specific exculpatory facts about their particular case and general exculpatory facts about the unreliability of facial recognition which would be known to any properly trained investigator, they violate the constitutional rights of the suspect. And when police departments encourage such investigations as a matter of custom or policy while failing to provide obviously necessary training, they are liable for the results of their

failures under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978).

This case and *Williams* will likely yield the first judicial opinions addressing some of the questions raised here relating to FRT, and the Court's decision could affect the lives of countless individuals. The record in *Oliver* already reflects genuine issues of material fact that should suffice to deny Defendants' motion for summary judgment.[1] *See generally* Pl.'s Opp. Br., ECF No. 49. And the more exhaustive record that this Court can anticipate in *Williams* may further inform the Court about how FRT functions, about Detective Bussa's pattern of sloppy investigations, and about DPD's pervasive failures of policy and training that infect both cases.

Three points, in particular, are highlighted by amici here. First, FRT "matches" are nowhere near as reliable as Defendants imply in their motion and as Detective Bussa suggested in his warrant applications. Second, the use of FRT investigative leads as the sole basis for conducting a photo lineup is unduly suggestive, which was compounded in these cases by Detective Bussa's failure to disclose exculpatory information about deficiencies in the lineups when requesting

---

[1] Among other issues, the record shows that the warrant application did not disclose that FRT is particularly prone to errors when it is fed lower quality images or used to identify darker-skinned people, and that the probe image was "blurry" and shadowed. Dablitz Dep., ECF No. 51-3, PageID.982–983. Nor did it disclose known exculpatory information or the numerous other deficiencies in Detective Bussa's investigation and in the photo lineup procedure. *See* ECF No. 49, PageID.741–744.

a warrant. Third, DPD's broader failure to train its detectives caused obvious constitutional defects in both investigations.

## I.   FRT is always unreliable, and is especially likely to result in false arrests when used without training and policy guardrails.

The use of facial recognition technology by the DPD in 2019 was grossly unregulated. This is in vivid contrast to other law enforcement tools such as DNA evidence, which is subject to "strict and standardized requirements." Rebecca Darin Goldberg, *You Can See My Face, Why Can't I? Facial Recognition and* Brady, 5 Colum. Hum. Rts. L. Rev. Online 261, 270–71, 281 (2021).

Michael Oliver was identified as an investigative lead solely through an FRT match. DPD's uncritical reliance on that FRT result may seem innocuous to those unacquainted with the technology. But consistent with evidence in *Oliver*, *see, e.g.*, Pl's Opp. Br., ECF No. 49, PageID.738–739; Howell Dep., ECF No. 51-2, PageID.914–919, the record in *Williams* will show that the investigative lead-generating process is surprisingly less robust than it may appear at first glance.

First, face recognition algorithms used by police are not designed to (and do not) return a single definitive "match." Rather, they are probabilistic systems that return a number of *potential* matches. That number can be high: the DPD employee who ran the face recognition search in *Oliver* explained that DPD's system could generate "anywhere up to 10 to 100 or 500" potential matches. Dablitz Dep., ECF No. 51-3, PageID.984. In the *Williams* case, a pair of FRT algorithms generated a

total of 486 potential matches (243 potential matches each). Thus, FRT search results will *always* contain many, often hundreds, of innocent false positives—people who the algorithm calculates appear similar to the person in the probe image (the suspect) but who are not, in fact, that person. Indeed, the search results will often consist solely of false positives, either because a photo of the actual suspect is not contained in the databases of images (like arrest photos) that the system searches, or because limitations of the technology simply result in a failure to make a true match.

Although FRT algorithms generate false positives even in controlled test conditions, they are especially prone to error when probe image quality is low. The quality of the probe photo and the ways in which it is manipulated necessarily affect the accuracy of the search results. Lighting, angle, pixel density, and partial occlusion of the face all affect accuracy. *See, e.g.*, Grother, *Identification*, *supra*, at 9–10. Even where probe image quality is ideal, facial recognition systems exhibit race, gender, and age bias, with more false matches when used on people of color, women, and young adults than on white people, men, and older people. *See, e.g.*, Grother, *Demographic Effects*, *supra*, at 7–8. According to the National Institute of Standards and Technology, today "even the best algorithms can be wrong more than 20 percent of the time," Khari Johnson, *The Hidden Role of Facial Recognition Tech in Many Arrests*, Wired (Mar. 7, 2022), https://perma.cc/ECB6-LM22, and "Asian and African American people were up to 100 times more likely to be misidentified

than white men, depending on the particular algorithm and type of search." Drew Harwell, *Federal Study Confirms Racial Bias of Many Facial-Recognition Systems, Casts Doubt on Their Expanding Use*, Wash. Post (Dec. 19, 2019), https://perma.cc/3FFW-BRA5. These issues will all be further explored in the record in *Williams*, including by an expert in FRT.

Additional risk of error is introduced by human review of the FRT search results. The photos the computer initially returns are then reviewed by a human analyst who attempts to determine which one individual, out of the hundreds provided by FRT, is most similar looking to the suspect. But human identifications are also flawed, including because of racial and cognitive biases. For example, research has consistently shown that it is difficult for people to accurately identify people from other racial and ethnic groups. *See The Handbook of Eyewitness Psychology*: *Volume 1 Memory for Events* 257–81 (Michael P. Toglia et al. eds., 2007) (detailing dozens of studies); Kate Crookes & Gillian Rhodes, *Poor Recognition of Other-Race Faces Cannot Always Be Explained by a Lack of Effort*, 25 Visual Cognition 430 (2017).

Further, people reflexively over-rely on computer outputs because of "automation bias," "a heuristic replacement for vigilant information seeking and processing" that can "lead to decisions that are not based on a thorough analysis of all available information but that are strongly biased by the automatically generated

advice." Raja Parasuraman & Dietrich Manzey, *Complacency and Bias in Human Use of Automation: An Attentional Integration*, 52 Hum. Factors 381, 391 (2010). Automation bias lulls human users of automated technologies such as FRT into an over-reliance on the computers, leading the analysts to uncritically accept the computer's returns. *Id.* at 391–97. FRT produces confidence scores, visible to the human FRT examiners, and ranks the hundreds of possible matches from the most likely to least likely match. Automation bias means analysts will be less critical and discerning when selecting a possible match, relying on how confident the computer is in determining a match. Human analysts will also assume there is an accurate match in a computer's returns even when there is not.

For these and other reasons, "research has shown that human operators make 50% errors on average when deciding which faces in candidate lists match the search image. This is consistent with research on eye-witness identification—which is known to be unreliable, with well-meaning witnesses often mistakenly identifying innocent suspects." David White et al., *Human Oversight of Facial Recognition Technology in Forensic Applications* ¶ 5 (U.K. Parliament 2021), https://committees.parliament.uk/writtenevidence/38555/html/. *See also* David White et al., *Error Rates in Users of Automatic Face Recognition Software*, 10 PLoS ONE e0139827 (2015) (concluding that the subjective selection process "potentially reduc[es] benchmark estimates [of FRT accuracy] by 50% in operational settings").

Furthermore, the record in the *Williams* case will show that FRT examiners routinely fail to take obvious measures that might help reduce the likelihood of false identifications. In *Williams*, the photo of the suspect was run through three FRT algorithms. One algorithm failed to return any results, and a second algorithm's 243 potential matches did not include a photo of Mr. Williams, even though that algorithm searched a database that contained photos of Mr. Williams. The algorithm that *did* return Mr. Williams's photo as a potential match identified him as the ninth most likely match (out of 243 returned) and did so based only on his *expired* driver's license photo. Mr. Williams's then-current driver's license photo was also in the databases examined by the two algorithms that returned results, but neither identified it as being among the 243 most likely matches to the suspect. This information was available to the examiners with a few mouse clicks, had they sought it, but they did not do so before generating an investigative lead. Had Detective Bussa been properly trained on FRT, he might have thought to ask the examiners for this important information.

The *Williams* record will show that FRT examiners identified the probe photo as being of "poor" quality, with the face at an angle and a hat obstructing several facial features, yet they proceeded to generate an investigative lead anyhow. Meanwhile, DPD detectives were not trained on what makes probe photos they proffer to FRT examiners low quality, nor were they trained to ask about the level

of certainty associated with the resulting investigative lead, or to treat results from searches of low-quality images with the requisite skepticism. Nor did DPD officers pause at being given an investigative lead that utilized an *expired* driver's license photo despite having access to Mr. Williams's current driver's license photo. These failures to critically question FRT returns are, to an extent, an inevitable risk of using FRT because of cognitive bias in favor of trusting algorithmic outputs. Parasuraman & Manzey, *supra*, at 381–82. This cognitive bias might be partially combatted by trainings for detectives about FRT; but DPD still has not instituted such training.

In sum, even when used under ideal conditions—conditions woefully lacking in *Williams* and *Oliver*—FRT suffers from major flaws that must, at the very least, be explained to investigators, addressed through policies and trainings, and disclosed to magistrates. As the record and legal arguments in *Williams* will further show, the failure to do so creates obvious risks of Fourth Amendment violations and can form the basis for *Monell* liability. *See, e.g.*, *Edrei v. City of N.Y.*, 254 F. Supp. 3d 565, 581 (S.D.N.Y. 2017) (denying motion to dismiss *Monell* claim because "[e]ven in the absence of prior similar violations, the NYC [sic] knew that officers with [new, potentially dangerous technology] in the field were likely to face difficult scenarios . . . where the risk and harm of improperly using [the technology] are great— problems that could have been avoided with proper training."). *See also Berg v. Cnty. of Allegheny*, 219 F.3d 261, 276–77 (3d Cir. 2000) (holding that a county that

adopted an automated computer system for issuing warrants was liable under *Monell* for failing to install adequate human training and safeguards).

## II.   Witness identifications from lineups in which the suspect was included solely because of an FRT match are inherently suggestive and cannot support probable cause, particularly when, as in both *Williams* and *Oliver*, the investigator conceals exculpatory evidence about the lineup.

DPD acknowledges that an FRT search alone does not constitute probable cause. When DPD's FRT operators send a result back to investigators, it includes the disclaimer that "[t]he result of a facial recognition search . . . is only an investigative lead and is NOT TO BE CONSIDERED A POSITIVE IDENTIFICATION OF ANY SUBJECT." *See* ECF No. 49-5, PageID.818. However, DPD believes that if it couples an FRT match with a witness identification from a photographic lineup, probable cause then exists. The experiences of both Mr. Oliver and Mr. Williams demonstrate why that is not so.

The lone bit of investigative work Detective Bussa did after receiving the FRT lead that named Mr. Oliver was contacting the victim to do a photo lineup. Detective Bussa ignored exculpatory evidence and leads—namely that Mr. Oliver had full sleeves of arm tattoos (while the suspect did not) and that the victim earlier said he recognized the perpetrator as a former student of his (which Mr. Oliver was not). Detective Bussa similarly ignored exculpatory evidence and information in the *Williams* case—including that the person who conducted the lineup was not an actual eyewitness and was not even on the scene of the alleged crime—and made no

16

attempt whatsoever to determine if Mr. Williams had an alibi (he did). The witnesses performing the lineups in both cases were told that FRT already identified a suspect. Then, in both cases, when a witness selected the photo that had been generated as a lead by FRT, Detective Bussa sought a warrant without conducting any further investigation. He concealed the exculpatory evidence about the FRT match and the lineups in his warrant applications in both cases.

The conduct in these cases violates well-known legal standards. As the American Legal Institute explains: "Policing agencies should not conduct eyewitness identifications unless they have: (a) a substantial basis to believe that the suspect committed the crime and should therefore be presented to the eyewitness, and (b) a substantial basis to believe that the eyewitness can reliably make an identification." Am. Law Inst., *Principles of the Law, Policing* § 10.03, *supra.*

Expert testimony in *Williams* will demonstrate that one of the most significant determinants of the reliability of an eyewitness identification from a photo array is the inclusion of the actual perpetrator of the crime. Gary L. Wells et al., *Eyewitness Identification: Bayesian Information Gain, Base-Rate Effect Equivalency Curves, and Reasonable Suspicion*, 39 L. & Hum. Behav. 99, 115 (2015). As explained in the prior section, however, FRT searches are prone to returning false matches. A photo array containing a candidate photo that was identified solely by an FRT match

17

is much less likely to contain the actual suspect than an array developed after a more robust and reliable investigation. White et al., *Human Oversight*, *supra*, ¶¶ 18–23.

Further, because results generated by "facial recognition programs are specifically designed to produce results that look like the perpetrator," "[t]he inclusion of a suspect selected by facial recognition in an identification procedure may increase the chance of eyewitness misidentification because eyewitnesses are likely to positively identify look-alikes, regardless of whether the look-alikes are actually the perpetrator." Goldberg, *supra*, at 274; *see also, e.g.*, Laura Moy, *Facing Injustice: How Face Recognition Technology May Increase the Incidence of Misidentifications and Wrongful Convictions*, 30 Wm. & Mary Bill Rts. J. 337 (2021). The very purpose of FRT is to find the best look-alike a computer can muster, which, as explained above, will often not be the actual suspect. The inclusion of FRT-generated false-match look-alikes in photo lineups is likely to lead to witness misidentifications.

The suggestiveness of a photo array generated after an FRT search is amplified because filler images are very unlikely to be nearly as close of a match to the suspect as the image chosen by FRT. Filler images are typically randomly selected by an officer from a photo database based on the police officer's perception of the suspect. Police may use a more limited database of images, cannot process those images as fast or as effectively as a computer, and are often working hastily.

Thus, "[i]f a witness is shown only one computer-selected image" in a photo array, as is the case at the DPD, "the witness's corroboration may be so closely tied to the computerized face-recognition match that it lacks independence." Henry H. Perritt Jr., *Defending Face-Recognition Technology (And Defending Against It)*, 25 J. Tech. L. & Pol'y 42, 59 (2021). Because of these and other issues, expert testimony in *Williams* will show that a photo lineup based entirely on an FRT-generated lead is inherently unreliable for probable cause purposes.

Additional sources of suggestiveness and bias increase the risk of misidentifications even more. In both *Williams* and *Oliver*, the witness was told before viewing the photo lineup that a suspect had been generated by FRT. Expert testimony in *Williams* will show that this disclosure primes the witness to be influenced by automation bias and complacency. A crucial component of reliable lineups is credibly instructing the witness that the suspect may or may not be included in the photo array. *E.g.*, Mich. State Bar, Eyewitness Identification Task Force, *Law Enforcement and Eyewitness Identifications: A Policy Writing Guide* 10 (2012), https://perma.cc/G2UW-255D. This makes the witness more likely to make no selection if they are not confident that the array contains a photo of the suspect. However, if a witness is told a computer identified the suspect, they are likely to believe the computer (and the police) *must* have gotten it right. Instead of concluding that the photo array does not include the suspect, they are likely to "ID" the face in

the lineup that looks most like the suspect—likely the same one a computer thought looked most similar to the suspect. The severity of this effect is underscored in *Oliver*, where the witness initially identified *a different suspect who was known to him* (a former student)[2] and who was not present in the photo lineup, but nonetheless mistakenly identified Mr. Oliver in the lineup.  Mistaken identifications under these circumstances are reflective of the fact that "observers become confident when multiple pieces of sensory evidence point to the same conclusion, even when the individual pieces are themselves sparse and unreliable." Thomas D. Albright, *Why Eyewitnesses Fail*, 114 Proc. Nat'l Acad. Scis. 7758, 7760 (2017).

Yet more risk of false identification is introduced when lineups are not administered double blind.[3] *See, e.g.*, Margaret Bull Kovera & Andrew J. Evelo, *The Case for Double-Blind Lineup Administration*, 23 Psychol. Pub. Pol'y & L. 421 (2017). Deposition testimony in *Williams* will show that it is DPD practice for lead detectives (i.e., detectives who know which photo is the "right" photo) to be in the room while the witness picks a suspect. Detective Bussa was in the room for the

---

[2] *See* ECF No. 43-3, PageID.595 (Reporting Officer Narrative noting that "the [victim] stated that the [suspect] is a previous student, possibly named Terry").

[3] "A 'double-blind' lineup is one in which neither the administrator nor the eyewitness knows who the suspect is. This prevents the administrator of the lineup from providing inadvertent or intentional verbal or nonverbal cues to influence the eyewitness to pick the suspect." Innocence Proj., *Eyewitness Identification Reform*, https://innocenceproject.org/eyewitness-identification-reform.

lineups in both *Oliver* and *Williams*. *See* ECF No. 43-1, PageID.481–482. Expert testimony in *Williams* will explain why this practice is extremely suggestive. Even when a second detective administers the lineup, the presence of the lead detective in the room, in sight of the witness, introduces a significant risk of tainting the identification because he "could subtly, nonverbally, or even unconsciously communicate information to witnesses about which lineup member is the suspect." Kovera & Evelo, *supra*, at 422. Because DPD did not begin recording lineups until recently, we are unable to know for certain just how suggestive the lineup in *Williams* was, but the risk of suggestiveness is intolerable.

Quite simply, in both *Oliver* and *Williams*, the witness's identification was far from reliable and did not establish the particularized "reasonable ground for belief of guilt" required for probable cause. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).

The magistrates who issued the arrest warrants in each case could only have done so because Detective Bussa omitted exculpatory information from the warrant applications, inclusion of which would have undermined the appearance of probable cause. In *Williams*, Bussa failed to mention that the FRT "match" was to an expired driver's license photo, that the witness had not actually seen the suspect other than in CCTV footage, that the witness had looked at an image from the CCTV footage to compare to the photo array while performing the lineup, and that the witness already knew that a suspect had been identified by FRT. Detective Bussa similarly

omitted exculpatory information in *Oliver*. ECF No. 49, PageID.742–744. And as explained in the prior section, in both cases Detective Bussa did not disclose numerous exculpatory facts about the unreliability of FRT in this context because DPD failed to train him.

The failure to disclose material exculpatory information in this context violates the Fourth Amendment, and the subsequent issuance of a warrant does not insulate law enforcement from liability when the evidence shows that the detective was knowing or reckless in their omission. *See Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010).

For the above reasons, Detective Bussa's overreliance on FRT so biased the photo lineups in both cases that it could not have been considered probable cause, even were there no other exculpatory evidence. And the omission of material exculpatory facts from the warrant applications provides a clear basis for a Fourth Amendment false arrest claim.

## III. Detective Bussa's unconstitutional conduct was enabled by DPD's consistent failure to train on the use and reliability of FRT and on policing in general.

The unconstitutional conduct in this case was facilitated by deficient or nonexistent policies and an inadequate or nonexistent training regime by the DPD that created obvious risks of violating individuals' constitutional rights.

Evidence in *Williams* will show that, at the time of DPD's investigations into Mr. Williams and Mr. Oliver, DPD was providing no investigative training whatsoever to new detectives, including Detective Bussa. DPD's failure to train Detective Bussa on key aspects of his new role—coupled with the absence of relevant policies to guide investigations—created obvious risks that he would engage in unconstitutional conduct.

For example, in *Williams*, Detective Bussa testified that when he was promoted to detective, he received no training on how to determine whether probable cause exists. DPD's failure to train Detective Bussa on probable cause manifested in his premature and misguided pursuit of Mr. Oliver and Mr. Williams based solely on an unreliable FRT result combined with an unreliable photo lineup procedure. Experts in *Williams* will testify that a failure to train detectives in probable cause violates the minimum professional policing norms and creates the obvious risk of false arrests. Moreover, the Sixth Circuit has recognized that the failure to provide any training on probable cause determinations is "constitutionally inadequate" and may "amount to deliberate indifference" due to the frequency with which detectives like Bussa must evaluate whether probable cause exists. *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 289 (6th Cir. 2020). This is particularly true where, as here, a failure to train on probable cause is paired with a failure to train officers in

identifying and disclosing exculpatory evidence. *Gregory v. City of Louisville*, 444 F.3d 725, 754 (6th Cir. 2006).

Detective Bussa also testified in *Williams* that he had not received any training on how to properly conduct eyewitness identifications or construct photographic lineups. In this case and in *Williams*, DPD's failure to train Detective Bussa on eyewitness lineup procedures manifested in him developing photo six-packs around unreliable FRT results in an inherently suggestive manner, biasing the witnesses by informing them that FRT had made a match, and failing to ensure double-blind lineup administration, as well as using a non-eyewitness to view the lineup in *Williams*. Experts in *Williams* will testify that a failure to train detectives in proper eyewitness lineup procedures violates the minimum professional norms of policing and creates the obvious risk of false arrests. Moreover, the Sixth Circuit has recognized that the systemic failure of a police department's detectives to consider circumstances that would render a lineup suggestive while preparing a lineup may amount to a constitutional violation. *See Gregory*, 444 F.3d at 756–57 (a municipality "opens itself up to § 1983 liability" when it allows a police culture that fails to consider ways to minimize the factors that lead to highly suggestive lineups).

These are just a few examples of what the *Williams* record will show regarding the constitutional inadequacy of DPD's detective training regime (or, rather, its lack of a training regime altogether). Detective Bussa testified in *Williams* that he did not

24

receive any training on investigative techniques at all. That systemic failure to train infected Detective Bussa's investigation and precipitated the false arrests here and in *Williams*.

## CONCLUSION

As demonstrated in this case and as will be shown in *Williams*, Defendants' misuse of FRT, withholding of exculpatory evidence, and failure to train led to the false arrests of innocent men. Accordingly, and for the reasons set forth above and in Mr. Oliver's brief, this Court should deny Defendants' motion for summary judgment. Alternatively, amici suggest that it may be appropriate to stay further proceedings in this matter until summary judgment motions have been filed and fully briefed in *Williams*, so that the Court may consider the cases concurrently.

Dated: April 28, 2023                    Respectfully submitted,

                                         /s/ Ramis J. Wadood
Michael J. Steinberg (P43085)            Ramis J. Wadood (P85791)
Ben Mordechai-Strongin*                  Philip Mayor (P81691)
Lauren Yu*                               Daniel S. Korobkin (P72842)
William Ellis*                           American Civil Liberties Union
Mickey Terlep*                             Fund of Michigan
Julia Kahn*                              2966 Woodward Avenue
Civil Rights Litigation Initiative       Detroit, MI 48201
University of Michigan Law School        (313) 578-6803
701 S. State Street, Suite 2020          rwadood@aclumich.org
Ann Arbor, MI 48109                      pmayor@aclumich.org
(734) 763-1983
mjsteinb@umich.edu                       Nathan Freed Wessler
                                         American Civil Liberties Union
                                           Foundation
*Student Attorney practicing             125 Broad Street, 18th Floor
pursuant to Local Rule 83.21             New York, NY 10004
                                         (212) 549-2500
                                         nwessler@aclu.org

26

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL OLIVER

     Plaintiff,

v.

DONALD BUSSA, in his individual
and official capacity, and CITY OF
DETROIT, jointly and severally

     Defendant.

Case No. 20-12711

Honorable Laurie J. Michelson

---

## BRIEF FORMAT CERTIFICATION FORM

I, Ramis J. Wadood, hereby certify that the foregoing brief complies with Eastern District of Michigan Local Rules 5.1(a), 5.1.1, and 7.1 and Judge Michelson's Case Management Requirements. In particular, I certify that each of the following is true (click or check box to indicate compliance):

☒ the brief contains a statement regarding concurrence, *see* LR 7.1(a);

☒ the brief, including footnotes, uses 14-point font, *see* LR 5.1(a)(3);

☒ the brief contains minimal footnotes and, in all events, no more than 10, *see* Case Management Requirements § III.A;

☒ the brief and all exhibits are searchable .pdfs, *see* Case Management Requirements § III.A;

☒ the brief is double spaced (except for footnotes and necessary block quotes) with one-inch margins, *see* LR 5.1(a)(2);

☒ deposition transcripts have been produced in their entirety and not in miniscript, *see* Case Management Requirements § III.A;

☒ if the brief and exhibits total 50 pages or more, a courtesy copy with ECF headers will be sent to chambers, *see* Case Management Requirements § III.B.

I also acknowledge that if the Court later finds that these requirements are not met, my brief will be stricken.

/s/ Ramis J. Wadood
Dated: April 28, 2023